John N. ROBINSON, Plaintiff,

v.

George J. MAGOVERN, Cardiothoracic Surgical Associates, Inc., Allegheny General Hospital and Henry G. Allyn, Jr., Gay E. Bodick, Fred Brand, Jr., Henry Chalfant, Ronald R. Davenport, Harry Edelman, III, Harry M. Epstine, William H. Genge, W. H. Krome George, R. Burt Gookin, Thomas C. Graham, Kenneth C. Hewitt, John A. Huffman, Jr., B. F. Jones, III, Bernard H. Jones, Caryl M. Kline, Richard K. Means, Francis B. Nimick, David B. Oliver, II, Robert B. Pease, G. Harton Singer, III, Elizabeth A. Smith, W. P. Snyder, III, Leonard A. Swanson, W. Bruce Thomas, and Paul H. Weyrauch, individually and as Trustees of Allegheny General Hospital, Defendants.

Civ. A. No. 77–75.

United States District Court, W. D. Pennsylvania.

Aug. 31, 1981.

See also, D.C., 456 F.Supp. 1000.

Roslyn Litman, H. Yale Gutnick, Pittsburgh, Pa., for plaintiff.

David L. McClenahan, Robert B. Sommer, David A. Borkovic, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for Allegheny General Hospital etc.

David B. Buerger, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa. for McGovern.

Robert L. Frantz, Michael A. Snyder, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for Cardio-Thoracic Surgical Associates, Inc.

## OPINION

COHILL, District Judge.

## Table of Contents

| | Page |
|---|---|
| Introduction | 848 |
| I. The Parties | 848 |
| A. Plaintiff | 848 |
| B. The Defendants | 850 |
| 1. Allegheny General Hospital | 850 |
| 2. The Trustees | 851 |
| 3. George J. Magovern, M.D. | 851 |
| 4. Cardio-Thoracic Surgical Associates, Inc. | 852 |
| II. The Claims | 853 |
| III. Delivery of Open Heart Surgical Services | 854 |
| A. Diagnosis | 854 |
| B. Open Heart Surgery—The Procedure | 855 |
| C. Open Heart Surgery—The Major Players | 856 |
| 1. The Lead Surgeon | 856 |
| 2. The Hospital | 857 |
| IV. Allegheny General's Competitive Strategy | 858 |
| A. Institutional Objectives | 859 |
| B. Marketing | 860 |
| C. Role of the Department Directors | 860 |
| D. Results of the Revitalization Campaign | 862 |
| V. The Application of John N. Robinson, M.D. | 863 |
| A. The Interview | 863 |
| B. Submission of the Application | 864 |
| C. The Magovern Report | 866 |
| D. The Credentials Committee | 866 |
| E. The Rejection of the Application | 872 |
| VI. The Legal Action: Jurisdiction And Relevant Market | 876 |
| A. Subject Matter Jurisdiction | 876 |
| B. Relevant Market | 877 |
| 1. The Product Market | 877 |
| 2. The Geographic Market | 878 |

848

Table of Contents

 Page

VII. The Legal Action: Antitrust Claims ........................... 886

 A. Overview .................................................... 886

 B. Section 2 Claims ........................................... 886
 1. Monopoly ............................................... 886
 2. Attempt to Monopolize ................................. 891
 3. Conspiracy to Monopolize .............................. 892
 a. Agreement .......................................... 892
 b. Specific Intent to Monopolize ..................... 896

 C. Section 1 Claims ........................................... 903
 1. The Standard .......................................... 903
 2. Group Boycott ......................................... 904
 3. Essential Facility .................................... 913
 4. Unfair Acts With Intent to Destroy Competition ....... 913
 5. Rule of Reason ........................................ 914
 a. Notice of Standards ................................ 916
 b. Standards Reasonably Advance Hospital's Legitimate Objec-
 tives ............................................... 917
 c. Standards Do Not Impose Unreasonable Restraint ...... 919
 d. Allegheny General's Conclusions About Dr. Robinson .... 920
 e. Consistent With Other Personnel Decisions ............ 923

VIII. The Legal Action: Pendent Jurisdiction Claims ................ 925

 A. Breach of Contract ......................................... 925

 B. Interference With Prospective Contractual Relationship ..... 926

 C. Conspiracy in Restraint of Trade .......................... 926

Conclusion ........................................................ 927

## Introduction

After Allegheny General Hospital rejected Dr. John N. Robinson's application for staff privileges in October, 1976, Dr. Robinson filed this antitrust action against the hospital, members of its Board of Trustees, and certain thoracic surgeons who are members of the hospital's staff. Three years of extensive discovery followed, punctuated by a variety of motions to compel and motions for protective orders. The litigation culminated in a ten-week non-jury trial that included the testimony of fifty-two witnesses, extensive briefing, and arguments by counsel. We now rule in favor of all defendants on all claims. Pursuant to Federal Rule of Civil Procedure 52, we make the following findings of fact and conclusions of law.

## I.

### The Parties

#### A. Plaintiff

John N. Robinson, M.D., the plaintiff in this litigation, is a board-certified thoracic surgeon, licensed to practice medicine in the Commonwealth of Pennsylvania. Dr. Robinson graduated from George Washington University Medical School in 1963. He then served an internship with the Harvard Surgical Service at Boston City Hospital and a five-year general surgical residency at Presbyterian Hospital, which is affiliated with Columbia University in New York City. Dr. Robinson's cardiothoracic[1] training began in 1970 with a one-year residency in Texas at the Baylor College School of Medicine in a program headed by Dr. Michael

---

1. The thorax is the area of the body between the neck and the respiratory diaphragm, encased by the ribs. Thoracic surgery includes pulmonary, esophageal, mediastinal and open heart surgery. Cardiovascular surgery is surgery performed on the heart or on any of the blood vessels throughout the body. Thus, open heart surgery is included within the terms "thoracic," "cardiothoracic," or "cardiovascular" surgery.

DeBakey. In order to acquire the experience in pulmonary and esophageal surgery that the American Board of Thoracic Surgery requires for certification eligibility, Dr. Robinson cut short his residency at Baylor and transferred to the Veterans Administration Hospital at Little Rock, Arkansas to train for four months under Dr. Raymond Read. The following year, Dr. Robinson served as a resident in thoracic surgery at the Texas Heart Institute, where he worked under Drs. Denton Cooley and Grady Hallman.

While Dr. Robinson was serving his residency at the Texas Heart Institute, Dr. James Giacobine, an established cardiovascular surgeon in the Pittsburgh-McKeesport area, informed Dr. Cooley that he would like to have the assistance of a young surgeon in his thriving practice. Dr. Cooley suggested to Dr. Robinson that he pursue this opportunity, and Dr. Robinson subsequently did enter into practice with Dr. Giacobine. As Dr. Giacobine's junior associate, Dr. Robinson was expected to cover patients at all of the hospitals where Dr. Giacobine practiced medicine. Accordingly, Dr. Robinson made application to, and was accepted on, the medical staffs of various hospitals in the Pittsburgh-McKeesport area, including St. Francis, McKeesport, North Hills Passavant, St. John's, and South Side Hospitals.

With primary care physicians and cardiologists referring more patients to Dr. Giacobine than he could operate on himself, he called upon Dr. Robinson to serve as lead surgeon in from three to five open heart operations per week. This frequency permitted Dr. Robinson to develop and maintain his surgical proficiency.

During Dr. Robinson's association with Dr. Giacobine, St. Francis Hospital sponsored a residency program in thoracic surgery under the guidance of Dr. Giacobine. Dr. Robinson assisted in the teaching of the residents by taking them on rounds and by permitting them to assist in the operating room.

The professional relationship between Drs. Giacobine and Robinson continued for two and one-half years, ending abruptly and with bitterness in December, 1974. The dissolution resulted primarily from disagreements over two points. First, Dr. Robinson felt that he was not receiving proper recognition for his work. Although Dr. Giacobine's reputation attracted the open heart patients, and although Dr. Giacobine interviewed them, Dr. Robinson testified that he often performed the surgery without their knowledge. Dr. Robinson objected to Dr. Giacobine's alleged refusal to inform "Robinson's patients" of the identity of the operating surgeon. This practice constituted "ghost surgery," according to Dr. Robinson.

The second source of discord involved Dr. Giacobine's intention to add another surgeon to the Giacobine-Robinson association. Dr. Robinson opposed the addition of this third surgeon because he had heard rumors that the surgeon, who was related to Dr. Giacobine by marriage, had homosexual tendencies.

In January, 1975, Dr. Robinson embarked upon a solo practice in Pittsburgh after making an unsuccessful effort in late 1974 to relocate.[2] His practice primarily consisted of vascular procedures and emergency surgery. He had as his goal, however, a practice of predominantly open heart surgery, which he regards as the most challenging and rewarding type of thoracic surgery. In order to broaden his base of contacts with referring physicians, Dr. Robinson applied for, and was granted, staff privileges at several additional area hospitals.

In July, 1975, Dr. James Martin, who also is a thoracic surgeon, joined Dr. Robinson in

2. Dr. Robinson had believed that he would be able to continue working with Dr. Giacobine on a month-to-month basis until he could establish his own practice. Shortly before the employment agreement expired in December, 1974, however, Dr. Giacobine informed Dr. Robinson that no month-to-month agreement would be executed unless Dr. Robinson agreed not to practice in Pittsburgh after their association ceased. Dr. Robinson refused to accept this condition. Subsequently, Dr. Robinson initiated a lawsuit for breach of contract against Dr. Giacobine in the Court of Common Pleas of Allegheny County, Pennsylvania. That litigation ultimately was resolved in Dr. Giacobine's favor.

practice. These two men initially formed a partnership, but they eventually reorganized into a professional corporation called "Cardiovascular and Thoracic Surgery Associates, Inc." Their association continued until November, 1979. From November, 1979 to the present, Dr. Robinson has provided surgical services as a sole practitioner. In open heart and complex vascular procedures where it is necessary to have a second doctor participate in the surgery, Dr. Robinson has arranged for Dr. Frank Thomas, a board-certified thoracic surgeon, to assist him.

### B. The Defendants

#### 1. Allegheny General Hospital

Allegheny General Hospital is a 726-bed, regional referral, teaching hospital located in the North Side area of the City of Pittsburgh, Allegheny County, Pennsylvania.[3] The hospital offers total health care service to the residents of the North Side and secondary and tertiary care service to referral patients from the "tri-state area," which encompasses Western Pennsylvania, Eastern Ohio and Northern West Virginia.[4]

Allegheny General is organized into clinical departments, each of which is headed by a director appointed by the hospital's Board of Trustees. Some of the departments are subdivided into two or more divisions. Open heart surgery, for example, comes within the jurisdiction of the Department of Surgery and the Division of Thoracic Surgery.

The keystone for the clinical operation of the hospital is the medical staff. A physician must apply for and receive staff privileges at Allegheny General before he may admit patients to the hospital or use its facilities. Regional referral, teaching hospitals, such as Allegheny General, strive to cultivate and maintain a balanced staff whose members will provide high quality clinical care while also making a contribution to the hospital's teaching and research programs.

In order to succeed professionally and financially, a regional referral hospital must develop and market services in numerous subspecialties. This, Allegheny General has done, in such fields as renalogy, cardiology, radiology, pulmonary medicine, and sports medicine. In addition, Allegheny General has achieved modest success in establishing comprehensive centers for the care and treatment of trauma, cardiac and cancer cases. The hospital aggressively markets its secondary and tertiary level services both within and beyond Allegheny County by encouraging members of its staff to participate in educational programs at various hospitals and medical societies, by distributing information and research results to referring physicians, and by encouraging members of its staff to produce articles for publication. The fact that two-thirds of Allegheny General's open heart patients in 1976 lived outside of Allegheny County exemplifies the success that the hospital has experienced in marketing its services over a broad geographic area.

Allegheny General is a member of the Council of Teaching Hospitals; it operates fully approved residency programs in Internal Medicine (Cardiology), General Surgery, Thoracic Surgery, Anesthesiology, Pathology, Diagnostic Radiology, Obstetrics and

---

3. Organized under the laws of the Commonwealth of Pennsylvania as a private, nonprofit hospital corporation, Allegheny General has served the community since 1882. During the pendency of this litigation, Allegheny General Hospital underwent a corporate reorganization. The health care provider known as Allegheny General Hospital is now a subsidiary of the Allegheny Health, Education and Research Corporation. The latter corporation also owns another subsidiary known as the Allegheny-Singer Research Corporation.

4. Regional referral hospitals usually are fully integrated health care providers with facilities for primary, secondary and tertiary level care. Primary care involves the monitoring of a person's basic state of health and the diagnosis and treatment of common, relatively minor illnesses. Secondary care involves the treatment of more serious illnesses or injuries, such as routine surgery or the repair of fractures, that may require extended hospitalization but do not present the physician with any complex problems. Tertiary care involves the treatment of complex medical problems with intensive care and sophisticated equipment. An open heart operation is an example of tertiary care.

Gynecology, and Oral Surgery. In addition, residents at the University of Pittsburgh Medical Health Center in the fields of Ophthalmology, Orthopedics, Otolaryngology and Pediatrics rotate through Allegheny General as a regular component of their respective training programs. Allegheny General also sponsors educational programs for hospital administrators, nurses, medical technicians and medical technologists.

Laboratories at Allegheny General perform significant research in the basic and applied medical and biomedical sciences. The hospital established a separate research facility for thoracic surgery in the late 1960's, and this facility has since made important contributions to the medical literature in the field.

## 2. The Trustees

Twenty-six of the persons whom the plaintiff names as defendants in his complaint served as members of the Board of Trustees of Allegheny General during the period when the hospital considered and denied Dr. Robinson's application for staff privileges. The Board of Trustees is legally responsible for the operation of the hospital. It meets quarterly to review and approve the decisions and actions of its executive committee. The Board consists of thirty-seven members, who are elected from among prominent citizens in the community or who are appointed because of their position within the hospital administration. Appointed members include the president of the hospital, the president of the medical staff, and the chairman of the executive committee of the medical staff. Elected members serve without compensation.

The executive committee of the Board of Trustees, which is empowered to exercise the full authority of the Board of Trustees when the Board is not in session, provides continuous supervision over the operation of the hospital. Members of the executive committee include the officers of the Board of Trustees, the president of the hospital, the president of the medical staff, and the chairman of the executive committee of the medical staff. Among its duties, the executive committee reviews and approves or disapproves the recommendations made by the executive committee of the medical staff on applications for staff privileges, subject to ratification by the Board of Trustees.

## 3. George J. Magovern, M.D.

Defendant, Dr. George J. Magovern, is a nationally prominent thoracic surgeon who has served as the Director of the Department of Surgery and Chief of the Division of Thoracic Surgery at Allegheny General Hospital since 1968. As Director of the Department of Surgery, Dr. Magovern actively participates in the evaluation of candidates who are seeking staff privileges in the Department of Surgery.

Dr. Magovern began his career as a physician in 1947, after graduating from Marquette University Medical School. His post-graduate training included a two-year internship and a four-year general surgical residency at various hospitals in the New York area, service in the Army Medical Corps, a two-year residency in thoracic and cardiovascular surgery at George Washington University Medical School, and six months of work in Pittsburgh at Presbyterian University, Children's and Allegheny General Hospitals. After completing his training in 1957, Dr. Magovern chose to remain in Pittsburgh. He joined the medical staffs of Presbyterian University and Allegheny General Hospitals, and he became a member of the faculty at the University of Pittsburgh Medical School. Dr. Magovern maintained a loose affiliation with Dr. Edward Kent, the then Director of the Department of Surgery at Allegheny General Hospital and a pioneer in the field of open heart surgery. When the time came to select a successor to Dr. Kent, the Board of Trustees of Allegheny General appointed Dr. Magovern as Director of the Department of Surgery because of his clinical skills and his demonstrated commitment to academic medicine and research.

The Director of the Department of Surgery has, among his many duties, the responsibility of administering the hospital's residency program in thoracic surgery.

This task entails the selection of residents, the establishment of a curriculum, the assignment of personnel for training and the direct supervision of training. Largely as a result of Dr. Magovern's efforts, Allegheny General has maintained one of the few approved residency programs in thoracic surgery that is not affiliated with a university hospital. Moreover, this program has earned a reputation for high quality training. Many physicians who now practice thoracic surgery in the tri-state area are Allegheny General graduates.

Simultaneously with performing his administrative duties at Allegheny General, Dr. Magovern has engaged in a highly successful private practice in thoracic surgery through a professional corporation known as "Cardio-Thoracic Surgical Associates, Inc." He also has made many notable contributions to medical science through publications, research and experimental surgery.[5]

### 4. Cardio-Thoracic Surgical Associates, Inc.

Defendant, Cardio-Thoracic Surgical Associates, Inc. [hereinafter referred to as "CTSA"], is a Pennsylvania professional corporation with a membership of five physicians. Dr. William Cushing, a former resident in thoracic surgery under Dr. Kent, and Dr. George Magovern founded CTSA in 1970. Dr. George Liebler joined the group in 1972, Dr. Sang Park in 1973 and Dr. John Burkholder in 1975. Drs. Liebler and Park had trained as residents at Allegheny General under Dr. Magovern. Dr. Burkholder had taken his general surgical and thoracic surgical residencies at the University of Pittsburgh Medical School and trained under Dr. Magovern during operations performed at Presbyterian University Hospital

and during a three-month rotation to Allegheny General as part of his general surgical residency. All members of CTSA have board certification in thoracic surgery. Each participates in the teaching program at Allegheny General, but only Drs. Magovern, Liebler and Burkholder have university faculty appointments.

CTSA generates substantial revenues for Allegheny General. From 1976 to 1978, for example, CTSA accounted for between 9% and 11% of the total patient admissions to Allegheny General; it was one of the five most active services (group or sole practitioner) during that period. The statistics for patient days are even more impressive. In 1977 and 1978, CTSA's patients spent 19,417 and 20,021 days respectively at Allegheny General. These figures are roughly equivalent to the total patient days for the entire Division of General Surgery and are double the number of patient days attributable to any other single group for that time period.

CTSA dominates the open heart surgical practice at Allegheny General. Open heart procedures account for approximately 60% of CTSA's work, and its members perform about 95% of the open heart operations at Allegheny General. The explanation for this dominance lies in the decision by the CTSA members to concentrate their practices at Allegheny General (Drs. Magovern, Liebler and Burkholder also perform a small number of operations at Presbyterian University Hospital and Children's Hospital), while most of the other thoracic surgeons on Allegheny General's staff center their practices elsewhere. In addition to the members of CTSA, the staff of the Thoracic Surgery Division includes five other surgeons.[6]

---

5. Dr. Magovern's curriculum vitae contains a three page bibliography; all of the articles mentioned were written prior to 1968. The doctor participated in the development of the Magovern-Cromie sutureless heart valve, and he has conducted other research involving prosthetic heart valves, heart transplantation and the concept of the artificial heart. Dr. Magovern headed a team that performed the second lung transplant operation in the world.

6. Dr. John Mitchell performs only non-open heart, thoracic procedures. Dr. Michael Gerber was very active at Allegheny General in 1973 and 1974, with eighty and one hundred-ten admissions respectively, but his volume declined sharply thereafter, with no admissions in 1977 and five admissions in 1978. This decline followed a disagreement with Dr. Magovern over the emergency nature of a particular operation. Dr. Gerber now concentrates his practice at

## II.

### The Claims

Dr. Robinson alleges in his complaint that when his application for staff privileges was denied, the defendants violated the United States Constitution, several federal statutes and three legal duties imposed by state common law. A synopsis of the six-count complaint follows:

1. Count I alleges violations of section 1 and section 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1976), based on agreements and acts that were designed to ensure that only members of CTSA received staff privileges in Allegheny General's Division of Thoracic Surgery.

2. Count II alleges a denial of due process and equal protection in violation of the Fifth and Fourteenth Amendments of the United States Constitution and section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983 (1976 & Supp. III 1979).

3. Count III asserts a third-party beneficiary right of action based on the defendants' alleged failure to comply with regulations that the Secretary of Health, Education and Welfare promulgated pursuant to section 102(a) of the Health Insurance for the Aged Act, 42 U.S.C. § 1395hh (1976).

4. Count IV asserts a pendent state third-party beneficiary claim for breach of contract based on the defendants' alleged violation of the hospital's Medical Staff By-laws.

5. Count V asserts a pendent state claim for tortious interference with a prospective contractual relationship that denied the plaintiff the right to freely practice his profession and resulted in damage to his reputation.

6. Count VI asserts a pendent state claim of conspiracy in restraint of trade.

Early in the history of this litigation, the defendants moved for summary judgment. The late Judge Daniel Snyder of this Court entered judgment in favor of all defendants on Count II and Count III. *Robinson v. Magovern,* 456 F.Supp. 1000 (W.D.Pa.1978).

The evidence presented at the trial and counsels' subsequent arguments focused primarily on the alleged violations of the Sherman Act. Section 1 of the Sherman Act prohibits any contract, combination or conspiracy that unreasonably restrains trade [7]; section 2 of the Sherman Act prohibits any entity from monopolizing, attempting to monopolize or conspiring to monopolize a particular market.[8] Dr. Robinson seeks both damages and injunctive relief for the alleged antitrust violations, pursuant to section 4 and section 16 of the Clayton Act, 15 U.S.C. §§ 15, 26 (1976).[9]

---

Shadyside Hospital. In November, 1978, Dr. Pablo Hong-Barco, an associate of Dr. Gerber, obtained staff privileges, but he has done very little work at Allegheny General. Dr. Kenneth Barron, a former associate of Dr. Gerber, obtained staff privileges during 1979, but he concentrates his practice elsewhere. Dr. John McCabe, a sole practitioner, recently received staff privileges, but he has yet to admit any patients.

**7.** Section 1 of the Sherman Act provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceed-

ing three years, or by both said punishments, in the discretion of the court.
15 U.S.C. § 1 (1976).

**8.** Section 2 of the Sherman Act reads:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.
15 U.S.C. § 2 (1976).

**9.** Section 4 of the Clayton Act provides:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United

## III.

### Delivery of Open Heart Surgical Services

Congress enacted the antitrust laws to protect competition in the marketplace, which is the essence of our private enterprise system. An allegation that these laws have been violated requires the court to familiarize itself in some detail with the industry within which the illegal conduct is alleged to have occurred. The technical complexity involved in the delivery of open heart surgical services and the absence of prior case law addressing the antitrust implications of a denial of hospital staff privileges [10] makes such an inquiry especially important in the present case.

### A. Diagnosis

Heart disease is currently the leading cause of death in the United States. It presents major health care problems, both medically and financially. The term "heart disease" encompasses a wide variety of cardiovascular disorders. These disorders may be either congenital or acquired, and may involve either the heart itself, such as a septal defect or an abnormality of the valves, or the great vessels within the thorax, such as a blockage in a coronary artery.

Most heart problems are discovered by general practitioners and internists through blood tests, x-rays or electrocardiograms that are taken during routine physical examinations. Depending on the type of dis-

order, the primary care physician may begin treatment or he may refer the patient to a cardiologist [11] for further testing. The cardiologist must determine the scope of the disorder and develop an appropriate treatment program. Many cardiovascular problems can be successfully treated with medication. For example, anti-coagulant drugs can prevent the formation of blood clots or the enlargement of existing clots, thereby reducing the possibility of blockage of a major blood vessel. Other drugs can increase the pumping power of the heart or control irregularities in the heart beat. A few disorders, however, can be corrected only by surgery.

Cardiac catheterization in combination with coronary arteriography is currently the definitive method for diagnosing heart disorders that may require corrective surgery. This procedure involves passing a catheter through a vein of the arm or leg and through a heart valve and into one of the chambers of the heart. The cardiologist then injects an opaque fluid into the chamber and takes a high speed X-ray motion picture, a cineangiogram, that records the passage of the dye through the heart. Blood samples and pressure readings from inside the heart also may be taken. As the description of the procedure indicates, cardiac catheterization requires sophisticated equipment and involves some risk to the patient. Most cardiologists therefore perform the procedure in a "catheterization

States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15 (1976).

Section 16 of the Clayton Act reads in relevant part:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing

such proceedings .... In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff.

15 U.S.C. § 26 (1976).

10. We know of no case challenging a denial of hospital staff privileges that has gone to trial on an antitrust theory. Cf. Borsody, The Antitrust Laws and the Health Industry, 12 Akron L.Rev. 417, 449–50 (1979) (most prior cases in federal court involving denial of staff privileges were brought on due process or civil rights theories).

11. A cardiologist is an internist who specializes in the diagnosis and the non-surgical treatment of heart disease.

laboratory" at a hospital that has surgical facilities.

If the cardiologist determines that a patient has a heart disorder that can be treated only through surgery, the patient next must obtain the services of a cardiothoracic surgeon. Few open heart candidates are familiar with the cardiothoracic surgeons who practice in their community. Therefore, most patients rely on the recommendation of their primary care physician or their cardiologist. Recognizing the delicate and dangerous nature of open heart surgery, the referring physician will base his selection of a surgeon primarily on his perception of the surgeon's ability to provide the particular patient with high quality service. A variety of other considerations may influence the referring physician's decision in the event that he must choose among several equally skilled surgeons. The referring physician may consider the proximity of the patient's home to the hospital where the surgeon performs his operations. If the patient has a strong religious preference, the referring physician may attempt to select a surgeon who performs his operations at a hospital that is affiliated with the particular religious denomination. If a primary care physician is making the referral, he may consider the accessibility and the cooperativeness of the surgeon because he will be responsible for monitoring the patient's health after the patient leaves the surgeon's care. If a cardiologist is making the referral, he may prefer a surgeon who previously has referred patients to his catheterization laboratory or who performs surgery in the same hospital that houses his catheterization laboratory. Over time, each referring physician will develop a referral pattern based on these various factors.

## B. Open Heart Surgery—The Procedure

Open heart surgery is a complex procedure requiring costly, sophisticated equipment and personnel from a variety of medical disciplines. The surgery must be performed by a cohesive, well-trained team, headed by an experienced cardiothoracic surgeon and including an additional thoracic surgeon or a resident in the thoracic surgery program, scrub nurses, circulating nurses, two pump technicians (perfusionists) and an anesthesiologist. The operating room must accommodate the team and the special equipment, some of which has extraordinary electrical and plumbing specifications. Also, a special coronary care unit is needed for the postoperative phase. The estimated capital expenditure for a fully equipped operating room and a postoperative unit is about one million dollars.

Open heart surgery became practical with the introduction of the cardiopulmonary bypass (heart/lung) machine during the 1960's. This machine is actually an amalgam of several devices that takes the blood returning to the heart, filters it, oxygenates it, regulates its temperature and then pumps the blood back through the body. With the patient connected to the cardiopulmonary by-pass machine, surgeons can operate on a relaxed, non-functioning heart while the integrity of the patient's circulatory system is preserved.[12]

An open heart procedure begins with the opening of the chest cavity. The junior surgeon or the resident makes an incision down the center of the chest with a scalpel and then cuts the sternum and ribs with a saw. The exposed blood vessels are cauterized. This phase of the procedure generally requires one to two hours. The perfusionists spend this time setting up the components of the heart/lung machine.

The lead surgeon becomes involved after the initial phase has been completed successfully. Under the lead surgeon's supervision, the chest opening is widened through the use of a retractor and the patient's veinous and arterial systems are connected to the heart/lung machine via flexible cannulae. With the flow of blood now diverted from the heart, the surgeon slits the thin tissue surrounding the heart and begins cor-

12. By stipulation during the trial, counsel agreed that when they referred to "open heart surgery," the reference was to a surgical procedure during which the patient was attached to a cardiopulmonary by-pass machine.

rective surgery. The most common open heart procedure is the coronary artery by-pass.[13] Other common procedures are the repair of the great vessels, the replacement of heart valves and the repair of septal defects.

During the surgery, the perfusionists operating the heart/lung machine are responsible for maintaining the proper oxygen and carbon dioxide content and the proper acid/base ratio in the blood by adjusting blood flow and pressure and by adding drugs and solutions to the circulation. Deviations from acceptable levels endanger the patient. Even if the perfusionists regulate the circulatory system perfectly, however, a patient can remain on the heart/lung machine for a maximum of only four hours before his blood begins to suffer irreparable damage. Therefore, the surgeon must work quickly.

After completion of the surgical procedure, veinous flow to the oxygenator is gradually reduced as the heart assumes the circulatory load. Irregular beating or failure to beat are frequent problems, and electric defibrillation or drugs may be required. When the heart can sustain circulation, the patient is taken off the heart/lung machine. With the natural cardiopulmonary system functioning again, the lead surgeon's participation in the operation is complete. The junior surgeon or the resident performs additional cauterization and closes the chest. The patient then is removed to the coronary care unit for continual monitoring during the critical postoperative phase. Postoperative recovery time normally is twelve days. If the patient experiences difficulty during the recovery period, the lead surgeon will supervise additional treatment and may perform a second operation.

Not surprisingly, open heart surgery is expensive. Currently, the simplest by-pass procedure will result in a total bill to the patient of $9,000 to $18,000; a complicated procedure might result in a total bill of $35,000 or more. The surgeon's fee alone will range from $1500 to $5000. Few patients could afford the costs of surgery without receiving some assistance. Fortunately, the government through Medicare and Medicaid and insurance companies through health care insurance plans absorb most of these costs. Without the existence of these third-party payor systems, open heart surgery would not have expanded beyond the experimental stage.

## C. Open Heart Surgery—The Major Players

### 1. The Lead Surgeon

Surgeons who perform open heart operations are among the most highly trained individuals in the medical profession. Following medical school and an internship, the physician must complete a four-year general surgical residency and a two-year thoracic surgical residency. Upon completion of his formal training, the doctor is eligible for examination by the American Board of Thoracic Surgery. If successful on the examination, the doctor becomes board-certified in thoracic surgery.

Although board-certified thoracic surgeons are qualified to perform a wide variety of procedures, they usually emphasize one facet of thoracic surgery in their practices because each type of procedure has its own peculiarities that must be mastered. Studies indicate that the mortality rate of open heart patients increases as the frequency of open heart procedures performed by a given surgical team declines. A surgeon should perform a minimum of three open heart procedures per week in order to maintain his proficiency. Those doctors concentrating on open heart surgery generally augment their surgical schedules and their incomes with less complex thoracic or vascular procedures.

The open heart surgeon may work as a sole practitioner or as a member of a group of cardiothoracic or cardiovascular sur-

---

**13.** A coronary artery by-pass is performed when a patient is suffering from a narrowing or occlusion of the vessels leading from the heart. The occluded area is by-passed with a vessel graft, usually a portion of the saphenous vein that the junior surgeon or resident has removed from the patient's leg.

geons. After reviewing the voluminous evidence presented at trial on the delivery of open heart surgical care nationally and in the Pittsburgh area, we perceive a trend toward group practice.

Without doubt, a group practice achieves certain efficiencies. As noted earlier, open heart surgery requires at least two surgeons. If no qualified resident is available for a particular operation, the group can provide the second surgeon. A group also can more readily provide coverage during the critical postoperative phase. Furthermore, association with an established group can give a young surgeon a mix of instruction and practice that will help him to develop his skills.

In 1979, surgeons performed approximately 118,000 open heart procedures in the United States. Experts predict a modest growth in open heart surgery over the next few years. The glamour and high fees associated with open heart surgery have combined to ensure that there is no shortage of open heart surgeons. In fact, in many areas of the country, a young sole practitioner faces a formidable task in obtaining open heart patients.

### 2. The Hospital

The host hospital for an open heart operation provides equipment and support personnel to the surgeon. The nurses, perfusionists and physicians from related fields, such as anesthesiology, are either employees of the hospital or independent contractors. Often, the hospital undertakes the responsibility of recruiting, training and supervising the nurses and/or the perfusionists.

Although the cost of establishing and maintaining an open heart surgical facility is high, the revenue that such a facility generates also can be substantial. Open heart patients require lengthy postoperative recovery periods in a specialized unit that has sophisticated monitoring equipment and a high nurse-to-patient ratio. As we mentioned earlier, patients admitted to Allegheny General by CTSA in the years considered accumulated as many patient days as did all of the patients admitted by the Division of General Surgery.

Not all hospitals have the capability of hosting an open heart operation, which is a tertiary level service. Hospitals in the United States fall into one of three general categories: community, teaching or regional referral, secondary teaching.[14] All three types of hospitals provide some degree of patient care, but each has a different primary mission.

The vast majority of hospitals in the United States are community hospitals. They are essentially arenas or workshops, as it were, supplied by the community for physicians who provide basic health care services to local patients. In keeping with their purpose, community hospitals usually grant staff privileges to any licensed physician from the surrounding area who applies. Most of these physicians are not under contract to the hospital, but rather, they use the hospital's facilities and the hospital bills the patients separately for this use.[15] The members of the staff perform minimal hospital committee responsibilities on a rotating basis and department heads, if they exist, frequently are elected by their colleagues. Generally, little teaching or research occurs in community hospitals.

For economic reasons, community hospitals cannot offer most tertiary level services. Such services require specialized personnel and sophisticated equipment, which must be used on a daily basis if the cost per procedure is to be held within an acceptable range. Each community hospital provides coverage for a relatively small population base. This population base would not gen-

---

14. Although hospitals properly can be classified into three groups for purposes of discussion, we recognize that hospitals actually fall along a spectrum that reflects differences in size, composition of staff, range of medical services, educational programs and involvement in research.

15. The hospital probably would have a few specialized personnel under contract, such as an anesthesiologist and a pathologist.

erate a sufficient number of tertiary level procedures to keep a given tertiary care unit at anywhere near optimum utilization. Therefore, community hospitals offer only basic medical care. If a local patient needs more complex treatment, the physician will transfer that patient to the care of a specialist at a regional hospital.

At the opposite end of the spectrum from the community hospitals lie the major teaching hospitals, which are relatively few in number and closely linked to, or owned outright by, universities. These hospitals serve as centers of learning, where medical students and residents receive training and where doctors work to increase the pool of medical knowledge through research. A teaching hospital has a large medical staff relative to its bed capacity. Many members of this staff are employees of the hospital with no private practice or with an arrangement by which all patient fees exceeding a certain amount are turned over to the hospital. The staff has extensive research and teaching responsibilities, and therefore, appointments to the staff often are greatly influenced by the candidates' interest in these activities. Most doctors on the staff hold university appointments, and the full-time staff members are jointly selected and appointed by the university and the hospital. Teaching hospitals possess highly sophisticated equipment and operate at the front line of advancing medical science. Often they use the treatment of complex, tertiary level cases as pedagogical devices. The excellent quality of care and the advanced technology available at the teaching hospitals attract patients needing tertiary level services from a broad geographic area, and even occasionally from foreign countries.

In the middle of the spectrum lie the regional referral, secondary teaching hospitals such as Allegheny General. These hospitals are more numerous than the major teaching hospitals, but much less common than the community hospitals. Regional referral hospitals often provide basic medical care to the people living in the immediate vicinity, thus serving the function of a community hospital for that area. In addition, however, they have developed advanced care units in a limited number of subspecialties. These units receive referrals from primary care physicians and from the surrounding community hospitals.

A particular region may contain several regional referral hospitals, each of which will offer advanced care units in a different set of subspecialties. Thus, any one hospital will have the capability of providing advanced care only in a few types of cases, but optimally, there will be at least one hospital in the region that can satisfy a given patient's needs.

In conjunction with its advanced care units, a regional referral hospital often will conduct clinical research and operate postgraduate training programs. Although the hospital hires a few physicians as full-time employees, it provides instruction to the participants in its residency programs primarily through the voluntary efforts of the doctors who concentrate their private practices at the hospital. A symbiotic relationship should develop between these private practitioners and the residents. For example, residents in a surgical program will save time for the private practitioner by opening and closing the patients, while the private practitioner will instruct these residents during the course of the operations and at regularly scheduled conferences.

Much of the responsibility for maintaining the hospital's performance standards in patient care, teaching and research falls on the departmental chairmen. One of the critical tasks that most departmental chairmen perform is the evaluation of applications for appointment to the staff. When considering such an application, the chairman must compare the interests and abilities of the applicant with the department's present needs in patient care, teaching and research. He also must determine whether an additional doctor would overburden the hospital's physical facilities.

## IV.

### Allegheny General's Competitive Strategy

Equipped with a basic understanding of the elements involved in the delivery of

open heart surgical services to patients in the United States, one is now prepared to examine Allegheny General's decision to deny staff privileges to Dr. Robinson. The hospital contends that it made this decision after determining that the addition of Dr. Robinson to the medical staff would not be consistent with the hospital's institutional objectives or competitive strategy.

## A. Institutional Objectives

Allegheny General formulated its present institutional objectives and competitive strategy during 1967 and 1968 in response to a study that the management consultant firm of Cresap, McCormick and Paget performed at the request of the Board of Trustees. During the early and mid 1960's, a phalanx of problems confronted Allegheny General. These problems included an antiquated physical plant, a lack of parking facilities, a serious deterioration in the surrounding neighborhood, an operating deficit, a medical staff that did not hold many university appointments and did not display great loyalty toward the hospital, discontent among hospital personnel, and the placing of three of the hospital's residency programs on probation. Realizing that the hospital would have to take decisive action if it was to rectify the situation, the Trustees retained Cresap, McCormick and Paget to assist them in charting the hospital's future course.

After making the initial decision to rebuild at the present site rather than to relocate in the suburbs, the Trustees began a nationwide search to find the right administrator to lead the efforts to revitalize Allegheny General. On January 1, 1968, Allegheny General hired Lad F. Grapski as the new president of the hospital. Mr. Grapski had extensive experience in hospital administration and academic medicine, having served as associate director or director of three university hospitals during the period 1947 through 1967.

In the months following Mr. Grapski's appointment, he worked with certain Trustees and members of the medical staff to draft a statement of objectives that would give direction to the hospital's revitalization campaign. These objectives, which the executive committee of the Board of Trustees formally approved on March 25, 1968, reflect the belief that secondary and tertiary medical care can best be provided by an institution that also has developed flourishing educational and research programs. "The primary objective of Allegheny General Hospital is to protect and improve the health of the people it services through the maintenance of the scope and quality of patient care . . . ." *Definition, Purpose and Statement of Objectives of the Allegheny General Hospital*, AGH Exh. 102, at 2. The leadership of Allegheny General stated, however, that "[a] true standard of excellence in patient care can be achieved only in those hospitals in which a stimulating and challenging educational environment is maintained. Allegheny General Hospital is committed to a role in graduate medical education for interns and residents to support patient care." *Id.* at 3. Furthermore, the leadership expressed

a firm commitment to the continued fostering and encouragement of research and investigation. The principal focus for such research is presently in the basic and applied medical and biomedical sciences. Allegheny General Hospital encourages and supports the strengthening of clinical departmental staffs with research scientists, or the appointment of physicians who devote a portion of their professional work to research activity. Allegheny General Hospital's commitment to the research objective is integral to, and a part of the commitment to excellence in patient care and education.

*Id.* at 4. The theory underlying this integrated approach to the delivery of medical services is that practicing physicians who participate in teaching or research, or who interact regularly with such participants, will thereby keep abreast of the latest developments in the field, which in turn should enhance patient care. Moreover, the obligation to teach students by example places continuous pressure on all of the medical staff and the support personnel to maintain high standards of patient care.

### B. Marketing

When formulating the set of institutional objectives, Allegheny General's leadership also had to consider the marketing of the hospital's services. Hospitals no longer can afford to sit back and hope that the patients will present themselves. *Cf.* Norris & Szabo, *Communication Between The Antitrust And The Health Law Bars: Appeals For More Effective Dialogue And A New Rule Of Reason*, 7 Am.J.L. & Med. i, ii (1981) ("The classical model of collegial physician control over health care delivery is being replaced rapidly by a view of health care providers (institutional as well as individual) as intense competitors for a limited health care dollar."). In order to financially support research programs, educational programs and the personnel and equipment necessary for tertiary level procedures, the hospital must attract enough patients to enable it to operate at near full capacity. Other regional referral hospitals and one university hospital in the Pittsburgh area compete with Allegheny General in the delivery of secondary and tertiary level medical services. St. Francis General Hospital, Mercy Hospital, The Western Pennsylvania Hospital, Shadyside Hospital and Presbyterian University Hospital compete with Allegheny General for adult open heart patients, and some excess capacity exists in the market.

Allegheny General's strategy for marketing secondary and tertiary level medical services is intimately connected with its institutional objectives. Mr. Grapski and the Trustees believe that a reputation for excellence and innovation in medical care will attract patients, both directly and through referrals. Prospective patients and referring physicians will perceive an institution whose staff provides formal instruction for young doctors as an institution that has a commitment to excellence in the delivery of medical services and has the talent available on the medical staff to fulfill that com-mitment. Likewise, they will perceive an institution whose staff participates in medical research as an institution that will provide its patients with care that incorporates the latest advances in medical science.

Allegheny General contacts prospective patients and the medical community through several channels. The hospital conducts a small amount of commercial advertising. The local news media provide the hospital with a far greater amount of publicity, however, through their coverage of research breakthroughs, unusual or dramatic cases and operations, and special services that the hospital offers. Naturally, the relative success that the hospital achieves in its research programs and in its treatment of tertiary level patients will affect the amount of media coverage that it receives. As we noted earlier, Allegheny General also distributes information and research data to the medical community, encourages the members of its staff to participate in educational programs sponsored by various medical organizations, and supports the efforts of members of its staff to write and publish scholarly works. Thus, for the past fifteen years, Allegheny General has anchored its marketing strategy on the proposition that a regional referral hospital will attract large numbers of patients if it develops a reputation for high quality programs in patient care, teaching and research.

### C. Role of the Department Directors

Although Mr. Grapski and the Trustees had the primary responsibility for formulating the revitalization campaign, they realized that, as a practical matter, they would have to place on the shoulders of the directors of the hospital's clinical departments the primary responsibility for improving the performance of each of the three components of the hospital's integrated medical services delivery system.[16] Therefore, the

---

16. Mr. Kenneth Hewitt, a long-time member of Allegheny General's Board of Trustees, served as chairman of the committee that oversaw the reorganization of Allegheny General in the wake of the report presented by Cresap, McCormick and Paget. He testified at trial that the directors of the clinical departments are supposed to run their departments as executive heads. They are supposed to take charge, plan and oversee the educational pro-

leadership placed a high priority on the selection of multitalented, dynamic individuals to head the hospital's major departments.[17] In order to perform effectively, these individuals would need managerial skills, experience in academic medicine, technical proficiency in their respective fields and an appreciation for the role of research.

On April 22, 1968, the Board of Trustees approved the appointment of Dr. George J. Magovern, an eminent thoracic surgeon and scholar, to the position of Director of the Department of Surgery. Dr. Magovern received authority to use his own judgment in building an integrated department that would achieve the hospital's institutional objectives. In his capacity as director, Dr. Magovern's duties have included establishing and maintaining high standards of clinical care, developing and supervising educational programs, encouraging and overseeing research activities, and making recommendations on staff applications and reappointments.

Dr. Magovern has had to devote particular attention to Allegheny General's residency program in thoracic surgery. The national accrediting agency, known as the Liaison Committee for Graduate Medical Education ("LCGME"), imposes very demanding requirements on such residency programs. A document entitled "Essentials of Accredited Residencies" sets forth these requirements in general terms. AGH Exh. 104. This document reads in part:

> The teaching staff should be composed of physicians and other health professionals qualified on the basis of educational background and professional accomplishment, oriented to the requirements and responsibilities of the teaching appointment and motivated to assign acceptable priority to teaching duties. A well organized and well qualified staff ... may well be the determining factor in the development and approval of a graduate training program....
>
> ....
>
> Members of the attending staff should be assigned by the department head to specific responsibility as far as the work of the services is concerned. The service of each attending physician should include an adequate number of patients and extend over a sufficient period to elicit his full interest and attention while on service. On the other hand the service should not be so large as to be a burden to the attending staff and thus result in reduced attention to the educational program....
>
> The staff must hold an adequate number of regularly scheduled clinical pathological conferences and other staff conferences, in addition to meetings of the staff at which the histories, clinical observations, laboratory studies, and pathology of selected cases are reviewed. Scientific meetings at which papers are presented by members of the staff or guest speakers are considered commendable but do not serve to meet the requirements of these scheduled conferences.

*Id.* at 24. The experience of Allegheny General's orthopedic residency program served notice to the hospital of the need to comply with these requirements. LCGME placed the orthopedic program on probation because the residents were providing serv-

---

grams that their department conducts. They are supposed to be sure that they are adequately staffed with competent doctors, and ... to run their department ... at the highest level of patient care possible. In other words, they have full responsibility and accountability for what went on in their department.

Tr. 4606.

Article VI, § 2 of the 1971 edition of the Medical Staff Bylaws reads in part that "[a] Director of a Department is expected to develop and maintain a strong well-balanced Department and Staff complement, compatible with the goals and resources of the Hospital...." Jt. Exh. 88.

**17.** Prior to 1968, the doctors in each department elected one of their colleagues to fill the position of director. The Board of Trustees changed this practice, however, giving itself the power of appointment. Through the Board's action, the hospital acquired the ability to recruit directors from outside the existing staff and to ensure that the directors' loyalty would lie primarily with the hospital.

ices' rather than receiving instruction. The members of the staff who participated in the program devoted very little time to teaching the residents, while using them to perform many tasks that did not contribute to their education. Dr. Magovern has had the responsibility of ensuring that the members of his department display an interest in teaching the residents in thoracic surgery and that these residents receive an educational experience rather than a service experience.[18]

### D. Results of the Revitalization Campaign

Under Mr. Grapski's leadership, Allegheny General has built a reputation as a vibrant and productive regional referral, secondary teaching hospital. Although it offered some secondary and tertiary level services before Mr. Grapski's arrival, the hospital has greatly expanded such services during the past fifteen years while deemphasizing its role in providing basic medical services. Specifically, the hospital has developed a cardiac center and an oncology center that provide comprehensive services for the diagnosis and treatment of heart disease and cancer respectively. It also has devoted substantial efforts to the establishment of a trauma center and a sports medicine clinic. In conjunction with this shift in emphasis, the hospital constructed additional operating rooms and diagnostic and treatment rooms during a renovation of the physical plant.

Allegheny General has improved the quality of its medical staff significantly. It has recruited several eminent physicians to serve as directors of various departments. For example, the Trustees appointed Dr. Claude Joyner, a cardiologist, as Director of the Department of Medicine. Prior to joining Allegheny General, Dr. Joyner pioneered the use of sound waves to diagnose heart disease at the University of Pennsylvania School of Medicine. In addition to serving Allegheny General as a department director, Dr. Joyner has accepted a position on the faculty at the University of Pittsburgh School of Medicine. Approximately eighty other members of Allegheny General's present staff likewise hold faculty appointments at the University of Pittsburgh's School of Medicine or School of Dentistry. The availability of such a large number of doctors with experience in academic medicine has contributed to the success of Allegheny General's residency programs, all of which now are fully accredited. Moreover, the hospital has experienced considerable success in its research activities. The staff has made many contributions to medical science, most notably in the diagnosis and treatment of heart disease.

Mr. Grapski and the Trustees also have attended to the hospital's physical needs. In addition to renovating the present hospital building, Allegheny General constructed a parking garage and a professional office building. A new main hospital building is scheduled for completion this year.

The many efforts to upgrade the hospital's integrated medical services delivery system have been well received by both the general population and the medical community. As a result of substantially achieving its institutional objectives, Allegheny General has attracted large numbers of patients from a wide geographic area. The hospital's total revenues (receipts and contributions) exceed its costs.

The Department of Surgery, and particularly its Division of Thoracic Surgery, has played an important role in the resurgence of Allegheny General. Through the efforts of Dr. Magovern, the department has maintained the accreditation of the general surgery and thoracic surgery residency programs, has greatly expanded its research activities, and has developed a reputation for providing secondary and tertiary level patients with high quality, innovative care.

---

**18.** Events at other Pittsburgh hospitals have shown that Dr. Magovern cannot take his responsibility lightly. Within the last six years, LCGME has withdrawn accreditation for the residency programs in thoracic surgery at St. Francis and Shadyside Hospitals.

Questions have been raised about the effect on competition caused by the involvement of LCGME in the accreditation of medical education programs. *See* Kissam, *Applying Antitrust Law to Medical Credentialing*, 7 Am.J.L. & Med. 1, 2 n.2, 26–27 (1981).

The achievements of the Department of Surgery have attracted a large volume of patients to Allegheny General and have won national recognition for Dr. Magovern.

## V.

### The Application of John N. Robinson, M.D.

Allegheny General's institutional objectives and competitive strategy influence the hospital's evaluation of applications for staff privileges. Dr. Robinson initiated his effort to obtain staff privileges at Allegheny General in February, 1975, after Dr. Kian Kooros, an invasive cardiologist on the staffs of Allegheny General and North Hills Passavant Hospitals, told Dr. Robinson that he would make referrals to Dr. Robinson for open heart surgery that was to be performed at Allegheny General if Dr. Robinson could acquire staff privileges. A member of Allegheny General's Board of Trustees, whom Dr. Robinson met socially, also had encouraged him to apply for staff privileges.

With the intention of obtaining an application form, Dr. Robinson visited the administrative office of Allegheny General. A woman in that office asked Dr. Robinson whether he was joining an established group at the hospital. He replied that he would be applying as a solo practitioner. The woman did not give Dr. Robinson an application form, but rather, told him that the hospital would mail a form to him. The following day, the woman telephoned Dr. Robinson to inform him that the Director of the Department of Surgery, Dr. Magovern, would have to interview him before the hospital would provide him with an application form. In compliance with that instruction, Dr. Robinson mailed a copy of his curriculum vitae to Dr. Magovern and obtained an appointment to see him.

### A. The Interview

Dr. Robinson met with Dr. Magovern for approximately one-half hour on April 4, 1975 at the latter's office. The two men offered differing accounts of that meeting in their testimony. Harmonizing the testimony and resolving questions of credibility, we find that the interview began with Dr. Robinson stating that an Allegheny General Trustee and Dr. Kooros had suggested that he make application to the hospital for staff privileges. Dr. Magovern responded that Dr. Robinson had excellent credentials.

Dr. Robinson then summarized his experience with Dr. Giacobine and explained the circumstances that led to the dissolution of their association.[19] During the course of his remarks, Dr. Robinson conveyed a negative attitude about St. Francis' thoracic surgery residency program, referred to certain foreign residents at St. Francis as "camel drivers," implied that a former Allegheny General resident was a homosexual, and criticized Dr. Giacobine's unwillingness to inform patients that Dr. Robinson would perform their surgery. Dr. Magovern replied that he understood Dr. Robinson's interest in establishing his own identity as a surgeon. The two men next discussed the surplus of thoracic surgeons in the United States. As a partial solution to the problem, Dr. Magovern suggested that American hospitals accept only those foreign residents who intend to return to their native lands after their training.

The conversation eventually turned to the Department of Surgery at Allegheny General. Dr. Magovern stated that Allegheny General was suffering from a shortage of operating rooms; he did not mention that construction of new operating rooms was expected to begin that fall. Dr. Magovern also explained the importance of the thoracic surgery residency program to Allegheny General, and he emphasized the difficulties involved in maintaining accreditation for a nonuniversity residency program. In that regard, he expressed the view that Allegheny General should grant staff privileges in its Division of Thoracic Surgery only to those doctors who have the qualifications to obtain a faculty appointment at the University of Pittsburgh School of Medicine. Dr. Magovern noted that Dr. Burkholder, who

---

**19.** Dr. Robinson had left Dr. Giacobine's service in December, 1974.

was to join CTSA after completing his residency at Presbyterian University Hospital, had a good chance of obtaining a faculty appointment. Dr. Robinson told Dr. Magovern that he had spoken with Dr. Henry Bahnson at the University of Pittsburgh about a faculty appointment, but that he believed that he could not now obtain such an appointment. At the conclusion of the interview, Dr. Magovern pointed the way to the office where Dr. Robinson could pick up an application form.

Dr. Magovern testified that, based on the interview, he was not impressed with Dr. Robinson. Discovering that Dr. Robinson did not have an outgoing personality, Dr. Magovern had some difficulty in carrying on a conversation with him. Dr. Robinson did not volunteer information and gave abrupt answers to several of Dr. Magovern's questions. Dr. Magovern was surprised by Dr. Robinson's negative attitude toward the St. Francis residency program. He felt that a young thoracic surgeon should welcome the opportunity to practice at a hospital that has a residency program and should work to improve it. Dr. Robinson's attitude raised a question in Dr. Magovern's mind as to whether or not Dr. Robinson was interested in teaching. Dr. Magovern also was very concerned about Dr. Robinson's reference to certain foreign residents as "camel drivers" because Allegheny General had residents from Middle Eastern countries. Dr. Magovern did not want a physician on the staff who might have trouble working with some of the residents. Furthermore, Dr. Robinson's curriculum vitae did not reflect an interest in research. He told Dr. Magovern that he had not participated in significant research because St. Francis did not have a laboratory. Finally, Dr. Magovern was irritated by Dr. Robinson's suggestion that a former Allegheny General resident was a homosexual. Dr. Magovern had trained that resident and had written letters of recommendation on his behalf. He did not believe that the accusation was true, and in any case, he felt that it was an inappropriate comment.

Disturbed by the interview with Dr. Robinson, Dr. Magovern telephoned Dr. Giacobine to ask about Dr. Robinson and about the former resident, who was related to Dr. Giacobine by marriage. Dr. Magovern's negative impressions of Dr. Robinson were reenforced by his conversation with Dr. Giacobine. He also learned that Dr. Robinson was suing Dr. Giacobine over certain aspects of the dissolution of their association.

Although Dr. Robinson described the interview as "friendly," he left it with the belief that Dr. Magovern, in effect, had rejected his request for staff privileges. AGH Exh. 1, at 190; Tr. 178–79. Therefore, he did not bother to obtain an application form following the interview. Angered by what he considered to be an infringement on his right to practice medicine, Dr. Robinson complained to the Allegheny County Medical Society about the "closed shop" at Allegheny General. Tr. 180–81. After speaking with the president of the medical society and with the society's attorney, Dr. Robinson retained private counsel in the person of Roslyn M. Litman, Esquire.

## B. Submission of the Application

Following the Magovern-Robinson meeting on April 4, 1975, no one at Allegheny General heard from Dr. Robinson for almost five months, that is, until August 27, 1975, when the hospital received a letter from Mrs. Litman, Dr. Robinson's attorney. That letter read in full as follows:

August 26, 1975

Allegheny General Hospital

320 East North Avenue

Pittsburgh, Pennsylvania 15212

Attention: Chief Administrative Officer

Gentlemen:

This office has been retained by Dr. John N. Robinson who has advised us that his several attempts to be favorably considered for admission to your surgical staff have been frustrated by the personnel of your hospital. After I learned of Dr. Robinson's credentials, I was frankly surprised that an appointment of Dr. Robinson to your staff had not been

made. The information I have received on this case leads to the conclusion that your failure to process my client's application to a just conclusion in accordance with the various applicable statutes and regulations governing the operation of hospitals like yours has caused our client serious damage.

I would be grateful if you would advise me as soon as possible the reasons for your failure to justly process Dr. Robinson's request to join your surgical staff. If your actions are supported by by-laws or other governing rules of the hospital, please submit a copy of these documents to me. I would appreciate, as well, your sending a copy of your written rules and regulations covering applications for staff membership, methods of processing applications, procedures related to submission and processing of applications and particularly your defined criteria for staff membership.

I will be happy to meet with a representative of your hospital to further discuss the problem presented by what has occurred since Dr. Robinson first attempted to file an application for membership on your staff. Since Dr. Robinson's extensive damages to date are continuing, I submit that it is necessary that the problem be resolved with minimal delay. If, of course, I do not receive an indication from you of a desire to resolve this problem within the next 15 days, I will have no further choice but to institute appropriate legal proceedings for the benefit of Dr. Robinson.

Very truly yours,
(Signed)
ROSLYN M. LITMAN
RML:esf
cc: Dr. George J. Magovern

Jt. Exh. 1–B.

The hospital administration immediately notified in-house counsel of the contents of Mrs. Litman's letter, and counsel thereafter participated in processing Dr. Robinson's application. Lad Grapski, the president of Allegheny General, investigated the assertions contained in the Litman letter and determined that Dr. Robinson never had submitted an application for staff privileges.

On September 16, 1975, after an exchange of correspondence with Mrs. Litman, Allegheny General mailed to Dr. Robinson an application form and a copy of the Medical Staff Bylaws. Dr. Robinson completed the application form, attached a copy of his curriculum vitae, and returned the form to Allegheny General on September 29, 1975.

Mr. Grapski gave copies of Dr. Robinson's application to Dr. Magovern and to Dr. John Feist, who was the chairman of the hospital's credentials committee. Article III, section 3(c) of the Medical Staff Bylaws places on the director of the relevant department the duty of preparing a report and recommendation, which are submitted for consideration by the credentials committee. Jt. Exh. 88. Article III, section 3(b) of those same bylaws provides that the credentials committee "shall investigate the personal character and professional ethics of the applicant, and shall evaluate his professional competence to exercise the privileges he requests, or to undertake the professional responsibility he seeks, and shall verify, through references given by the applicant and other sources available to it, that he meets and has established all the necessary qualifications set forth in these bylaws." *Id.*

In support of the work of the credentials committee, Mr. Grapski requested Boston City Hospital and the Veterans Administration Hospital at Little Rock, Arkansas to confirm that Dr. Robinson had received a portion of his training at those institutions. He also requested letters of recommendation from McKeesport Hospital, North Hills Passavant Hospital, Western Pennsylvania Hospital and St. Francis Hospital, which Dr. Robinson had listed on his application as "Present Affiliations," and from Drs. Denton Cooley, Edward Longabaugh and Michael Levis, whom Dr. Robinson had listed on his application as "References."

## C. *The Magovern Report*

Upon learning that Dr. Robinson had submitted an application for staff privileges, Dr. Magovern again telephoned Dr. Giacobine. When he told Dr. Giacobine that Allegheny General had received the application through the office of an attorney, Dr. Giacobine, referring to the lawsuit that Dr. Robinson had filed against him, responded: "Join the crowd." Tr. 4967.

Dr. Magovern also wrote letters to Dr. Denton Cooley and Dr. Grady Hallman, both surgeons at the Texas Heart Institute whom Dr. Magovern knew. The plaintiff contends that these letters were an attempt by Dr. Magovern to generate negative recommendations. We disagree. Although Dr. Magovern did delineate in his letters the reasons that made him inclined to recommend denial of Dr. Robinson's application, he also asked both men to provide him with any positive information about Dr. Robinson that might cast a different light on the application. For example, in the letter to Dr. Hallman, Dr. Magovern wrote:

> Since I felt I knew you well enough to at least inquire of your feelings, as he rotated through your service, I would like to hear from you. My feeling would be that unless he had such superb credentials that the above difficulty in getting along with people would be overcome by this, I would be less than pleased if he joined the staff. Basically what I'm saying if I have become over prejudice [sic] by this, I would like to know. If you think he is really a good fellow, then we can certainly try to look at the other side of the story.

Jt. Exh. 10. Dr. Magovern never received a response from either Dr. Cooley or Dr. Hallman.

On October 13, 1975, Dr. Magovern submitted his department director's report on the Robinson application. The report recommended that the hospital reject the application. It set forth the following seven reasons in support of this recommendation:

1) a shortage of operating room space and time existed;
2) Dr. Robinson is on the staffs of seven other hospitals, so it is doubtful that he would have time to contribute to a teaching program at an eighth institution;
3) Dr. Robinson's former associate, Dr. Giacobine, did not give a favorable recommendation;
4) Dr. Robinson has not published any papers since leaving medical school;
5) the University of Pittsburgh School of Medicine has refused to appoint Dr. Robinson to the faculty;[20]
6) Dr. Robinson has displayed a willingness to resort to legal action; and
7) Dr. Magovern did not initiate or encourage Dr. Robinson's application.

Jt. Exh. 1–S.

## D. *The Credentials Committee*

The six-member credentials committee[21] received an unusually large volume of information about Dr. Robinson between October 13, 1975, the day on which Dr. Magovern submitted his department director's report, and March 4, 1976, the day on which the committee met to consider Dr. Robinson's application. All four hospitals that Dr. Robinson had listed on his application form as "Present Affiliations" responded promptly to Mr. Grapski's request for information. Dr. John Gaisford, chief of the Division of Surgery at West Penn Hospital, replied that he was unable to evaluate the applicant because Dr. Robinson had not performed any surgery at West Penn since joining the staff. Jt. Exh. 1–DD. Mr. Robert Bigge, the executive director of McKeesport Hospital, wrote that "I have

---

**20.** Dr. Magovern was mistaken when he stated that the University of Pittsburgh had refused to appoint Dr. Robinson to its faculty. Dr. Robinson had expressed his interest in obtaining a faculty appointment to Dr. Bahnson, and felt discouraged, but he never formally applied for such an appointment and never was rejected.

**21.** The committee was composed of Drs. John Feist, radiology, Richard Deitrick, gynecology, Don Fisher, cardiology, David Hayeslip, pathology, Gerald Pifer, orthopedic surgery, and Arthur Murphy, general surgery.

had no occasion to question his ethics or his morals and have heard nothing derogatory about him. His fellow surgeons respect his work and tell me that he shows good judgment and skill in the operating room." Jt. Exh. 1–CC. Dr. Harry Feather, medical director of St. Francis Hospital, informed Allegheny General that

> I did not know Dr. Robinson before he joined our staff. Since that time I have found him to be completely ethical and his character to be above reproach. He is not too "outgoing" but gets along well with the staff and nursing personnel. He is a competent surgeon and I can recommend him to you.

Jt. Exh. 1–EE. Mr. Alexander McAliley, the executive director of North Hills Passavant Hospital, responded succinctly, stating that "I have enjoyed a business acquaintance with Dr. Robinson and feel that he would be an outstanding addition to any hospital staff . . . ." Jt. Exh. 1–FF.

A letter of recommendation from Dr. Edward Longabaugh supplemented Mr. McAliley's evaluation of Dr. Robinson's work at North Hills Passavant. Dr. Longabaugh's letter read in part:

> He has been, but briefly, a member of our staff, yet our impression of Dr. Robinson is highly favorable and I am pleased to recommend him to you.

> I feel personally unqualified to judge his competence in Cardiovascular Surgery, except to affirm that his work has been exceptable [sic], in so far as one can judge from the records. I have assisted him only occasionally in the operating room, but in so far as this brief exposure permits evaluation, I regard his technique as excellent.

> I've found no reason to question his moral character or the ethics of his practice. I would like to add that he has been exceptionally helpful to the physicians of the North Hills Passavant Hospital in answering consultations, in caring for emergency patients, at any and all hours, and he has been cooperative in carrying out his staff assignments.

> He has been a most welcome addition to our staff, and I feel that if he is granted privileges in Cardiovascular Surgery at Allegheny General Hospital, an admirable continuity of care may be offered the North Hills patient with cardiopulmonary problems.

Jt. Exh. 1–AA. A second physician on the staff of North Hills Passavant, Dr. Michael Levis, also submitted a letter of recommendation on Dr. Robinson's behalf. Dr. Levis, who at that time was the president of the Allegheny County Medical Society, wrote that

> [i]t has been my privilege to know Dr. Robinson for approximately six months. During this time I have found him to be an extremely dedicated, conscientious, and capable thoracic surgeon. He has had excellent training and in my brief acquaintance with him has demonstrated outstanding qualities as a clinician.

Jt. Exh. 1–V.

Several doctors who had participated in Dr. Robinson's training likewise responded to Allegheny General's request for information.[22] Dr. William McDermott, who had supervised Dr. Robinson's internship at Boston City Hospital from July, 1963 to June, 1964, wrote that Dr. Robinson "showed competence as a physician, was of unquestioned high moral character and had good relationships with his colleagues and patients." Jt. Exh. 1–HH. Two surgeons from the Baylor College of Medicine, Dr. Stanley Crawford and Dr. Michael DeBakey, submitted letters to the credentials committee. Dr. Crawford's letter read in part:

> I found him to be a tall, attractive person with good professional bearing. He was well informed medically and his technical skill was quite satisfactory. He got along well with all the people here and I think he made a good reputation.

Jt. Exh. 1–PP. Dr. DeBakey informed the committee that Dr. Robinson

---

22. Dr. Feist supplemented the inquiries that Mr. Grapski had made by mailing requests for information to Drs. Stanley Crawford, Michael DeBakey, Howard Baron and James Giacobine on January 16, 1976.

entered our Cardiovascular Fellowship Program on September 14, 1970, with the original intent of remaining in this program through June 30, 1971. In this position he functioned in the equivalent capacity of a Junior Resident in Thoracic Surgery. However, Dr. Robinson found it necessary to terminate his appointment on March 1, 1971, to accept an appointment as a Thoracic Surgery Resident in Little Rock, Arkansas. During the short time he was with us his performance was considered most satisfactory, and his knowledge and technical ability were above average. However, it is somewhat difficult to make definitive statements in this regard, but only because of the shortness of the period of time Dr. Robinson was in our program. Therefore, I would suggest that you obtain a more definitive evaluation by those responsible for his thoracic and cardiovascular surgical residency after he left our program.

Jt. Exh. 1–SS. At the Veterans Administration Hospital in Little Rock, Dr. Robinson worked for four months under the supervision of Dr. Raymond Read, the chief of surgical services. Dr. Read wrote to the committee that he thinks

> very highly of Dr. Robinson. He is an ex-Marine who fought in Korea. He is an excellent cardiovascular surgeon, is conscientious, takes care of his patients very well and gets along with his peers, and to the best of my knowledge has excellent moral and ethical standards. I think he would be a considerable asset to your staff and I would recommend wholeheartedly that he be appointed.

Jt. Exh. 1–U. Dr. Robinson completed his training at the Texas Heart Institute under the supervision of Dr. Denton Cooley. After two requests from Mr. Grapski and one request from Dr. Magovern for information about Dr. Robinson, Dr. Cooley sent the following response to Mr. Grapski:

> [Dr. Robinson] served as a Resident in Thoracic Surgery for the period July 1, 1971 to July 1, 1972 at the Texas Heart Institute of St. Luke's and Texas Children's Hospital. He performed his duties well, and we believe that he is an accomplished and capable cardiovascular and thoracic surgeon.

> Dr. Robinson can be a rather stern, rigid person in his dealings with others, but this does not necessarily indicate a serious personality handicap. I believe that he shows promise of success in his chosen specialty.

> Since I have not been in contact with Dr. Robinson since his departure from Houston, may I suggest that you get a reference from Dr. James Giacobine of Pittsburg. [sic] Dr. Giacobine and Dr. Robinson were associated in practice.

> I would appreciate any consideration given to him.

Jt. Exh. 1–RR.

The committee already had written to Dr. Giacobine to inquire about his experience with Dr. Robinson. Dr. Giacobine's reply read in part:

> I am sure his curriculum vitae is a fair assessment of his professional training. In successfully passing the examination of the Board of Thoracic and Cardiovascular Surgery, he has achieved the minimum requirement of our specialty. Absence of special qualification or achievement, I am sure, are also evident in his staff application.

> Several years ago, when I requested a recommendation from Doctor Denton Cooley, of Houston, Texas, his letter among other things, indicated Doctor Robinson's inability to accept criticism. I have since assessed this as being a masterful understatement of Doctor Robinson's problem.

Jt. Exh. 1–TT.

In all, the credentials committee requested and received letters from twelve physicians or hospitals concerning Dr. Robinson. Only Dr. Howard Baron of the New York University Medical Center failed to respond to Allegheny General's inquiry. Few applicants at Allegheny General are the subject of such a thorough investigation; normally the credentials committee requests information from only three or four sources.

While the credentials committee was waiting for responses to certain of its inquiries, Dr. Magovern spoke with Dr. Feist on several occasions about the Robinson application.[23] During a conversation that occurred in early February, 1976, Dr. Magovern told Dr. Feist that Dr. Robinson recently had exchanged blows with a Dr. Joseph DeCapua in the catheterization laboratory at St. Francis Hospital. This incident, which Dr. Robinson has described as "embarrassing," became widely known in the Pittsburgh medical community. AGH Exh. 1, at 207–08. Some members of the credentials committee attempted to learn more about the incident through informal inquiries, but they failed to obtain a verified account before making their recommendation on Dr. Robinson's application. The committee did not ask Dr. Robinson to explain the circumstances surrounding the altercation.[24]

Dr. Magovern submitted a letter to the credentials committee on January 20, 1976, in which he gave further explanations for some of the points that he had made in his department director's report. This letter read in part:

What I would like to stress is the overall approach to obtaining a position on the Allegheny General Hospital Staff, which is essentially "if nothing negative is submitted then one is therefore applicable [sic] for admission to our staff". I feel in reviewing anyone's application, we should look for the plus features as well and it is that aspect of his particular application which does bother me.

Dr. Robinson has not contributed a paper to the literature despite his extensive training in the past eleven years. He has not secured an appointment to the faculty at the University of Pittsburgh despite the fact he has been practicing in Pittsburgh for sometime.... I can see no extremely positive features in terms of what he has contributed even to the local community which would particularly qualify him to be a member of a teaching faculty at any institution which is involved in a residency training program. Indeed the one program in which he was a member has been discontinued.

... I feel we have every right to maintain the highest standards which are possible, and I think I have attempted to do this. Two of the men who had been appointed since I have directed the Department, Dr. Liebler and Dr. Burkholder, have been able to achieve University appointments and both have demonstrated their ability to contribute to the literature. The Thoracic Surgery Department as a whole has contributed 15 papers to the literature in the past year.

It is my firm conviction that given the responsibility that I have in maintaining the Department and its training program that people must demonstrate that they have done more than completed their training. In Dr. Robinson's case he certainly has had ample opportunity to do this. The attitude which I am trying to acquire in the people who would become affiliated with the Department is one of an inquisitive, didactic approach to the patient in addition to demonstrating their clinical skills and since we are one of approximately four improved [sic] residencies in the State of Pennsylvania, I think it is imperative that we look for the positive aspects as well as "the lack of negative features" in those people applying for a position on the staff. In addition I am a member of the Residency Evaluation Committee of the Directors of Thoracic Surgery Association and I feel if I can't maintain standards in my own Institution that I would have to bring this problem to the Board of Thoracic Surgery for their disposition of the status of our program.

---

**23.** Dr. Magovern and Dr. Feist are personal friends who sometimes socialize together and who often confer on professional matters.

**24.** Dr. Robinson later testified that Dr. DeCapua initiated the confrontation and threw the first punch. Neither of the combatants filed charges and St. Francis did not take any disciplinary action.

Jt. Exh. 1–OO.[25] Dr. Feist placed Dr. Magovern's letter in Dr. Robinson's official application folder.

On March 4, 1976, five of the members of the credentials committee met to consider Dr. Robinson's application for staff privileges.[26] Each of the members had had an opportunity to examine Dr. Robinson's application folder prior to the meeting. During the hour-long discussion, the committee reviewed all of the letters that Allegheny General had received concerning Dr. Robinson. They discounted the favorable letters from Dr. Longabaugh, Dr. Levis, Dr. Read and Dr. Crawford because these men had known Dr. Robinson for a relatively short period of time. In addition, the eleven year hiatus between Dr. Robinson's internship at Boston City Hospital and his application to Allegheny General caused the committee to discount Dr. McDermott's favorable letter. The committee read Dr. Cooley's letter as less than enthusiastic[27] and Dr. DeBakey's reply as evasive and surprisingly brief.

Although the letters from McKeesport, St. Francis and North Hills Passavant Hospitals all complimented Dr. Robinson and supported his application, they raised concern among the members of the committee that Dr. Robinson already was on the staffs of too many hospitals.[28] Recognizing that an open heart patient can experience serious complications during the twenty-four hours following the operation, the committee felt that Dr. Robinson could not provide adequate coverage for his patients at Allegheny General while also performing surgery and fulfilling staff commitments at several other hospitals. Moreover, they doubted that Dr. Robinson could contribute to the teaching program and to staff committees at Allegheny General if he maintained active affiliations with other institutions.

The committee gave the greatest weight to the letter from Dr. Giacobine, who had the longest and most recent experience with Dr. Robinson. Dr. Giacobine, a well-known and respected member of the Pittsburgh medical community, had informed the committee that Dr. Robinson had good, but not exceptional, credentials and that Dr. Robinson had a serious personality problem. The committee noted that additional evidence corroborating this latter observation came from Dr. Cooley's letter, from the report of the physical altercation between Dr. Robinson and Dr. DeCapua, and from Dr. Robinson's use of an attorney to obtain an application form.[29]

Finally, the committee considered Dr. Magovern's report and supplemental letter. Dr. Magovern strongly recommended denial of Dr. Robinson's application, stating that he believed that Dr. Robinson would not contribute to the department's teaching and research efforts, that Allegheny General lacked the physical facilities to accommodate an additional thoracic surgeon, and that Dr. Robinson might be a disruptive force in the department. The committee accorded substantial weight to Dr. Magovern's opinion for three reasons. First, the Board of Trustees had given the depart-

25. Counsel for the plaintiff has characterized the final sentence in Dr. Magovern's letter as a threat to terminate the thoracic surgery residency program if Allegheny General granted staff privileges to Dr. Robinson. We disagree with this characterization. Reading this sentence in context and keeping in mind the department director's role in achieving Allegheny General's institutional objectives, we believe that Dr. Magovern simply was advising Allegheny General that the appointment to the staff of surgeons who are not qualified to teach could jeopardize the accreditation of the residency program. Dr. Fisher, who was a member of the credentials committee, testified that he did not read the final sentence as a threat. Tr. 6046–47.

26. Dr. Hayeslip did not attend the meeting.

27. Dr. Robinson has admitted that he was disappointed with the contents of Dr. Cooley's letter. AGH Exh. 1, at 234.

28. Dr. Robinson's curriculum vitae also listed staff appointments at Pittsburgh, South Side and St. John's Hospitals.

29. Dr. Feist testified that all members of the credentials committee felt that the submission of an application for staff privileges through an attorney under threat of legal retaliation "was a very unusual and unseemly method of trying to obtain staff appointments." Tr. 4124–25.

ment directors the leading role in Allegheny General's effort to achieve its institutional objectives. Therefore, the credentials committee looked to the department director for an evaluation of the department's current personnel needs and for insight on the individual applicant's potential to make a significant contribution to the hospital. Second, Dr. Magovern's performance as department director over the previous seven years had earned him great respect among the members of the committee. Third, the committee had independent corroboration for Dr. Magovern's conclusions: Dr. Robinson's curriculum vitae informed the committee that he was affiliated with seven hospitals and that he had not written a research paper since medical school; the two surgeons on the committee verified that Allegheny General had a shortage of operating rooms; and at least four sources of information indicated that Dr. Robinson might be a disruptive force.

Based on the disappointing letters of recommendation, the strong opposition of the department director, and the concern that Dr. Robinson already was overextended, the credentials committee voted unanimously to recommend that Allegheny General deny Dr. Robinson's application for staff privileges. The members of the committee gave their chairman, Dr. Feist, the responsibility of conveying their recommendation to Dr. Lawrence Brent, who was the chairman of the executive committee of the medical staff. On March 9, 1976, Dr. Feist wrote the following confidential letter to Dr. Brent:

During its regular monthly meeting of March 4, the Credentials Committee [considered] the application of John N. Robinson, M.D., to the Associate Attending Staff in Cardiothoracic Surgery. Although his records indicate that he has fulfilled the minimum training requirements, the Committee voted unanimously to recommend denial of this application. In order to maintain confidentiality and minimize adverse publicity, it was decided to omit from the official minutes a listing of the reasons for rejection, and, instead, to transmit this material to you by letter.

The Credentials Committee's recommendation is based on the following findings and considerations:

1. Dr. Robinson already holds active Staff appointments in his specialty in 7 other area hospitals. This would inevitably fragment his professional efforts and preclude the prompt availability and devotion of the requisite time and effort necessary to render continuous care and supervision to his own patients. Moreover, it would be physically impossible to fulfill all the Staff responsibilities inherent in such a critical specialty, were he also to be appointed here.

2. George J. Magovern, M.D., Director of the Department of Surgery, recommends denial of this application because of:

 (a) Insufficient operating time and space to expand cardiothoracic surgery beyond its present volume;

 (b) Saturation of the Cardiothoracic Surgery residency staff by the current patient load;

 (c) Lack of evidence that Dr. Robinson has either the ability or the interest to make a substantial positive contribution to the daily conduct or continued approval of the residency program, or to the established high standard of quality of the clinical service in Cardiothoracic Surgery, or to the educational commitments of the institution at large, and

 (d) Inability to qualify for a faculty appointment at the University of Pittsburgh School of Medicine.

3. There is substantial doubt that the applicant meets the personal qualifications to function harmoniously and constructively in our institution, because:

 (a) The written references to his character by physicians in his own specialty and his training preceptors are in part evasive or ambiguous, in part clearly indicative of a serious personality defect and inability to get along well with his colleagues;

(b) The only clearly positive recommendations originate from physicians who have only brief and superficial acquaintance with the applicant; and (c) A recent episode of assault and battery upon a fellow physician on the premises of St. Francis Hospital has been reported to the Committee.

Jt. Exh. 1–UU.

### E. The Rejection of the Application

The executive committee of the medical staff develops clinical standards, monitors and coordinates the work of the hospital's various departments, advises the president of Allegheny General on matters of hospital policy and reviews the recommendations of the medical staff's many committees. Article III, § 3(d) of the Medical Staff Bylaws provides that "[u]pon receipt of the report of the Credentials Committee, the Executive Committee of the Medical Staff at its next regular meeting, shall consider the report and recommend to the Medical Staff through the President of the Medical Staff, that the application be accepted, deferred, or rejected." Jt. Exh. 88. The executive committee has fourteen voting members, consisting of the three elected officers of the medical staff, the directors of five of the hospital's departments, five members elected from the ranks of the senior attending and associate attending staffs, and the president of the hospital. Id., article VII, § 1(a)(1). In 1976, Dr. Magovern was CTSA's only representative on the executive committee.

On March 15, 1976, the executive committee met to consider, inter alia, the credentials committee's report on Dr. Robinson's application. Nine voting members were present, including two doctors who also served on the credentials committee.[30] Dr. Magovern did not attend the meeting.

The members of the committee discussed Dr. Robinson's application at length, in the process reviewing the letters of recommendation, Dr. Robinson's curriculum vitae, the

department director's report and Dr. Feist's letter to Dr. Brent. Mr. Grapski also informed the committee of one recent development. In connection with Dr. Feist's reference to the altercation between Dr. Robinson and Dr. DeCapua, Mr. Grapski reported that, in response to his telephone inquiry, Sister Adele Meiser, the executive director of St. Francis Hospital, neither had confirmed nor denied that the incident occurred. At the conclusion of the discussion, the committee voted unanimously to recommend that Allegheny General reject Dr. Robinson's application for staff privileges.

Three members of the committee testified at trial. Mr. Grapski stated that he voted to adopt the recommendation of the credentials committee for two reasons. First, he had great confidence in the ability of the credentials committee to judge an applicant's qualifications. Second, Mr. Grapski had serious doubts about Dr. Robinson's ability to function harmoniously in the stressful environment of the practice of cardiothoracic surgery. This concern had its origin in the letters of recommendation, the altercation at St. Francis, and the applicant's use of an attorney to obtain an application form.

Dr. Laibe Kessler, a neurosurgeon, testified that the letters of recommendation raised a red flag for him. Over the years, Dr. Kessler had found that such letters usually went overboard in their praise of an applicant. He characterized the letters received from those who had trained Dr. Robinson, however, as halting and evasive. Tr. 6688, 6691. Moreover, he noted that the favorable letters came from individuals who had not worked closely with Dr. Robinson. Two other factors also contributed to Dr. Kessler's negative vote. First, he did not believe that the applicant could provide adequate coverage for his patients and contribute to the residency program at Allegheny General while performing surgery at two or three other hospitals and consulting at still more hospitals. Although he looked

---

**30.** The voting members in attendance were Drs. Arthur Murphy, Frank Begg, M. Remsen Behrer, George Brodmerkel, Robert Hartsock, Claude Joyner, Laibe Kessler, Gerald Pifer and Mr. Grapski. Jt. Exh. 4.

for some indication that Dr. Robinson intended to concentrate his practice at Allegheny General, Dr. Kessler ultimately concluded that Dr. Robinson did not have such an intention. Second, Dr. Kessler did not want any physician on the staff who would resort to physical violence.

Dr. Frank Begg, a cardiologist, testified that two considerations persuaded him to cast a negative vote. Speaking from a position of familiarity with the field, Dr. Begg first stated that he did not believe that an open heart surgeon could provide high quality patient care, contribute to a residency program and perform research unless that surgeon concentrated his practice at one hospital. Dr. Begg noted that Dr. Robinson held multiple staff appointments and had not represented that he would make Allegheny General the focus of his practice. The second consideration underlying Dr. Begg's vote was the presence in the file of "some unflattering recommendations." Tr. 4498.

Following the unanimous vote of the committee, Mr. Grapski informed Dr. Robinson by letter that "the Executive Committee of the Medical Staff recommended denial of your application. If you wish a hearing as provided in Article 3, Section 6 of the Medical Staff Bylaws, you must submit a written request for same within ten days of receipt of this notice." Jt. Exh. 1–VV. Subsequently, Mrs. Litman did request that the executive committee conduct a hearing on her client's application. Jt. Exh. 1–WW.

Article III, section 6(a) of the Medical Staff Bylaws provides in part that

[i]n the event of such a hearing, the application, together with the report and recommendation of the Credentials Committee for denial shall form the basis upon which the Executive Committee may receive evidence bearing on the applicant's qualifications for appointment to the Medical Staff. The Credentials Committee shall present evidence in support of its findings and recommendations, and the applicant shall present evidence in support of his qualifications. The recommendation of the Executive Committee of the Medical Staff following this hearing shall be sent to the Board of Trustees and a copy of it sent to the applicant by certified or registered mail by the Office of the President of the Hospital.

Jt. Exh. 88. Dr. Robinson knew from his reading of the Medical Staff Bylaws that he would have the burden at the hearing of allaying the concerns expressed by the credentials committee and of establishing his good character and professional competence. *Id.*, article III, § 3(b). In anticipation of the hearing, Allegheny General supplied Mrs. Litman with a copy of Dr. Robinson's application form, a copy of all letters of reference that Allegheny General received concerning Dr. Robinson, and a copy of the report and recommendation of the credentials committee. Jt. Exh. 1–YY.

The executive committee convened on June 21, 1976 to conduct the hearing on Dr. Robinson's application. By agreement of counsel, John J. McClean, Jr., Esquire, a former judge of the Court of Common Pleas of Allegheny County, presided at the hearing. David B. Fawcett, Jr., Esquire, represented the credentials committee and Mrs. Litman appeared on behalf of Dr. Robinson. Three witnesses presented testimony.

Dr. Feist testified first, explaining how the credentials committee reached its decision. Dr. Magovern then recounted his initial meeting with Dr. Robinson and reviewed the reasons for his opposition to the appointment of Dr. Robinson to the medical staff.

The applicant took the stand as the final witness. Through questioning by Mrs. Litman, Dr. Robinson first presented a detailed account of his medical training. He then discussed his two and one-half year association with Dr. Giacobine and explained the circumstances that led to its termination. Dr. Robinson told the committee that "a long-term relationship was just impossible with the man" because Dr. Giacobine "interjected severe family problems into the practice" and would not permit Dr. Robinson to tell patients that he would be performing their surgery. AGH Exh. 1, at 182–83.

Dr. Robinson next attempted to rebut Dr. Magovern's testimony concerning their meeting of April 4, 1975. Directly contradicting Dr. Magovern, Dr. Robinson stated that he had not mentioned Dr. Giacobine's relative during the interview and definitely had not commented on that individual's sexual preferences. Moreover, Dr. Robinson testified that Dr. Magovern had told him that a faculty appointment at the University of Pittsburgh Medical School was a prerequisite to obtaining staff privileges at Allegheny General.

In an effort to establish that he had an interest in teaching, Dr. Robinson informed the committee that he had participated in the instruction of residents while serving as the chief surgical resident at Columbia Presbyterian Hospital. He also told the committee that Creighton University Medical School had offered him the position of professor of surgery and chief of cardiac and thoracic surgery upon his leaving the Texas Heart Institute. Finally, Dr. Robinson testified that he "taught the residents operating" at St. Francis Hospital. AGH Exh. 1, at 182.

Recognizing that the committee was concerned about his multiple staff appointments, Dr. Robinson assured the committee that "I'm not overworked and I fulfill all my obligations." Id. at 194. Noting that he originally had joined the staffs of the seven hospitals listed on his curriculum vitae at Dr. Giacobine's direction, Dr. Robinson testified that he visited South Side Hospital only once a week, that he had performed only one operation at St. John's Hospital, that he had not visited Pittsburgh Hospital for at least a year, and that he never had admitted a patient to West Penn Hospital. In 1976, Dr. Robinson concentrated his practice at St. Francis Hospital, McKeesport Hospital and North Hills Passavant Hospital. At no point during his testimony did Dr. Robinson state that he intended to make Allegheny General the focus of his practice.

Finally, Dr. Robinson discussed the altercation involving Dr. DeCapua. Although conceding that he was not proud about his participation in the altercation, he emphasized that Dr. DeCapua had thrown the first punch and later had apologized to Dr. Robinson for his behavior.

During cross-examination, Mr. Fawcett elicited several significant admissions. First, Dr. Robinson stated that he had written the only paper of his professional career during medical school on a subject that is unrelated to cardiothoracic surgery. Second, Dr. Robinson confirmed that he had initiated legal action against Dr. Giacobine after the termination of their association. Third, when asked whether he had talked to anyone at McKeesport Hospital about Dr. Giacobine's relative, Dr. Robinson responded as follows: "Well, they ask you why you are coming or why you left." AGH Exh. 1, at 225. Fourth, Dr. Robinson testified that he "may have" referred to residents at St. Francis as "camel drivers" during his interview with Dr. Magovern. Id. Fifth, another hospital, Suburban General Hospital in Bellevue, Pennsylvania, recently approved Dr. Robinson's application for staff privileges. Finally, Dr. Robinson stated that the letter of recommendation that Dr. Cooley submitted to Allegheny General disappointed him and hurt his feelings. Id. at 234.

During the course of the hearing, Mrs. Litman offered into evidence five letters of recommendation that were not available at the time that the credentials committee considered Dr. Robinson's application. The majority of these letters were solicited by the applicant directly. Dr. Thomas Madigan, the chairman of the Department of Surgery at St. Francis Hospital, addressed the following letter to the executive committee:

I would like to recommend the appointment of Dr. John N. Robinson in Cardiac and Thoracic Surgery.

I have known Dr. Robinson for the past ten years. He is well trained, has an excellent surgical background, makes a real effort to teach the residents, and he gets along well with his fellow physicians.

Jt. Exh. 36. Dr. Henry Madoff, a thoracic surgeon on the staff of McKeesport Hospital, addressed a letter to Mrs. Litman, stating in part that

Dr. Robinson has shown technical competence and knowledge of his field. He has been diligent in his responsibility to patients, residents and attending staff of the McKeesport Hospital. His ability to get along with members of the staff has been proven by his development of a good referral practice at McKeesport and other area hospitals, since starting on his own.

Jt. Exh. 34. Dr. Frank Bondi, the chairman of the Department of Surgery at McKeesport Hospital, informed Allegheny General that

Dr. Robinson has gradually increased his practice at McKeesport Hospital and on many occasions I have had an opportunity to observe him in the operating room and to watch some of his cases on the wards of the hospital. He has always demonstrated to me excellent judgment and in the operating room excellent ability and technique. He has been a very frequent participant in our educational programs and attends most of our scientific meetings here at the hospital.

Jt. Exh. 33. Dr. Arthur Beall, a professor of surgery at the Baylor College of Medicine, wrote that "Dr. Robinson satisfactorily performed all the duties assigned to him and was considered to be an excellent technical surgeon with mature judgement." Jt. Exh. 38. Finally, Dr. Grady Hallman, a central figure at the Texas Heart Institute, addressed the following letter to the credentials committee:

I knew Dr. John Robinson well and was in frequent contact with him during his years of training in thoracic and cardiovascular surgery here at the Texas Heart Institute of St. Luke's Episcopal and Texas Children's Hospitals. I believe that Dr. Robinson is highly intelligent and well motivated. He is of high moral character and possesses good surgical technique. I admired John's honesty and candor. He did not hesitate to speak his mind and give his opinion even if it differed from that of his seniors on the staff.

I believe that Dr. Robinson has a good future in cardiovascular surgery and would appreciate your favorable consideration of his application.

Jt. Exh. 27.

After the presentation of the evidence, the executive committee discussed the merits of Dr. Robinson's application for approximately one hour and then voted unanimously to endorse the committee's original decision to recommend denial of the application. Dr. Magovern and the members of the credentials committee did not participate in either the discussion or the subsequent vote. The voting members of the executive committee who testified at trial stated that the testimony and the exhibits presented at the hearing did not allay their primary concerns: Dr. Robinson did not represent to the committee that he intended to concentrate his practice at Allegheny General and several unrebutted pieces of information indicated that Dr. Robinson might not function harmoniously with the medical staff, the residents and the support personnel.

At the June 28, 1976 meeting of the executive committee of the Board of Trustees, Dr. Brent, in his capacity as the chairman of the executive committee of the medical staff, reported that the latter committee had afforded Dr. Robinson a formal hearing on his application for staff privileges and that it unanimously recommended that the Board of Trustees deny the application. The chairman of the Board of Trustees appointed a special committee comprised of two trustees, Mr. Kenneth Hewitt and Mr. Harry Epstine, to review the Robinson file for the purpose of determining whether Allegheny General had followed proper procedures in processing the application and whether the executive committee of the medical staff had reached the correct conclusion.

Mr. Hewitt [31] and Mr. Epstine independently read the transcript of Dr. Robinson's

31. Mr. Hewitt had known Dr. Robinson's parents in Washington, D. C. while Mr. Hewitt was serving in the United States Navy. At that time, John Robinson was a young boy. After Dr. Robinson moved to Pittsburgh to join Dr. Giacobine's service, he and his wife had dinner

hearing and the many letters of recommendation that Allegheny General had received concerning Dr. Robinson. The two gentlemen then discussed the file at length, ultimately concluding that Dr. Robinson had received a fair hearing, that the conduct of the hearing fully complied with the requirements of the corporate bylaws, and that they saw no reason to disagree with the recommendation of the executive committee of the medical staff. After the special committee reported its findings on September 27, 1976, the executive committee of the Board of Trustees passed a resolution recommending that the Board of Trustees reject Dr. Robinson's application for staff privileges.

The full Board of Trustees convened on October 25, 1976 for its fourth quarterly meeting. Mr. Grapski gave an oral report on the Robinson application, summarizing what had transpired at each level of review. After a discussion of the matter, the Board of Trustees passed the following resolution:

> RESOLVED, That the action of the Executive Committee of the Medical Staff taken with respect to the application for staff appointment of John N. Robinson, M.D. is approved and that said appointment is hereby rejected.

Jt. Exh. 7.

## VI.

### The Legal Action: Jurisdiction And Relevant Market

#### A. Subject Matter Jurisdiction

Dr. Robinson responded to Allegheny General's decision to deny his application for staff privileges by filing this action for injunctive relief and damages based on federal antitrust and pendent state law claims. As a threshold matter, the defendants argue that this Court lacks jurisdiction over the subject matter of Dr. Robinson's lawsuit. They contend that their alleged unlawful conduct did not substantially affect interstate commerce, and therefore, that Congress' power to regulate interstate commerce through the antitrust laws cannot extend to encompass their alleged conduct. If this Court lacks jurisdiction over the plaintiff's antitrust claims, his pendent state law claims lose their bridge to federal court.

■ We believe that the plaintiff did satisfy the jurisdictional element of the Sherman Act by establishing that the defendants' activities had a substantial effect on interstate commerce. See Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 743–44, 96 S.Ct. 1848, 1851–52, 48 L.Ed.2d 338 (1976); Doctors, Inc. v. Blue Cross of Greater Philadelphia, 490 F.2d 48, 50–51 (3d Cir. 1973). Virtually all of the supplies, drugs and equipment used by Allegheny General and the CTSA surgeons during open heart procedures are purchased from manufacturers outside the Commonwealth of Pennsylvania. The cost of single-use products expended in open heart surgery ranges from $300 to $3500 per procedure.[32] Moreover, Allegheny General and CTSA receive a substantial portion of their revenue from non-Pennsylvania sources. The hospital obtains one-third of its revenue from federally funded Medicare reimbursements. It also receives several million dollars in Medicaid funds, half of which originate from the federal government, and payments from Blue Cross and commercial insurance companies located outside the Commonwealth. CTSA likewise receives payments from these sources. Finally, Allegheny General's Division of Thoracic Surgery attracts a significant number of patients from Ohio, West Virginia and Maryland.

---

twice with Mr. and Mrs. Hewitt. During one of those dinners, Mr. Hewitt suggested to Dr. Robinson that he consider applying for staff privileges at Allegheny General. Based on this background, we assume that Mr. Hewitt was particularly conscientious in his examination of the matter.

**32.** In the United States in 1979, open heart surgery consumed between $120,000,000 and $130,000,000 worth of products that were either implanted in the patients or disposed of after use in the operating room. Single-use products include oxygenators, tubing, filters, priming solutions (for the heart/lung machine), sutures, catheters and artificial valves.

The plaintiff alleges that the defendants combined to exclude him from participation in a specialty within the medical profession that has significant links with interstate commerce. We hold that these links establish a sufficient nexus between the activities of the defendants and interstate commerce to support the application of the federal antitrust laws to the alleged restraint of trade by Allegheny General and by certain surgeons on the hospital's staff. *See McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980) (plaintiffs satisfied jurisdictional element of Sherman Act by demonstrating that defendants' brokerage activity had a substantial effect on interstate commerce; plaintiffs need not make particularized showing of effect on interstate commerce caused by the alleged unlawful activity); *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (plaintiff satisfied jurisdictional element of Sherman Act by alleging that it purchases a large percentage of its medical supplies from out-of-state manufacturers; it attracts a significant number of patients from out-of-state; it obtains a substantial portion of its revenue from out-of-state sources; and it plans to finance the construction of a new facility through the use of out-of-state lenders).

## B. Relevant Market

Before a court can evaluate the merits of a plaintiff's antitrust claims, it first must identify the market that the defendants' alleged unlawful conduct affects. This relevant market usually has two dimensions— product and geographic. Professor Lawrence Sullivan presented the following illustration of the concept of relevant market:

> To define a market in product and geographic terms is to say that if prices were appreciably raised or volume appreciably curtailed for the product within a given area, while demand held constant, supply from other sources could not be expected to enter promptly enough and in large enough amounts to restore the old price or volume. If sufficient supply would promptly enter from other geographic areas, then the "defined market" is not wide enough in geographic terms; if sufficient supply would promptly enter in the form of products made by other producers which had not been included in the product market as defined, then the market would not be wide enough in defined product terms. A "relevant market," then, is the narrowest market which is wide enough so that products from adjacent areas or from other producers in the same area cannot compete on substantial parity with those included in the market.

L. Sullivan, *Handbook of the Law of Antitrust* § 12, at 41 (1977) [hereinafter referred to as *"Sullivan"*]. This traditional description of relevant market applies to the present case with one modification. As we observed earlier, the third-party payor system generally insulates the consumer-patients from price considerations; this sharply contrasts with the commercial world, in which price often is the determinative factor for the buyer. When purchasing medical services, most consumer-patients look for a high quality of care rather than for a low price. The change in the buyers' focus does not impair the applicability of Professor Sullivan's illustration to the medical services industry, however, because quality of care can substitute without difficulty for price as the primary competitive variable. *Cf. SmithKline Corp. v. Eli Lilly & Co.,* 575 F.2d 1056, 1063–64 (3d Cir. 1978) (demand for various antibiotics with overlapping capabilities not sensitive to price; physicians prescribe particular antibiotic on basis of its range of effectiveness and its level of toxicity). Patients and referring physicians respond to the quality of care variable when selecting medical services just as they would respond to the price variable when purchasing table salt.

### 1. The Product Market

A properly defined product market should encompass all products—both items that are presently available and potential entrants—that have a significant, positive cross-elasticity of demand. *See Times—Picayune Publishing Co. v. United States,*

345 U.S. 594, 612 n. 31, 73 S.Ct. 872, 882 n. 31, 97 L.Ed. 1277 (1953); *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir. 1978). In other words, a relevant product market includes all products that consumers perceive as reasonable substitutes for each other. *See United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 394–95, 76 S.Ct. 994, 1006–07, 100 L.Ed. 1264 (1956); *Columbia Metal Culvert Company, Inc. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20, 26–30 (3d Cir. 1978).

The plaintiff contends that the appropriate product market in the present case is "adult open heart surgery," which the parties define as surgery requiring the use of cardiopulmonary by-pass equipment. We agree that the relevant product market is adult open heart surgery because no substitute for the product exists and because high entry barriers prevent most surgeons from becoming suppliers of open heart procedures.

Only a small percentage of patients who suffer from cardiovascular defects or diseases undergo cardiac catheterization, and only 25% to 30% of these are identified as candidates for open heart surgery. Recognizing the operation's risk and expense, physicians usually recommend open heart surgery only as a last resort for patients who do not respond to other treatment. A candidate for open heart surgery has no real choice.

An open heart operation can be supplied only by an experienced cardiothoracic surgeon working in cooperation with a team of support personnel in a hospital's specially equipped operating room. The lead surgeon is a highly trained specialist who has completed medical school, an internship, four years of general surgical training, a two-year residency program in cardiothoracic surgery and additional training while in private practice with experienced surgeons. The support team includes one or two less experienced cardiothoracic surgeons or residents, an anesthesiologist, scrub nurses, circulating nurses and perfusionists. This team uses sophisticated equipment that the hospital provides, such as the heart/lung machine, monitoring devices and a postoperative intensive care unit. Open heart surgeons and their support teams must perform a minimum of three operations per week in order to maintain their proficiency and to minimize mortality rates. Lateral entry by a doctor into the market from most other surgical fields is not possible.

Adult open heart surgery is a distinct market from pediatric open heart surgery (involving persons under seventeen years of age). Pediatric open heart surgery usually is for the correction of congenital heart defects, whereas most adult open heart surgery results from acquired defects. A surgeon who operates on children must develop skills that are somewhat different from those that the surgeon who operates on adults must develop, and pediatric surgery also requires specialized facilities and equipment. The vast majority of pediatric open heart procedures in Pittsburgh are performed at Children's Hospital; no pediatric open heart surgery is performed at Allegheny General.

### 2. The Geographic Market

A court attempting to define the relevant geographic market in an antitrust case must identify the area of effective competition that the defendant encounters when it offers the designated product for sale. *See Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 331–33, 81 S.Ct. 623, 630–31, 5 L.Ed.2d 580 (1961). The area of effective competition is the territory within which the buyer has, or in the absence of unlawful market power would have, the ability to seek alternatives if the supplier was to change one of the competitive variables to the disadvantage of consumers. *See United States v. Philadelphia National Bank*, 374 U.S. 321, 359–61, 83 S.Ct. 1715, 1739–40, 10 L.Ed.2d 915 (1963); *Weeks Dredging & Contracting, Inc. v. American Dredging Co.*, 451 F.Supp. 468, 490–92 (E.D. Pa.1978). As a corollary, the relevant geographic market is the territory within which the defendant can operate without encountering other suppliers who have the ability to compete on substantial parity.

See *United States v. Aluminum Company of America*, 148 F.2d 416, 430–31 (2d Cir. 1945); *Power Replacements Corp. v. Air Preheater Company, Inc.*, 356 F.Supp. 872, 896–97 (E.D.Pa.1973); *United States v. Kimberly-Clark Corp.*, 264 F.Supp. 439, 455–59, 464 (N.D.Cal.1967). A defendant has market power if it can exclude competition from a particular territory, thus permitting it to change the competitive variables of its product without thereby causing other suppliers to enter the market. *See Sullivan* § 19, at 67. Practical commercial realities govern when defining the relevant geographic market. *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 336, 82 S.Ct. 1502, 1529, 8 L.Ed.2d 510 (1962).

Courts, when appropriate, will recognize geographic submarkets for the purpose of evaluating the merits of antitrust claims. *See id.* at 336–39, 82 S.Ct. at 1529–31; *Erie Sand and Gravel Company v. Federal Trade Commission*, 291 F.2d 279, 283 (3d Cir. 1961). A submarket exists if a supplier, who competes at parity with other suppliers over most of a broad geographic area, can maintain a significant competitive advantage against all other suppliers within a small section of that broad geographic area. *See Case-Swayne Co., Inc. v. Sunkist Growers, Inc.*, 369 F.2d 449, 456–58 (9th Cir. 1966), *rev'd on other grounds*, 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967) (applicability of Capper-Volstead Act). Common examples of factors that can result in a local competitive advantage include high transportation costs for bulky items, unilateral advertising directed at a specific community, or the elimination of retailing costs through the establishment of a factory outlet store.

The plaintiff urges this Court to recognize both a broad geographic market and a relevant geographic submarket for adult open heart surgery. According to the plaintiff's economic expert, Peter Max, the broad geographic market should encompass the counties of Allegheny, Armstrong, Beaver, Butler, Cambria, Clarion, Elk, Fayette, Forest, Indiana, Jefferson, Washington and Westmoreland in Pennsylvania, Brooke and Hancock in West Virginia, and Jefferson in Ohio. Mr. Max found both supply and demand side evidence to support this definition of the broad geographic market. On the supply side, the six open heart hospitals in Pittsburgh obtained 89% of their open heart patients from these sixteen counties in 1976. On the demand side, a high percentage of the residents of these sixteen counties who underwent open heart surgery in 1976 had their operations performed at one of the six open heart hospitals in Pittsburgh.

For the purpose of evaluating the plaintiff's antitrust claims, however, Mr. Max urged the Court to focus on a geographic submarket composed of Beaver County and the northwestern section of Allegheny County. The plaintiff alleges that Allegheny General and CTSA possess unlawful market power in this geographic submarket over the delivery of adult open heart surgical services and that the defendants have excluded the plaintiff from performing open heart surgery on patients from this submarket.

In an effort to substantiate the existence of a viable submarket, Mr. Max first noted during his testimony that the Allegheny County Health Department subdivides the county into five districts to "better provide health services and to bring the Health Department closer to the people." Tr. 2503. The Health Department labels its districts "southeast," "northeast," "central," "northwest" and "southwest." Allegheny General is the only open heart hospital located in the northwest district, and 55.5% of the open heart procedures that were performed in 1976 at the six Pittsburgh hospitals on residents of that district were performed at Allegheny General. By contrast, only 9.4% of the residents of the southeast district who underwent open heart surgery in 1976 at one of the Pittsburgh hospitals had their operations performed at Allegheny General.

Like the Health Department, Allegheny General also subdivides Allegheny County for planning purposes. The hospital has identified four sectors: east, south, northwest and local. The local sector encompass-

es the Northside area of Pittsburgh, where Allegheny General is located. Mr. Max found further support for the existence of a submarket when he focused on Allegheny General's open heart patients who reside in each of these four subdivisions of Allegheny County. Two hundred and forty-seven residents of the northwestern and local sectors underwent open heart surgery in 1976 at one of the six Pittsburgh hospitals; surgeons at Allegheny General performed 44.1% of these procedures. Allegheny General obtained only a 10.3% share, however, of the open heart patients from the eastern sector of Allegheny County who underwent surgery at one of the six hospitals in 1976.

Mr. Max expressed the view that Allegheny General's ability to attract a large percentage of the open heart patients who reside in northwestern Allegheny County indicates that Allegheny General has market power in northwestern Allegheny County, and therefore, that northwestern Allegheny County should be a component in the submarket that the Court will use to evaluate Dr. Robinson's claims. Employing the same analysis, Mr. Max recommended that the Court exclude eastern and southern Allegheny County from the relevant submarket because Allegheny General has failed to demonstrate an ability to attract a substantial percentage of the open heart patients who reside in those areas.

In addition to northwestern Allegheny County, Mr. Max would include Beaver County in the relevant submarket. The Office of Management and Budget, a federal agency, identifies standard metropolitan statistical areas for the purpose of collecting and publishing statistical information. The agency establishes these areas by grouping counties that have close economic and social links with a particular urban center. The Pittsburgh standard metropolitan statistical area includes the Pennsylvania counties of Allegheny, Beaver, Washington and Westmoreland. Surgeons at Allegheny General performed 70.7% of the open heart operations done at all of the open heart hospitals in Pittsburgh on residents of Beaver County in 1976. In that same year, Allegheny General had a 34.4%

share among the six Pittsburgh hospitals of the open heart procedures that were performed on residents of Washington County and a 20.8% share of the open heart procedures that were performed on residents of Westmoreland County. Based on Allegheny General's predominance in providing open heart surgical services to the residents of Beaver County, Mr. Max concluded that the Court should include Beaver County in the relevant submarket. Although a sizable percentage of open heart patients from Washington and Westmoreland Counties underwent surgery at Allegheny General, Mr. Max did not believe that the submarket should include those counties.

Mr. Max proposed two slightly different submarkets. The first proposed submarket encompasses Beaver County and the Allegheny County Health Department's northwest district. During 1976, two hundred and forty-seven residents from this area underwent open heart surgery at the six Pittsburgh hospitals. Surgeons at Allegheny General performed one hundred and fifty-one of these operations, which is 61.1% of the total. Allegheny General outdrew its nearest competitor, St. Francis, by four to one. The second proposed submarket contains Beaver County and Allegheny General's northwestern and local sectors. During 1976, three hundred and thirty-nine residents from this area underwent open heart surgery at the six Pittsburgh hospitals. Surgeons at Allegheny General performed one hundred and seventy-four of these operations, which is 51.3% of the total. The nearest competitor attracted less than one-third as many patients as Allegheny General. The plaintiff asserts that Allegheny General held a monopoly position in either submarket in 1976.

CTSA concentrates its practice at Allegheny General, although its surgeons perform a few operations at Presbyterian University Hospital. In 1976, members of CTSA accounted for nearly all of the open heart procedures that were performed at Allegheny General. Dr. Magovern and other CTSA surgeons performed 61.5% of the total number of open heart operations that

were performed at the six Pittsburgh hospitals on residents of Beaver County and the Health Department's northwest district. Likewise, members of CTSA performed 51.9% of the total number of open heart operations that were performed at the six hospitals on residents of Beaver County and Allegheny General's northwestern and local sectors. Therefore, the proposed geographic submarket for Dr. Magovern and CTSA is identical to the proposed geographic submarket for Allegheny General. The plaintiff alleges that CTSA held a monopoly position in that submarket in 1976.

The defendants, through their economic expert, also contend that the Court should recognize a broad geographic market and a relevant submarket for adult open heart surgery, but these markets differ from the plaintiff's proposal. Paul Cook, the defendant's economic expert, testified that the broad market should include the entire nation and that the relevant submarket should encompass the sixteen counties in Pennsylvania, West Virginia and Ohio that the plaintiff proposes as the broad geographic market. Mr. Cook rejected the proposition that Beaver County and the northwestern portion of Allegheny County comprise the relevant submarket for this case.

In support of a national definition for the broad geographic market, Mr. Cook expressed the opinion that open heart candidates, faced with an extremely delicate operation and financed by a third-party payor, will travel to any location in the United States in order to obtain the highest quality of care. Therefore, he reasoned, the open heart hospitals in Pittsburgh must meet national standards of care established by such institutions as the Texas Heart Institute, Johns Hopkins Medical Center and the Mayo Clinic if they wish to attract patients from even Allegheny County. Should referring doctors and open heart candidates in Western Pennsylvania perceive a significant decline in the quality of care that the Pittsburgh hospitals offer, Mr. Cook predicted that the primary care physicians would refer their patients to surgeons in other areas of the country.

Although Mr. Cook believes that a national market exists for adult open heart surgery, he also has identified a sixteen-county submarket that is serviced by surgeons who operate at the six open heart hospitals in Pittsburgh. A distinct submarket exists, according to Mr. Cook, because primary care physicians now refer a high percentage of the open heart candidates who reside in these sixteen counties to Pittsburgh surgeons and because the six Pittsburgh hospitals obtain most of their open heart patients from these counties. Many of the referral patterns have become ingrained over time as the doctors developed professional and personal relationships. If the quality of care offered by Pittsburgh surgeons and hospitals deteriorated, the referral patterns would dissolve at different rates depending on the strength of the particular relationship. Mr. Cook believes that the natural reluctance to sever a relationship that has been satisfactory for an extended period would cause the shift from Pittsburgh suppliers to outside suppliers to occur gradually rather than in the form of a sudden stampede. This impediment to the prompt substitution of suppliers creates the submarket, in the opinion of Mr. Cook.

We cannot accept the existence of a national market or a two-county submarket for adult open heart surgery. Rather, we find that the relevant geographic market for the purpose of evaluating Dr. Robinson's antitrust claims is the sixteen-county area that the plaintiff proposes as the broad market and that the defendants propose as the submarket.

Although the existence of a national market for adult open heart surgical services makes sense in terms of traditional economic theory, practical realities indicate that it rests on two erroneous assumptions. First, Mr. Cook erred when he estimated the magnitude of any future deterioration in the quality of care that might occur at Pittsburgh open heart hospitals. He stated that if the quality of care offered by Pittsburgh-based suppliers deteriorated, the open heart candidates would seek surgical services out-

side the region. After examining the structure of the supply side of the market, we cannot accept the proposition that the quality of care could uniformly deteriorate at all six Pittsburgh hospitals. The cardiothoracic surgeons and the hospitals in the Pittsburgh area strive to provide the best care for their patients. Although some surgeons and hospitals may be more successful than others in providing high quality care, we have seen no evidence, and do not believe, that any would purposely cut corners or reduce the quality of care in order to increase profit. Moreover, the pride that the surgeons take in their work motivates them to maintain national standards of care by keeping abreast of the latest technical advancements in the field. Therefore, a decline in the level of care that one surgeon or hospital provides would have no effect on the level of care that another surgeon or hospital provides. Any one of a large number of catalysts, including the advanced age of a surgeon, personal problems or a low frequency of operations, can result in a decline in the quality of care; but at any one time, most surgeons and hospitals in Pittsburgh are able to provide high quality care. We cannot imagine that a large percentage of the open heart candidates and their primary care physicians would ever perceive the quality of care available in Pittsburgh as uniformly substandard, and therefore feel compelled to look outside of the region for a cardiothoracic surgeon.[33]

The second erroneous assumption that underlies Mr. Cook's argument for recognition of a national market is that open heart candidates are completely mobile and are willing to travel anywhere in the United States for their operations. Although patients do want quality care and although the third-party payor system shields the patients from the cost of the medical services, most patients do not want to be separated from their families while enduring the delicate operation and the extended period of recuperation. Therefore, they must either identify a local supplier who can provide high quality care or they must absorb travel and lodging expenses for family members who accompany them to distant hospitals. In light of our conclusion above that open heart candidates and their primary care physicians always should be able to locate suppliers in Western Pennsylvania who can provide high quality care, we believe that few patients would choose to incur the additional expense and inconvenience associated with leaving the region. Therefore, we will not consider a national market when evaluating the merits of Dr. Robinson's antitrust claims.

We also conclude that the facts established during the presentation of this case do not support the existence of a submarket that spans only two counties. The plaintiff's argument in favor of a two-county submarket has two main points. First, several organizations have decided that it is appropriate for their purposes to subdivide and/or to group certain counties in Western Pennsylvania. Second, a high percentage of the residents from the proposed submarket who undergo open heart surgery have their operations performed at one of the six Pittsburgh hospitals, and of the residents who select a Pittsburgh hospital, over half select Allegheny General and CTSA. Therefore, according to the plain-

33. The decision by some current open heart candidates from Western Pennsylvania to have their operations performed at hospitals with national reputations, such as the Texas Heart Institute, does not undermine our conclusion and does not support the existence of a national market. There always are a certain number of persons who feel more comfortable at a hospital that has a national reputation even though they could obtain comparable care closer to home. As Dr. Robinson stated, "cardiac surgery . . . is a high risk surgery. People are very emotional about it . . . . They want reassurance, and so they want to go to an established man with a well-known reputation . . . ." Tr. 841. Also, there always are a certain number of referring physicians who personally know or who have acquired great professional respect for a surgeon at one of the national heart institutes, and therefore, they refer their patients to these out-of-state surgeons and hospitals. We believe that the percentage of open heart candidates who travel to the nationally known hospitals would remain relatively constant over time and would not respond to changes that occur within the Pittsburgh-based market.

tiff, the Court should group Beaver County and northwestern Allegheny County because Allegheny General has obtained a large market share of the open heart procedures performed on patients from that area. We find serious defects in both parts of the plaintiff's argument.

The decisions by the Allegheny County Health Department and Allegheny General to subdivide Allegheny County for the purpose of facilitating the planning and the delivery of general health and medical care have little probative value when evaluating the propriety of subdividing Allegheny County for the purpose of determining Allegheny General's market power over the delivery of adult open heart surgical services. Allegheny General, as its name suggests, supplies a full range of medical services to the community, but the scope of the community that it supplies varies according to the particular type of medical service provided in a given situation. For example, Allegheny General provides emergency treatment primarily to residents from the North Side area of Pittsburgh, but its sports medicine clinic draws patients from all of Southwestern Pennsylvania. The community that Allegheny General supplies expands as the service in question becomes more specialized. Allegheny General's coverage reaches its geographic maximum in the delivery of tertiary care because most community hospitals could not economically and safely [34] provide such care. Thus, each type of medical service has a particular geographic market. *Cf. United States v. Philadelphia National Bank*, 374 U.S. 321, 360–61, 83 S.Ct. 1715, 1739–40, 10 L.Ed.2d 915 (1963) (Court, determining relevant geographic market, recognizes that some banking services are more local in nature than others and that each customer has distinct economic scale that affects customer's ability to conduct its banking over a distance). Subdivisions of a county that relate to the delivery of general health and medical services are not appropriate guidelines for a court to use when determining a relevant

geographic market for the delivery of adult open heart surgical services.

Likewise, the lines drawn by the Office of Management and Budget to designate the Pittsburgh standard metropolitan statistical area have no correlation to the appropriate boundaries of a relevant geographic market for adult open heart surgery. Tertiary care coverage by a regional referral hospital may well extend beyond the zone of an urban center's general economic and social impact. The relevance of the Pittsburgh standard metropolitan statistical area to the present case is further undermined by the plaintiff's decision to include in his proposed submarket only two of the four counties that compose the statistical area. Frankly, we do not understand why the plaintiff mentioned the Pittsburgh standard metropolitan statistical area if he was going to select from the four counties only those that yield the most favorable statistics.

A more logical reason for recognizing a two-county submarket originated in the testimony of Alexander McAliley, the Executive Director of North Hills Passavant Hospital, who described Allegheny General's role in the Northwest Allegheny Hospital Corporation ("NAHC"). Nine hospitals, seven general hospitals and two specialty hospitals, formed NAHC for the purpose of increasing the efficiency of each of the member hospitals by consolidating services where possible. According to Mr. McAliley, NAHC's service area encompasses the northern and northwestern sections of Allegheny County, the southeastern section of Beaver County, and the southern section of Butler County. Within this service area, Allegheny General is the only hospital that offers a broad range of tertiary care. Mr. McAliley testified that the hospitals within NAHC attempt to support each other by referring patients to the member hospital that is best equipped to provide the type of care that the particular patient requires. The plaintiff asks us to draw the inference that Allegheny General and CTSA have mo-

---

**34.** Medical teams that perform complex and delicate procedures, such as open heart surgery, must perform a minimum number of procedures a week in order to maintain their proficiency. A community hospital could not generate the necessary volume of cases.

nopoly power within NAHC's service area because the member hospitals refer open heart patients to Allegheny General. Based upon this inference, he contends that we should recognize a relatively small submarket within Allegheny General's total area of coverage.

We note first that NAHC's service area is not identical with the plaintiff's proposed submarket. The member hospitals serve southern Butler County, which the plaintiff has not included in the proposed submarket, and the proposed submarket contains all of Beaver County even though the member hospitals only provide coverage for the southeastern portion of that county. Furthermore, NAHC has not affirmatively addressed the delivery of open heart surgical services. Mr. McAliley testified that the member hospitals have established a consolidated laundry service and have developed plans for the delivery of services in the areas of alcohol and drug abuse, rehabilitation, pediatrics and obstetrics, but that they have not made a specific study of open heart surgery.

In addition to the two minor discrepancies just discussed, the plaintiff's position is fatally flawed because it rests on an erroneous premise. Mr. McAliley's testimony did not establish that NAHC provides Allegheny General and CTSA with an effective monopoly over open heart procedures for patients who reside in NAHC's service area. The witness stated that the member hospitals want to support each other and that they attempt to persuade the doctors on their respective staffs to refer patients to doctors on the staffs of other member hospitals. He freely admitted on cross-examination, however, that "[y]ou do not tell a doctor where he takes his patient. You can lead him and suggest, but you do not tell him." Tr. 1435. Exercising the independence that they possess, some physicians on the staffs of member hospitals do refer open heart patients to cardiothoracic surgeons who do not have staff privileges at Allegheny General. When asked by defense counsel to explain why physicians at member hospitals would choose to refer patients to hospitals other than Allegheny

General, Mr. McAliley listed the following reasons:

[T]hey may not have a personal contact with the personnel that would be doing the coronary surgery.

They may have personality differences of opinion.

They may have preferences of skills that they have grown familiar with at other facilities.

They send where they feel most comfortable in referring.

Tr. 1437–38.

When defining the relevant geographic market in an antitrust action, we must focus on the area of effective competition. Mr. McAliley's testimony provided two important items of information about the area of effective competition for adult open heart surgery in Southwestern Pennsylvania. First, doctors on the staffs of NAHC member hospitals have the freedom to refer open heart patients to surgeons who perform their operations at hospitals other than Allegheny General. Second, some doctors on the staffs of member hospitals exercise their freedom to refer open heart patients to surgeons outside the NAHC system. We infer from this information that some referring physicians in northwestern Allegheny County, southeastern Beaver County and southern Butler County believe that acceptable alternate sources of supply exist for adult open heart surgical services.

Unquestionably, a substantial percentage of the open heart patients who reside in the proposed submarket have their operations performed at Allegheny General by CTSA surgeons. The defendant hospital, however, also had a 50% or better market share in 1976 in the delivery of adult open heart surgical services by Pittsburgh hospitals to residents of Bedford, Huntingdon, Indiana, Mercer and Somerset Counties, but the plaintiff did not include these counties in his proposed submarket. AGH Exh. 165. No identifiable factor distinguishes the proposed submarket from surrounding areas, and the plaintiff's economic expert admitted that Allegheny General and the CTSA

surgeons do not discriminate against residents of the proposed submarket in quality of service or price. Tr. 2875–76.

The acquisition of a 50% to 60% share in the proposed submarket does not alone prove the existence of market power or the absence of effective competition. *Cf. Weeks Dredging & Contracting, Inc. v. American Dredging Co.*, 451 F.Supp. 468, 490–92 (E.D.Pa.1978) (although particular dredging company may do most of its work in particular harbor, customers in that harbor have choice because twelve dredging companies compete along entire Atlantic coast line). "Although actual sales patterns can . . . illuminate the geographic character of a market, we should be aware that actual patterns can also be virtually meaningless." P. Areeda & D. Turner, II *Antitrust Law* § 522, at 357 (1978). *Cf.* Landes & Posner, *Market Power in Antitrust Cases*, 94 Harv. L.Rev. 937, 947 (1981) (market share is only one of several factors that should be used in determining market power). The plaintiff's economic expert testified that a relevant geographic market should encompass the area over which buyers realistically can look for alternate sources of the product and/or over which sellers realistically can provide the product. Tr. 2777–78. *Accord, United States v. Empire Gas Corp.*, 537 F.2d 296, 304 (8th Cir. 1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977). The validity of the plaintiff's proposed submarket therefore depends on a determination of the area over which open heart candidates realistically could look for alternate suppliers if Allegheny General and CTSA were to change the competitive variables to the disadvantage of the patients.[35]

All six open heart hospitals in Southwestern Pennsylvania are located within the City of Pittsburgh, and only a few miles separate any two of them.[36] Pittsburgh has an unusual geographic configuration. The heart of the downtown area lies between the Allegheny River, which flows southwest toward the city from the north, and the Monongahela River, which flows northwest toward the city from the south. These two rivers meet at the "Point" and form the Ohio River, which flows away from the city in a westerly direction.

Allegheny General is located just to the north of the Allegheny River. The other five hospitals that offer adult open heart surgery lie between the Allegheny and Monongahela Rivers. Several bridges over the Allegheny River connect the Northside area of Pittsburgh with the downtown area.

The geographic proximity of all of the open heart hospitals means that most patients would not attach any significance to the relative locations of the hospitals. We cannot imagine that a referring physician would make a referral to one of the six hospitals on the basis of its location or that a patient would overrule his doctor's advice because he or she wanted to be a mile or two closer to home.

In 1976, a high percentage of the residents of sixteen counties who underwent open heart surgery chose to have their operations performed in Pittsburgh, and almost all of these sixteen counties were represented at each of the six open heart hospitals. If the quality of care offered by Allegheny General and CTSA were to decline, the residents of this sixteen-county area realistically could turn to cardiothoracic surgeons who operate at the other five Pittsburgh hospitals.[37] Therefore, we hold

---

**35.** The area over which the suppliers realistically could provide the product has little meaning in the present case because the operating rooms cannot travel to the open heart patients.

**36.** This clustering of suppliers results from the financial reality that hospitals providing tertiary care must draw patients from an extensive population base in order to achieve optimal use of personnel and equipment. The City of Pittsburgh is the urban hub for the population living in extreme Eastern Ohio, Northern West Vir-

ginia and Southwestern Pennsylvania. By locating in Pittsburgh, the tertiary care facility maximizes its availability to the population base.

**37.** Residents of many of these sixteen counties also could view the Cleveland Clinic as a realistic alternative to Allegheny General. Ninety-one residents of Southwestern Pennsylvania underwent open heart surgery at the Cleveland Clinic in 1976, while one hundred and three residents from this area underwent open heart

that the relevant geographic market includes, at the minimum, the counties of Allegheny, Armstrong, Beaver, Butler, Cambria, Clarion, Elk, Fayette, Forest, Indiana, Jefferson, Washington and Westmoreland in Pennsylvania, Brooke and Hancock in West Virginia, and Jefferson in Ohio.

## VII.

### The Legal Action: Antitrust Claims

#### A. Overview

Equipped with a definition of the relevant product and geographic markets, one now is prepared to explore the merits of Dr. Robinson's antitrust claims. The plaintiff has asserted four separate antitrust claims under section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), and three separate claims under section 2 of the Sherman Act, 15 U.S.C. § 2 (1976).

Section 1 of the Sherman Act proscribes every contract, combination or conspiracy in restraint of trade that affects interstate commerce. The plaintiff alleges that, in violation of section 1, Dr. Magovern and CTSA combined or conspired with representatives of Allegheny General (1) to unreasonably restrain trade that affects interstate commerce, (2) to engage in a group boycott against or a concerted refusal to deal with Dr. Robinson, (3) to deny Dr. Robinson access to a facility that is essential to the practice of his profession and (4) to commit unfair acts with the specific intention of eliminating Dr. Robinson as a competitor in the practice of adult open heart surgery.

Section 2 of the Sherman Act prohibits anyone from monopolizing, attempting to monopolize or conspiring to monopolize any part of interstate commerce. The plaintiff alleges that, in violation of section 2, the defendants jointly and/or severally have monopolized or have attempted to monopolize the delivery of adult open heart surgi-

surgery at West Penn Hospital. AGH Exh. 167a. Thus, the Cleveland Clinic already has a competitive presence in the core of the Pittsburgh hospitals' service area, and we would

cal services in the relevant geographic submarket and that the defendants have conspired to monopolize the relevant product in the relevant geographic submarket.

#### B. Section 2 Claims

##### 1. Monopoly

Our definition of the relevant geographic market has its most graphic impact on the plaintiff's section 2 claim of monopoly. Dr. Robinson contends that Allegheny General and CTSA have monopolized the delivery of adult open heart surgical services in a submarket that consists of Beaver County and northwestern Allegheny County. We have held that no such submarket exists, and that all six Pittsburgh open heart hospitals compete in a sixteen-county area of Western Pennsylvania, Eastern Ohio and Northern West Virginia. Consistent with this holding, we now will determine whether any of the defendants has monopolized the relevant product in the sixteen-county area.

In order to establish that a defendant has committed the offense of monopolization, the plaintiff must prove "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). A defendant possesses monopoly power if it has the ability to change the competitive variables of a product to the disadvantage of consumers without causing effective competitors to enter the relevant market. *See United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391–92, 76 S.Ct. 994, 1004–05, 100 L.Ed. 1264 (1956); *American Tobacco Co. v. United States*, 328 U.S. 781, 811, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946).

expect this presence to increase if the quality of care offered by one or more of the Pittsburgh hospitals was to decline.

"The [section] 2 market definition looks to the existence of competitors as evidence of countervailing power which would preclude monopolization." *Columbia Metal Culvert Company, Inc. v. Kaiser Aluminum & Chemical Corporation,* 579 F.2d 20, 27 n.11 (3d Cir.), *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978). Allegheny General faces competition in the relevant geographic market from five other Pittsburgh open heart hospitals. In 1976, cardiothoracic surgeons performed nineteen hundred and twelve open heart procedures at the six Pittsburgh hospitals; surgeons at Allegheny General performed 29.5% of these procedures. Pl. Exh. 110. Shadyside Hospital, Allegheny General's most successful competitor, garnered a 22.1% share of the open heart procedures that were performed at the Pittsburgh hospitals. *Id.* Allegheny General's market share increased to 32.6% in 1977 and to 36.4% in 1978, but it declined to 34% in 1979. Pl. Exh. 112.

■ In *United States v. Aluminum Company of America,* 148 F.2d 416 (2d Cir. 1945), the Second Circuit, considering the appeal on referral from the United States Supreme Court, stated that a ninety percent market share "is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three percent is not." *Id.* at 424. Based upon Allegheny General's 30% market share and the existence of at least five viable competitors,[38] we hold that Allegheny General does not possess monopoly power over the delivery of adult open heart surgical services in the relevant geographic market. *Accord, Yoder Brothers, Inc. v. California-Florida Plant Corp.,* 537 F.2d 1347, 1368 (5th Cir. 1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540

(1977) (as a matter of law, company with 20% market share cannot be guilty of monopolization). Allegheny General does not have the ability to lower the quality of its product without losing patients to other hospitals. All physicians who testified on the subject stated that they would refer their patients to surgeons on the staffs of other hospitals if they perceived a diminution in the quality of care that Allegheny General provided.

■ Likewise, CTSA does not possess monopoly power over the delivery of adult open heart surgical services in the relevant geographic market. Many other cardiothoracic surgeons and surgical groups in the Pittsburgh area offer the same services that CTSA offers. CTSA cannot lower the quality of care that it provides without losing volume, and it cannot prevent competitors from practicing at the other five hospitals in the relevant geographic market. *Cf. Sokol v. University Hospital, Inc.,* 402 F.Supp. 1029, 1030 (D.Mass.1975) (surgeon at one Boston Hospital does not have monopoly over delivery of cardiac surgery in relevant geographic market because eight hospitals in Boston area are equipped to host open heart procedures).

Although we have rejected the plaintiff's contention that a geographic submarket exists, we acknowledge that the ability of Allegheny General and CTSA to attract a high percentage of the open heart candidates from Beaver County, Indiana County and northwestern Allegheny County who undergo surgery at Pittsburgh hospitals looks suspicious upon initial examination. A more careful review of the facts reveals, however, that this success does not result from anticompetitive behavior, but rather, it results from the natural development of referral patterns.

**38.** The statistics given in the text for Allegheny General's share of the market actually overstate that share for two reasons. First, they do not reflect those open heart candidates from the relevant geographic market who underwent surgery at the Cleveland Clinic or at one of the other national open heart centers. Second, they include all patients who underwent open heart surgery at the six Pittsburgh hospitals rather than being limited to patients from the sixteen-county relevant market. In 1976, the six hospitals obtained 89% of their patients from the sixteen-county area; Allegheny General drew a higher percentage of its open heart patients from areas beyond the sixteen counties than did the other hospitals. Thus, the statistics presented in the text do not precisely reflect Allegheny General's share of the relevant geographic market. Nevertheless, the discrepancy is not important for our purposes because the statistics overstate that market share.

As we discussed earlier, few patients in need of open heart surgical services personally know of a cardiothoracic surgeon. Therefore, most open heart candidates rely on their primary care physician or their cardiologist to recommend a surgeon. If the surgeon achieves satisfactory results on the first referral, the referring physician probably will recommend that surgeon to future patients. If the surgeon continues to achieve satisfactory results, a referral pattern will develop and eventually will become established.

Dr. Robinson recognizes the crucial role that referral patterns play in developing and maintaining a practice in open heart surgery. On cross-examination by counsel for Allegheny General, Dr. Robinson gave the following testimony:

Q [O]pen heart surgery patients . . . are referred to surgeons like yourself by cardiologists who have catheterization privileges or catheterization abilities, as well as by cardiologists and other physicians who do not have the capacity to do cardiac catheterizations. Isn't that true?

A Yes.

Q And in fact many of the open heart surgery patients are referred by physicians who have no staff privileges at hospitals where open heart surgery is performed. Isn't that correct?

A I would say that. Oh, yes, I would have to say that.

Q And many of your patients would be referred by physicians in that category, aren't they?

A Yes.

Q Isn't it true, Dr. Robinson, that these physicians who don't have staff privileges at open heart surgery hospitals tend to make their referrals to the surgeons who they think will do the best job, that are the best qualified to perform that surgery?

A Well, generally it is on a basis of an established referral pattern. That's the advantage of being a senior man, being there. That's why young doctors work for senior doctors.

. . . .

Q But initially isn't it true that these men refer to the doctors they think will do the best job for them?

A Well, that's one of the reasons.

Q And that these referral patterns are built up over time?

A Yes. . . . It is a long term referral pattern. It is very difficult once they are established to break through them and establish yourself on your own.

Q All right, because once a referring physician makes the relationship with the surgeon and becomes satisfied with the quality of his work and with his results, he tends to keep that relationship, doesn't he?

A Yes. I'd say that's correct.

Q And do younger referring physicians tend to refer to younger surgeons?

A Generally that's about really the—I would say so, but it can be a senior man referring to you.

Q Older referring physicians, having established their referral patterns a long time previously, tend to stay with the surgeon with whom they already have established a pattern, provided they are satisfied with the results?

A I'd say that's fair.

Q. Is it true that referring physicians tend to watch the results of their surgeons very closely?

A Oh, yes.

Tr. 1217–19.

Open heart surgery entails substantial risks, so a referring physician, in order to satisfy himself psychologically, must feel comfortable with the surgeon whom he recommends. The referring physician will base his selection of a surgeon primarily on the surgeon's reputation in the medical community, any personal contact that he has had with the surgeon, and the results that the surgeon achieved on any prior patients whom the physician referred. Once a physician has found a surgeon in whom he has confidence, he naturally will continue to recommend that surgeon. The development of such lines of referral from physicians to a particular surgeon does not vio-

late the antitrust laws. *Cf. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 76–80 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970) (two manufacturers, *acting independently and without anticompetitive intent but with knowledge of the other's actions, did not commit per se* violation of section 1 of the Sherman Act by terminating exclusive distributor and granting an exclusive distributorship to another company; manufacturer has legitimate interest in the quality, competence and stability of its distributors); *Lawlor v. National Screen Service Corp.*, 270 F.2d 146, 152 (3d Cir. 1959), *cert. denied*, 362 U.S. 922, 80 S.Ct. 676, 4 L.Ed.2d 742 (1960) (independent decisions by various film producers to grant exclusive licenses to particular company to provide film accessories does not constitute *per se* violation of antitrust laws).

Although lines of referral do not implicate the antitrust laws, they do present young surgeons with a problem. Using his experience with Dr. Giacobine as an example, Dr. Robinson discussed the difficulty that a young surgeon faces when competing for patients with long-established surgeons.

Q And you testified . . . that you developed or were able to develop a sizable number of patients at McKeesport after you established an office out there?

A Yes.

Q All right. Did you have difficulty establishing a referral pattern and a base for patients prior to that time?

. . . .

A . . . .

Of course, I am not going to walk—Dr. Giacobine is long established in McKeesport. That's one of his primary referring areas, and you are not going to just, you know, do a lot of cases in an area where another fellow is well established.

Q Are you now well established in McKeesport?

A Well, as much as anybody else. I mean it is sort of a—

Q I am sorry.

A As I say, it is sort of a wide open staff out there and there is a lot of cardiovascular surgeons there.

Q Don't you generate a substantial volume of patients from McKeesport Hospital?

A Well, not an overwhelming thing. I would say Dr. Giacobine still gets the lion's share of what goes on out there.

Q And he has been there longer than anybody else?

A Yes. He was the first one there of any significance, I think.

Q And he would have been the first one to have established these referral lines?

A Yes.

. . . .

Q And that accounts in large part for the fact that he still gets a lot of patients from that area, does it not?

A That and he does good surgery. Tr. 1222–23.

Q Did the time come when you began to do open heart surgery at West Penn Hospital as well?

A Yes.

Q How did that come about?

A We felt that the structure of West Penn was more meaningful in trying to establish a young group. Now St. Francis was so structured that Dr. Giacobine was there and he was a very good cardiac surgeon. He had a very well established reputation and the people in the catheterization lab were limited in numbers of men. They did all the catheterizations from Dr. Giacobine. It was very difficult to try to establish yourself in that set of circumstances.

West Penn had an open staff. They were on the other hand trying to increase the number of cases they were doing, . . .

. . . .

Q Now when you did the open hearts at West Penn, where did those patient referrals come from?

A Primarily the younger cardiologists there on the staff.

Tr. 206, 208.

Recognizing the obstacle that referral patterns present, many young surgeons associate themselves with an older, established surgeon rather than attempting to build a solo practice. These young surgeons assist the established surgeon during operations, provide coverage for patients when the established surgeon is not available, and perform surgery on the overflow of patients whom the established surgeon attracts. The system is analogous to the practice of law in the multiperson firm.

If a young surgeon eschews an association with an older surgeon and wishes to develop a solo open heart practice, he must concentrate his efforts to obtain patients on young primary care physicians and young cardiologists who have not yet established referral patterns.[39] Moreover, the young surgeon must provide the "three A's": ability, availability and affability. He must be willing to perform less complex surgery to "prove" his ability; he must offer service when others are less willing or unable, such as in emergencies or during the late hours; and he must be personable. After leaving Dr. Giacobine, Dr. Robinson pursued such a strategy by joining the staffs of several additional hospitals in order to make contact with as many referring physicians as possible. He impressed many of these physicians by his willingness to provide coverage at any time and on any day, his willingness to travel to outlying hospitals for consultations, and his technical proficiency when performing non-open heart procedures. This strategy has yielded the plaintiff a tremendous volume of non-open heart cases and an increasing volume of open heart cases. Drs. Robinson and Martin performed forty open heart procedures in 1975,

thirty-two such procedures in 1976, forty-two such procedures in 1977, sixty-seven such procedures in 1978 and sixty-eight such procedures in 1979. AGH Exh. 166. Some of these open heart patients resided in Beaver County and northern Allegheny County, which are the areas that Allegheny General and CTSA allegedly have monopolized. Dr. Robinson had his greatest success in this two-county area in 1978, when he attracted eight open heart patients from Beaver County and ten open heart patients from northern Allegheny County.[40] AGH Exh. 164.

A new competitor entering a market must attempt to overcome loyalty to preexisting suppliers and tap new sources of demand. A new entrant in the field of open heart surgery must follow these same basic principles. The substitution by open heart candidates of quality of care for price as the primary competitive variable makes the young surgeon's path more difficult, however. A new supplier of laundry soap, for example, can attract consumers by undercutting the price that the established suppliers charge. A new supplier of open heart surgical services does not have this option; rather, the young sole practitioner, at a minimum, must convince referring physicians that he has the technical ability to successfully perform one of the most difficult surgical procedures now attempted. Even if he does possess the technical ability, however, many physicians will see no reason to shift their referrals away from a surgeon in whom they have developed confidence.

If a young surgeon wishes to perform a large quantity of open heart procedures immediately, he must join an established surgical group that has cultivated lines of referral over an extended period of time. Dr.

---

**39.** After a young surgeon achieves some recognition in the local medical community, he also may receive referrals from older physicians who have become dissatisfied with the surgeon whom they had been recommending.

**40.** The figures for northern Allegheny County are based on an area designated by the Health Systems Agency rather than by the Allegheny County Health Department or by Allegheny General. Therefore, they may not precisely reflect Dr. Robinson's success in the area that he has proposed as the relevant geographic submarket. Nevertheless, the figures show that Dr. Robinson has not been precluded from competing against CTSA even in Allegheny General's "backyard."

Robinson initially followed such a course by associating himself with Dr. Giacobine at St. Francis. The Giacobine group has successfully competed with CTSA throughout the relevant geographic market, and Dr. Giacobine has attracted more open heart patients than he personally can handle. In late 1974, however, Dr. Robinson decided to strike out on his own. Not surprisingly, the plaintiff's volume of open heart operations declined sharply because few referring physicians in the geographic market knew of John Robinson. Over the past few years, Dr. Robinson has worked to develop a reputation as a skilled surgeon by performing primarily non-open heart procedures.

Congress did not pass the antitrust laws in order to insure that every young surgeon can perform the type and number of procedures that he considers to be most satisfying. Rather, Congress sought to insure that consumers have a choice. Although CTSA has a large number of lines of referral in Beaver County, northwestern Allegheny County and Indiana County, those referring physicians can recommend surgeons who practice at the other five open heart hospitals if they become dissatisfied with the quality of care provided by CTSA at Allegheny General.[41] No surgical group or hospital has monopolized the delivery of adult open heart surgical services in the relevant geographic market.

### 2. Attempt to Monopolize

The plaintiff alleges that Allegheny General and CTSA have attempted to monopolize the delivery of adult open heart surgical services in violation of section 2 of the Sherman Act. The essential elements of an attempt to monopolize are (1) a specific intent to monopolize the relevant product and geographic markets and (2) such existing market power that there is a dangerous probability of success. See Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905). See generally Handler & Steuer, Attempts to Monopolize and No-Fault Monopolization, 129 U.Pa.L.Rev. 125 (1980).

Examining the second essential element first, we find that there is not a dangerous probability that Allegheny General and CTSA have sufficient market power to monopolize the delivery of adult open heart surgical services. The definition of the relevant market is critical when evaluating a claim of attempted monopolization. See Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 117 (3d Cir. 1980). Within the sixteen-county geographic market that we have identified, Allegheny General and CTSA face competition from surgeons on the staffs of five other Pittsburgh hospitals. As a matter of law, no section 2 violation exists if the relevant market contains six competing firms and no one firm has more than a 30% share of the market. See Harold Friedman, Inc. v. Kroger Company, 581 F.2d 1068, 1079-80 (3d Cir. 1978) (six supermarket chains in Butler County).

Although we will address the issue of specific intent in more detail later, we find now, in the context of the attempt to monopolize claim, that none of the defendants had the specific intent to monopolize the relevant product and geographic markets. If Allegheny General had wanted to eliminate competition from the other hospitals, it should have been trying to recruit all the open heart surgeons in the relevant geographic market. Instead, it chose to compete by attempting to be selective in its staff in order to render the highest quality of health care service. The rejection of Dr. Robinson's application by the hospital's

41. The evidence in this case has focused on CTSA's large market share in Beaver County and northwestern Allegheny County. Competing surgical groups undoubtedly have similar dominant positions, however, in other sections of the relevant geographic market. For example, we quoted earlier from Dr. Robinson's testimony about the strong position that Dr. Giacobine has developed in the McKeesport area.

Nevertheless, the existence of such referral patterns must not be permitted to obscure the crucial fact that referring physicians throughout the relevant geographic market are free to recommend any of the surgeons who operate at the six Pittsburgh open heart hospitals, and, as will be discussed, Dr. Robinson is on the staffs of three of those hospitals.

Board of Trustees did not result in the exclusion of the plaintiff from the relevant market; he can perform surgery at the three open heart hospitals that have admitted him to their staffs. Ironically, approval of the plaintiff's application by the Board of Trustees would have increased Allegheny General's share of the market if Dr. Robinson subsequently had concentrated his practice at that hospital.

Likewise, if CTSA had wanted to eliminate competition, it would have recruited a large number of surgeons. Instead, CTSA has grown slowly and has been very selective. Moreover, CTSA has actively supported Allegheny General's residency program in thoracic surgery, which produces well-trained surgeons who ultimately may practice in Southwestern Pennsylvania in competition with CTSA. Someone who has an intent to monopolize would not assist in the education of future competitors.

### 3. Conspiracy to Monopolize

Dr. Robinson contends that Dr. Magovern, acting on behalf of himself and CTSA, and Mr. Grapski, Mr. Sanders and Dr. Feist, acting on behalf of Allegheny General, conspired to monopolize the delivery of adult open heart surgical services in the relevant geographic market in violation of section 2 of the Sherman Act. The plaintiff has the burden of producing sufficient evidence to establish that the alleged conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980). The essential elements of a conspiracy to monopolize are (1) an agreement or understanding between two or more economic entities, (2) a specific intent to monopolize, and (3) the commission of an overt act in furtherance of the alleged conspiracy. *See, e. g., Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 709–10, 82 S.Ct. 1404, 1415–16, 8 L.Ed.2d 777 (1962); *Cullum Electric & Mechanical, Inc. v. Mechanical Contractors Association*, 436 F.Supp. 418, 425 (D.S.C.1976), *aff'd*, 569 F.2d 821 (4th Cir.), *cert. denied*,

439 U.S. 910, 99 S.Ct. 277, 58 L.Ed.2d 255 (1978). *Accord*, 3 J. von Kalinowski, *Antitrust Laws and Trade Regulation* § 9.02 (1981). A plaintiff can obtain a judgment on a conspiracy claim without establishing the existence of market power or a dangerous probability of monopolization. *See, e. g., Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir. 1980); *Giant Paper and Film Corp. v. Albermarle Paper Co.*, 430 F.Supp. 981, 987 (S.D.N.Y.1977). *But see V. & L. Cicione, Inc. v. C. Schmidt & Sons, Inc.*, 403 F.Supp. 643, 651–52 & n.11 (E.D.Pa.1975), *aff'd mem.*, 565 F.2d 154 (3d Cir. 1977). Nevertheless, evidence indicating the presence or absence of market power may be probative on the issue of specific intent to monopolize. *See Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co., Inc.*, 510 F.2d 1140, 1144 (2d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2416, 44 L.Ed.2d 679 (1975); *Carlo C. Gelardi Corp. v. Miller Brewing Company*, 421 F.Supp. 237, 245 (D.N.J.1976). Similarly, the trier of fact may infer specific intent to monopolize from predatory conduct. *See Chisholm Brothers Farm Equipment Co. v. International Harvester Co.*, 498 F.2d 1137, 1145 (9th Cir.), *cert. denied*, 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974).

#### a. Agreement

The four individuals whom the plaintiff alleges conspired to defeat his application for staff privileges undeniably had ample opportunity to enter into such an agreement. They worked in the same building, and their duties frequently required them to speak to one another about hospital business. Dr. Feist knew Dr. Magovern quite well, occasionally socializing with him and often consulting with him on professional matters. All four admitted that they each had had conversations with one or more of the others about the Robinson application. Nevertheless,

> [p]roof of opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place. Inferred factual conclusions based on circumstantial evidence are permitted only, and to the extent that, human experience

indicates a probability that certain consequences can and do follow from basic facts. Human experience does not support the inference of actual conspiracy from proof of the basic fact of opportunity to conspire.

*Tose v. First Pennsylvania Bank*, 648 F.2d 879, 894 (3d Cir. 1981).

A plaintiff may use either direct or circumstantial evidence to establish that alleged conspirators actually took advantage of their opportunity to conspire. *See Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980); *Mt. Lebanon Motors, Inc. v. Chrysler Corp.*, 283 F.Supp. 453, 462 (W.D.Pa.1968). In the present case, the plaintiff has referred us to a plethora of points in both the trial transcript and depositions where the alleged conspirators recount the various conversations they had with one another about the Robinson application. A brief summary of this testimony follows.

After Allegheny General received Mrs. Litman's initial letter, both Mr. Grapski and Mr. Sanders asked Dr. Magovern, who also had received a copy of the letter, whether he had interviewed Dr. Robinson. Dr. Magovern told both of them that he had talked with Dr. Robinson about staff privileges at Allegheny General, but that he had not known at the time of the interview whether Dr. Robinson intended to submit an application. As Allegheny General processed Dr. Robinson's application through the various levels of review, Mr. Grapski kept Dr. Magovern informed of any significant developments. On one occasion, Mr. Grapski reviewed the Robinson file with Dr. Magovern and asked him for ideas on how Allegheny General could obtain prompt replies to several outstanding requests for information. At various times, Dr. Magovern reiterated to Mr. Grapski, Mr. Sanders and Dr. Feist his objections to the Robinson applica-

tion. On January 15, 1976, Dr. Feist asked Dr. Magovern to submit a revised department director's report to the credentials committee in which he would more fully explain his belief that Dr. Robinson would not make a contribution to Allegheny General's programs. In that same conversation, Dr. Feist asked Dr. Magovern to suggest the names of persons whom Allegheny General should contact for information about Dr. Robinson. Dr. Magovern suggested that Dr. Feist write to Dr. Giacobine. In early February, 1976, Dr. Magovern told Dr. Feist that Dr. Robinson had exchanged blows with another doctor at St. Francis Hospital. Dr. Feist then asked Mr. Grapski whether there was any way that he could learn more about the altercation. Mr. Grapski later telephoned Sister Adele Meiser in an unsuccessful attempt to verify that Dr. Robinson had been involved in a fight.

Although Mr. Grapski, Mr. Sanders, Dr. Feist and Dr. Magovern exchanged a substantial amount of information about Dr. Robinson and the processing of his application, no witness, either in a deposition or at trial, indicated that he had agreed with another individual to work together to defeat Dr. Robinson's application.[42] Even if we were to disbelieve the witnesses' testimony,[43] "mere disbelief [can]not rise to the level of positive proof of agreement to sustain [plaintiff's] burden of proving conspiracy." *Venzie Corp. v. United States Mineral Products Company, Inc.*, 521 F.2d 1309, 1313 (3d Cir. 1975).

The plaintiff asserts that other evidence does provide positive proof from which we can infer the existence of an agreement. Although the plaintiff relies on many pieces of evidence to support this assertion, we believe that only a few points merit discussion.

**42.** The fact that Dr. Magovern reiterated his objections to the Robinson application in conversations with Dr. Feist and Mr. Grapski, and that the latter two gentlemen ultimately voted against the application, does not establish a conspiracy if they made their decisions independently and in good faith. *See Edward J.*

*Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 110–11 (3d Cir. 1980).

**43.** Mr. Sanders did not testify at trial. We found most of the testimony given by Mr. Grapski, Dr. Feist and Dr. Magovern to be credible.

The plaintiff makes much of the fact that Mr. Grapski and Mr. Sanders sent Dr. Magovern copies of almost all correspondence that Allegheny General received or sent regarding Dr. Robinson, and that someone placed white out substance over the "cc" notations on some of the letters in Allegheny General's official file. We do not find it surprising or sinister that the hospital administration kept Dr. Magovern abreast of developments in the Robinson application. Dr. Robinson was applying for staff privileges in the department that Dr. Magovern supervises; Dr. Magovern had expressed great concern about Dr. Robinson's application; and Dr. Magovern personally knew many of the individuals whom Allegheny General contacted for information about Dr. Robinson. Mr. Grapski and Mr. Sanders undoubtedly sent copies of the letters to Dr. Magovern both as a courtesy and as a means to insure that the hospital would receive an informed opinion from the department director.

As additional support for his theory of conspiracy, the plaintiff alleges that Mr. Grapski sent a copy of Dr. Robinson's application to Dr. Magovern immediately after the hospital received the application. Apparently Mr. Grapski normally sends the department director a copy of an application approximately a week after the hospital receives it. We note initially that there is no evidence that Mr. Grapski gave Dr. Magovern a copy of the application immediately after Dr. Robinson submitted it; the evidence established only that Dr. Magovern saw Dr. Robinson's application within three days after the hospital received it. Even if Mr. Grapski did send Dr. Magovern a copy of the application more quickly than usual, however, we believe that such action was natural under the circumstances. Dr. Robinson's application had been preceded by a letter from counsel that threatened the hospital with legal action. Mrs. Litman had sent a copy of this letter to Dr. Magovern, thereby implying that he too might be the target of legal action. We would expect Dr. Magovern to be anxious to see the application and Mr. Grapski to be anxious to obtain a prompt evaluation of the application from the department director.

The plaintiff presents as further evidence of a conspiracy the fact that Mr. Grapski did not inform the executive committee of the medical staff that he recognized that Dr. Magovern might have anticompetitive reasons for opposing Dr. Robinson's application. We do not believe that Mr. Grapski's failure to speculate publicly on Dr. Magovern's motives indicates that Mr. Grapski previously had agreed with Dr. Magovern to oppose the Robinson application. Moreover, the members of the executive committee did not need Mr. Grapski to speculate for them because they already were very familiar with Dr. Magovern and the position of CTSA at Allegheny General.

Plaintiff's counsel established through questioning at depositions and at trial that Mr. Grapski conferred with the chairman of the Board of Trustees several times a month in 1976 and that he met with Mr. Hewitt and Mr. Epstine before the special committee reported its findings on the Robinson application to the Board of Trustees. The plaintiff wants us to infer from these meetings that Mr. Grapski, acting as an agent of the conspiracy, persuaded the chairman of the Board of Trustees to take no action that would impair CTSA's position at Allegheny General and that he influenced the conclusions of the special committee. The testimony does not support such inferences, however. The chairman of the Board of Trustees simply acknowledged that Mr. Grapski had briefed him on the status of the Robinson application; he could not recall any specifics about the briefings. Mr. Hewitt's testimony explicitly contradicts the plaintiff's assertion that Mr. Grapski attempted to influence the special committee. On cross-examination by plaintiff's counsel, Mr. Hewitt testified as follows:

Q Now, when you were meeting with Mr. Grapski, did he tell you that he had participated in the consideration of Dr. Robinson's application at the Executive Committee level?

A No, he didn't say anything about it. We told him what we thought about the report.

Q He didn't give you any information?

A No, no.

Q And he didn't enlighten you in any way as to what his prior role had been in the application procedure?

A No, no, no.

Tr. 4662.

Finally, the plaintiff offers as evidence of a conspiracy Mr. Grapski's recommendation to the Board of Trustees that Allegheny General pay Dr. Magovern's legal fees in the present case. Article IX of Allegheny General's corporate bylaws provide for the indemnification of "any person . . . who . . . is a party or is threatened to be made a party to any threatened, pending or completed . . . suit . . . by reason of the fact that he is or was a representative of the Corporation." Jt. Exh. 45. Many corporations have similar provisions in their bylaws. From the hospital's viewpoint, Dr. Robinson sued Dr. Magovern for actions that Dr. Magovern had taken in his capacity as Director of the Department of Surgery. Therefore, Mr. Grapski's recommendation, which he made after consulting with corporate counsel, was consistent with hospital policy. Moreover, we do not understand how Mr. Grapski's decision to assist the department director, after Dr. Robinson filed suit, makes it any more probable that Mr. Grapski previously had conspired with Dr. Magovern to defeat Dr. Robinson's application.

The plaintiff asserts that Mr. Grapski participated in the alleged conspiracy because he recognized an opportunity for his own financial benefit and aggrandizement. We do not believe that the evidence established any nexus between CTSA's dominance at Allegheny General and Mr. Grapski's financial position. The Board of Trustees bases Mr. Grapski's salary on his overall performance as the hospital's chief administrator. Open heart surgery, which generates substantial revenue but does not directly produce a profit for Allegheny General, is only one of many components in the hospital's repertoire of services. Moreover, any attempt to predict the financial and

political impact on Allegheny General of Dr. Robinson's admission to the staff would have been highly speculative. Therefore, we cannot accept the proposition that Mr. Grapski conspired to defeat Dr. Robinson's application because he feared that a significant loss of personal income would result if Dr. Robinson joined the staff against Dr. Magovern's wishes.

The plaintiff has not suggested any reason that adequately explains why Mr. Sanders, the executive vice president of the hospital, or Dr. Feist, a radiologist, would compromise themselves for the benefit of Dr. Magovern. We do not believe that Mr. Sanders reasonably could have feared that events in the Division of Thoracic Surgery would have any significant impact on his salary or employment status. Likewise, Dr. Feist did not have any financial motive for joining the alleged conspiracy; his field of specialization is not closely connected with thoracic surgery. Although Dr. Feist knew Dr. Magovern quite well, he testified that "[t]he [credentials] committee functioned in this case and in all the others with which we had to deal as an independent group of professional people on behalf of the hospital rather than on behalf of any component staff, group or individual within that hospital." Tr. 4106. We have no reason to disbelieve Dr. Feist.

When investigating the possible existence of a conspiracy, a court must consider the evidence as a whole rather than "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962). Even after viewing all of the evidence in the aggregate, however, we still do not see the outline of a conspiracy in this case. We also do not understand how the alleged conspirators could have hoped to accomplish their objective if any significant opposition had arisen. They had only one representative on the six-member credentials committee and only two representatives among the fourteen voting members of the executive committee of the

medical staff.[44] After considering all of the evidence and the reasonable inferences that can be drawn from the evidence, we hold that the plaintiff has failed to establish that Mr. Grapski, Mr. Sanders, Dr. Feist and Dr. Magovern, or any two of these men, conspired to prevent Dr. Robinson from obtaining staff privileges at Allegheny General.

### b. Specific Intent to Monopolize

 Even if we are incorrect in our conclusion that no conspiracy existed, we still would find against the plaintiff on his conspiracy to monopolize claim because he has failed to establish that the alleged conspirators had the specific intent to monopolize the delivery of adult open heart surgical services. Although the plaintiff views almost every act that the alleged conspirators performed in connection with the Robinson application as reflecting a specific intent to monopolize, we will limit our discussion to those points that we believe arguably indicate the existence of such an anticompetitive intent.

The plaintiff alleges that a department director never has intervened in the consideration of an application for staff privileges at Allegheny General to the extent that Dr. Magovern intervened in the consideration of Dr. Robinson's application. According to the plaintiff, the most objectionable components of this intervention were the derogatory letters that Dr. Magovern sent to Dr. Denton Cooley and Dr. Grady Hallman, the letter that Dr. Magovern submitted to the credentials committee, the conversation that Dr. Magovern had with Dr. Feist in which he stated that Dr. Robinson had been involved in a fight at St. Francis with another doctor, and the conversation that Dr. Magovern had with Dr. Feist in which he stated that Drs. Cooley and Hallman had refused to write letters of recommendation.

Addressing first the plaintiff's general contention, we believe that the root of Dr. Magovern's active opposition to Dr. Robinson's application lay in his initial interview with Dr. Robinson and in the manner in which Dr. Robinson submitted his application to Allegheny General, rather than in any anticompetitive intent. Not only had a doctor never before used an attorney to obtain an application for staff privileges at Allegheny General, but Mrs. Litman's initial letter raised the possibility of legal action. The involvement of an attorney angered Dr. Magovern, who already had formed a negative impression of Dr. Robinson on the basis of the personal interview. Convinced that Dr. Robinson would be a disruptive force in the Division of Thoracic Surgery, Dr. Magovern met the force that Dr. Robinson was exerting with a measure of counterforce.

Although Dr. Magovern's level of involvement in the hospital's consideration of Dr. Robinson's application was unusually high, we find that most of the plaintiff's specific criticisms of Dr. Magovern's conduct lack merit. Earlier in this opinion we disagreed with the plaintiff's characterization of the letters that Dr. Magovern sent to Drs. Cooley and Hallman as "derogatory." *See* section V(C) *supra*. Dr. Magovern did express his concerns about Dr. Robinson in those letters, but he also invited the two doctors to provide him with positive information about Dr. Robinson if they disputed his assessment.

We find no factual basis for the plaintiff's assertion that the letter that Dr. Magovern submitted to the credentials committee reflected an unlawful purpose because no department director has ever, before or since, followed his report with an explanatory letter. Although we have seen only a few complete application files from Allegheny General, some of those files do contain such explanatory letters. *See, e. g.,* Pl. Exhs. 19S & 19W (department director's report and supplemental letter concerning application of Dr. Abdollah Alavi). Moreover, we are not surprised that a member of the credentials committee would ask Dr. Magovern to submit an explanatory letter

---

**44.** Dr. Magovern, one of the two representatives on the executive committee, did not participate in the discussion or the vote on the Robinson application at either meeting of the executive committee, thus further weakening the effectiveness of the alleged conspiracy.

because the comments on the director's reports that we have seen have been brief, unclear and conclusory. We previously rejected the plaintiff's additional argument that the final sentence in Dr. Magovern's letter contained a threat. *See* note 25 *supra.*

In early February, 1976, Dr. Magovern told Dr. Feist that Dr. Robinson had been involved in a fight with another doctor. We cannot find fault with Dr. Magovern's decision to convey this information to the chairman of the credentials committee. The information was both accurate and relevant, and the credentials committee encouraged anyone with information about an applicant to communicate with the committee. *See, e. g.,* Jt. Exh. 1–II (general notice posted on bulletin board in staff lounge inviting anyone with information about Dr. Robinson to submit it to credentials committee).

Dr. Magovern was unable to adequately rebut one aspect of the plaintiff's criticism of his conduct. On January 15, 1976, Dr. Magovern told Dr. Feist that Drs. Cooley and Hallman had "refused" to write letters of recommendation for Dr. Robinson. Jt. Exh. 39. At trial, on cross-examination, Dr. Magovern stated that he had "had no reason to believe" that Dr. Cooley would not submit a letter of recommendation. Tr. 5571. Allegheny General received letters of recommendation from Dr. Cooley on January 26, 1976 and from Dr. Hallman on May 10, 1976. The plaintiff asks us to infer that Dr. Magovern lied to Dr. Feist with the intent of poisoning the credentials committee. We do not believe that the evidence supports such a conclusion, although we admittedly are baffled by Dr. Magovern's use of the word "refused." Dr. Magovern had written letters of inquiry to Drs. Cooley and Hallman on October 3, 1975, and Mr. Grapski had written letters of inquiry to Dr. Cooley on October 6, 1975 and December 19, 1975. When Dr. Magovern and Dr. Feist reviewed the Robinson file on January 15, 1976, Dr. Magovern reasonably could have concluded, from the time that had elapsed since he and Mr. Grapski sent the letters, that Drs. Cooley and Hallman had decided

not to submit letters on behalf of Dr. Robinson. Nevertheless, he lacked a basis for stating that they had refused to submit letters. This inconsistency standing alone does not establish that Dr. Magovern acted with the specific intent to monopolize; Dr. Magovern simply may have misspoken or he may have characterized as a refusal the doctors' apparent decision not to respond to the requests for information. Any misimpression that Dr. Magovern's statement may have caused was corrected when Dr. Cooley submitted a letter of recommendation to Allegheny General in late January.

In addition to alleging that Dr. Magovern had participated excessively in Allegheny General's consideration of the Robinson application for the purpose of advancing his economic well-being, the plaintiff also asks us to infer the existence of specific intent to monopolize from Dr. Magovern's alleged failure to supply members of the credentials committee with certain information about Dr. Robinson. On separate occasions, Dr. Magovern talked with Dr. Edward Longabaugh, Dr. Michael Levis and Dr. Denton Cooley about Dr. Robinson. He did not convey the substance of any of these conversations to the members of the credentials committee. We do not believe that Dr. Magovern withheld any relevant information that would have assisted Dr. Robinson. Dr. Longabaugh and Dr. Levis already had submitted letters of recommendation on behalf of Dr. Robinson; their remarks to Dr. Magovern did not add significantly to what they had stated in those letters. Dr. Cooley, on the other hand, was very critical of Dr. Robinson in his conversation with Dr. Magovern. Therefore, Dr. Robinson cannot reasonably claim that he was prejudiced by Dr. Magovern's failure to convey to the credentials committee the substance of Dr. Cooley's remarks.

The plaintiff complains that Dr. Magovern also failed to inform the members of the credentials committee, other than Dr. Feist, that Dr. Robinson did not actively practice at all seven of the hospitals that he listed on his curriculum vitae. We believe that the plaintiff has no basis for challeng-

ing Dr. Magovern's conduct in this respect. First, Dr. Robinson did hold staff privileges at the seven hospitals that he listed on his curriculum vitae. Second, the evidence did not establish that Dr. Magovern knew the extent of Dr. Robinson's involvement at each of those seven hospitals. Dr. Magovern reasonably could have assumed that Dr. Robinson performed some work and had some staff obligations at every hospital that he considered to be sufficiently significant to include on his curriculum vitae. We note that Dr. Magovern did not list multiple staff appointments on his curriculum vitae. *See* Jt. Exh. 94. Third, in September, 1975, Dr. Robinson held staff privileges at several hospitals that he did not include on the curriculum vitae that he presented to Allegheny General. Dr. Robinson had applied for and received staff privileges at Suburban General Hospital immediately before he submitted his application to Allegheny General. In addition, he had obtained staff privileges at Columbia Hospital, St. Margaret's Hospital, St. Joseph's Hospital and Ohio Valley Hospital while working with Dr. Giacobine. On cross-examination, Dr. Robinson gave the following testimony:

Q Isn't it true, Dr. Robinson, at that time you were actively running around to at least seven other hospitals?

A I would run to any number it took in an effort to try to build my referral practice. That is the only way you can do it. It is what every young surgeon that goes on his own has to do, everyone. Tr. 572.

As further evidence of Dr. Magovern's alleged anticompetitive intent, the plaintiff refers us to Dr. Michael Gerber's experience on the staff at Allegheny General. Dr. Gerber, a cardiothoracic surgeon, trained at Allegheny General as a thoracic surgery resident during 1968 and 1969. Upon entering private practice, Dr. Gerber formed an association with Dr. Henry Madoff. They concentrated their practice at Shadyside Hospital. In 1971, Dr. Gerber obtained staff privileges at Allegheny General. Dr. Madoff did not have staff privileges at Allegheny General and he did not make application to join the staff. Therefore, Dr. Gerber had to rely on residents to assist him in his open heart operations at Allegheny General.

During the years 1971 through 1973, Dr. Gerber received an increasing number of referrals for surgery to be performed at Allegheny General. Two problems developed late in 1973, however. First, Dr. Gerber's case load at Allegheny General began to outstrip his allotment of operating room time and resident coverage. Second, a disagreement occurred between Dr. Gerber and Dr. Magovern over an open heart operation that Dr. Gerber performed on Christmas Eve, 1973. This latter problem had its genesis in Dr. Magovern's announcement to the doctors and support personnel in the Division of Thoracic Surgery that no operations should be scheduled for Christmas Eve or Christmas. Christmas fell on a Tuesday in 1973, which was Dr. Gerber's regular operating day at Allegheny General. On Christmas Eve, Dr. Gerber performed an open heart operation that he has described as emergency surgery. Dr. Magovern subsequently learned about this operation. Upon investigation, he discovered that the coronary arteriograms that Dr. Gerber used when deciding to operate had been taken six months earlier, that Dr. Gerber had not shown the arteriograms to the attending resident before the operation, and that the attending cardiologist had not indicated on the patient's chart that immediate surgery was necessary. Dr. Magovern wrote a harshly worded letter to Dr. Gerber in which he questioned the urgency of the operation and criticized Dr. Gerber's failure to take the time to review the arteriograms with the attending resident. He threatened to withdraw resident coverage from Dr. Gerber unless he received an adequate explanation for Dr. Gerber's conduct. Although Dr. Magovern sent this letter to Dr. Gerber through the United States Mail, Dr. Gerber first learned of the letter when he saw a copy of it posted on the bulletin board in the Allegheny General staff lounge. Dr. Magovern denies posting the letter and no one else has accepted responsibility for its presence on the board.

In a letter to Dr. Magovern and at a meeting with Mr. Sanders and Dr. Magovern, Dr. Gerber gave the following explanation of his conduct. The patient's cardiologist, who was a member of the Allegheny General staff, transferred the patient from a community hospital to Allegheny General on December 22, 1973. Dr. Gerber first saw the patient on December 23rd. The patient looked extremely ill and was in considerable pain. The arteriograms, which in fact were five rather than six months old, showed that the patient was an excellent candidate for open heart surgery. Dr. Gerber determined that the patient was in immediate danger of suffering a myocardial infarction and that the risk involved with further angiography and the accompanying delay outweighed any potential usefulness. Therefore, he decided to operate on the following day. He did not give the arteriograms to the attending resident because the resident never asked to see them.

Although Dr. Gerber's explanation did not entirely satisfy Dr. Magovern, he did not withdraw resident coverage or ask the hospital to take any disciplinary action. On the other hand, Dr. Magovern did not increase Dr. Gerber's allotment of operating time and the cardiologist who had referred the "emergency case" to Dr. Gerber did not refer any more cases to him. With a growing practice at Shadyside Hospital, fewer referrals at Allegheny General, and strained relations with the department director at Allegheny General, Dr. Gerber phased out his practice at Allegheny General during 1974. Between 1975 and May, 1978, he performed all of his open heart operations at Shadyside.

In early 1978, Drs. Gerber and Madoff decided to add another thoracic surgeon, Dr. Kenneth Barron, to their association.[45] Dr. Gerber subsequently discussed with Mr. Sanders and Dr. Magovern the possibility of reactivating his practice at Allegheny General. He recounted at trial the thought process that led him to reestablish a presence at Allegheny General:

I thought that enough time had elapsed since all this unpleasantness at the end of '73 at Allegheny that we had all made our peace with one another, and I still think this is so, and I felt that although I couldn't myself go back and function as an individual practitioner because I was too busy at Shadyside, I felt that with another associate who could be there a good deal of the time, I would be able to function effectively . . . .

Excerpt Tr. 90 (June 9, 1980). Mr. Sanders and Dr. Magovern responded favorably to Dr. Gerber's expression of interest in reactivating his practice, and Dr. Gerber began to receive referrals for operations to be performed at Allegheny General. Dr. Gerber testified that he did not have any difficulty obtaining operating room time and that Dr. Magovern provided resident coverage.

Dr. Barron severed his professional arrangement with Drs. Gerber and Madoff after only two months because of personality conflicts. This reduction in available manpower forced Dr. Gerber to again phase out his practice at Allegheny General because, as he testified, "there would be no way I could continue to function effectively at more than Shadyside Hospital, at least as I was presently constituted." *Id.* at 94–95.

We find that Dr. Gerber's experience does not provide evidence from which we can infer that Dr. Magovern had a specific intent to monopolize. In fact, we believe that his experience provides evidence from which we can infer that Dr. Magovern had no such anticompetitive intent. Dr. Magovern had valid questions about Dr. Gerber's decision to perform the Christmas Eve operation, and Dr. Gerber subsequently admitted to Dr. Magovern that he had occasional breakdowns in communication with the thoracic surgery residents. As department director and division chief, Dr. Magovern has the responsibility of supervising the professional conduct of the surgeons and administering the residency program. In light of Dr. Gerber's otherwise excellent record, however, Dr. Magovern is vulnera-

---

**45.** Drs. Gerber and Madoff had brought Dr. Pablo Hong-Barco into their association in July, 1976. Dr. Hong-Barco, a thoracic surgeon, performed most of his work at Shadyside.

ble to a charge that he overreacted to indications that Dr. Gerber had deviated from established procedure. Dr. Magovern probably would have achieved better results had he asked Dr. Gerber to come to his office for a private discussion rather than writing a harshly-worded, threatening letter to Dr. Gerber. A less provocative initial response from Dr. Magovern might have prevented the serious deterioration in relations that subsequently occurred between the two men. This deterioration in relations, combined with the shortage of operating rooms and the limited number of residents, caused Dr. Magovern to take no action to provide Dr. Gerber with additional operating room time at Allegheny General.[46] Congress did not enact the antitrust laws, however, to punish those who are overly excitable or who display napoleonic behavior. *Cf. Tose v. First Pennsylvania Bank*, 648 F.2d 879, 891–92 (3d Cir. 1981) (ruthless behavior by bank towards customer debtor is not proof of antitrust violation).

For purposes of the present case, the most important aspect of Dr. Gerber's experience occurred after he phased out his practice at Allegheny General in 1974. Together with Dr. Madoff, Dr. Gerber built a thriving cardiothoracic practice at Shadyside Hospital. In 1978, Dr. Gerber had so many cases at Shadyside that he was unable to maintain a presence at Allegheny General after Dr. Barron terminated his professional arrangement with Drs. Gerber and Madoff. If Dr. Magovern had as the objective of his behavior the elimination of Dr. Gerber as a competitor, he failed completely. Dr. Gerber has competed effectively for open heart patients in the relevant geographic market.

With five other hospitals in Pittsburgh equipped to host open heart surgery, an effort by Dr. Magovern and Allegheny General to monopolize the delivery of adult open heart surgical services would be futile. "Although specific intent to monopolize, and not monopoly power, is the essential element when a conspiracy to monopolize is involved, the absence of any likelihood of success is certainly some evidence on the question of whether such specific intent existed." *Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co., Inc.*, 510 F.2d 1140, 1144 (2d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2416, 44 L.Ed.2d 679 (1975) (citation omitted). In 1976, Dr. Robinson had staff privileges at two of the six Pittsburgh open heart hospitals and he since has obtained staff privileges at Mercy Hospital. Therefore, any conspiracy between Dr. Magovern and Allegheny General to exclude Dr. Robinson from the relevant product and geographic markets could not succeed.[47]

The plaintiff contends that we also should infer the existence of a specific intent to monopolize from the behavior of the other members of the alleged conspiracy. We conclude that neither Mr. Grapski's nor Dr. Feist's conduct provides any support for a finding of anticompetitive intent. One aspect of Mr. Sander's conduct, however, is disturbing. We will discuss seriatim the plaintiff's allegations against each of these men.

Mr. Grapski told Mr. Kenneth Hewitt, one of the two members of the special committee of the executive committee of the Board of Trustees, that he had heard that

---

**46.** The incident involving Dr. Gerber apparently was not the only time that Dr. Magovern has been abrasive in his relations with others. When asked by counsel to describe Dr. Magovern's demeanor, Dr. Howard Pfupajena, a former resident in thoracic surgery at Allegheny General, gave the following testimony:

> One, he is very tempermental; two, he is awfully difficult to get along with in the operating room; three, he is very demanding and domineering in the operating room; and, four, he frequently yelled and raised his voice.

Tr. 2094.

In fairness to Dr. Magovern, we must note that when Dr. Pfupajena gave this testimony, he had a lawsuit pending against Allegheny General and Dr. Magovern challenging the denial of his application for staff privileges. Dr. Pfupajena subsequently moved for voluntary dismissal of his lawsuit, and this Court granted the motion.

**47.** We note that Dr. Robinson's reported earned income increased from $153,000 in 1976 to $245,000 in 1978.

Dr. Robinson had exchanged blows with another doctor at St. Francis Hospital. The plaintiff asserts that Mr. Grapski intentionally failed to tell Mr. Hewitt that he had been unable to verify this information. We do not understand how Mr. Grapski's failure to communicate his inability to verify the incident could have prejudiced Mr. Hewitt against Dr. Robinson. Reports of the incident quickly circulated through the local medical community. Moreover, one of the primary tasks of the special committee was to review the transcript of Dr. Robinson's hearing before the executive committee of the medical staff to determine whether Allegheny General had followed proper procedures and had given Dr. Robinson a full opportunity to be heard. Mr. Hewitt read in the hearing transcript Dr. Robinson's admission that he had exchanged blows with Dr. DeCapua.

The plaintiff would have us infer the existence of anticompetitive intent from three aspects of Dr. Feist's conduct. First, Dr. Feist did not obtain, for consideration by the credentials committee, copies of the letters that Dr. Magovern wrote to Dr. Denton Cooley and Dr. Grady Hallman on October 3, 1975. The plaintiff contends that those letters were designed to prejudice Drs. Cooley and Hallman against Dr. Robinson and to elicit from them negative letters of recommendation. According to the plaintiff, the members of the credentials committee would have discounted Dr. Cooley's unenthusiastic letter and the absence of a response from Dr. Hallman if they had seen Dr. Magovern's letters. Thus, by failing to obtain copies of the letters, Dr. Feist allegedly prevented the credentials committee from properly evaluating Dr. Cooley's letter.[48]

An objective examination of the evidence reveals no basis from which to infer anticompetitive intent on the part of Dr. Feist. As we discussed earlier, we do not find Dr. Magovern's letters to be derogatory or to be designed to elicit negative letters of recommendation. Moreover, the plaintiff has offered no reason that would explain why two eminent physicians would change their opinions of an individual whom they had trained in response to a letter of inquiry that contained some negative comments. Dr. Magovern certainly had no leverage over Drs. Cooley and Hallman. Finally, even if we were to assume that the letters were derogatory and that they were designed to elicit negative letters of recommendation, we still would find that Dr. Feist acted reasonably. Although Dr. Magovern told Dr. Feist that he had written to Drs. Cooley and Hallman, he never described in detail the contents of the letters nor showed copies of the letters to Dr. Feist. With no reason to believe that Dr. Magovern's letters contained damaging information, Dr. Feist naturally would have felt uncomfortable asking Dr. Magovern to provide the credentials committee with copies of personal correspondence.

The plaintiff's second challenge to Dr. Feist's conduct involves Dr. Feist's alleged failure to inform the other members of the credentials committee about a conversation that he had with Dr. Joseph Marasco, who was the Chief of the Department of Radiology at St. Francis Hospital. In a telephone conversation on October 15, 1975, Dr. Marasco told Dr. Feist that he was unable to evaluate Dr. Robinson's surgical skill, but that Dr. Robinson was "reasonable," "easy to get along" with, "cooperative," and "competent," that he "seems OK," and that he "has a fair amount of work at St. Francis." Jt. Exh. 39. The plaintiff alleges that Dr. Feist intentionally withheld this information as part of his effort to manipulate the decision of the credentials committee.

The record does not establish definitely that Dr. Feist failed to inform the remainder of the credentials committee about his conversation with Dr. Marasco. Dr. Don

---

**48.** Neither Mr. Grapski nor Dr. Feist had requested that Dr. Hallman supply a letter of recommendation. Therefore, the members of the credentials committee, other than Dr. Feist, would not have drawn a negative inference from the fact that Allegheny General had not received a letter from him. Dr. Hallman did submit a letter on behalf of Dr. Robinson on May 5, 1976, which was two months after the credentials committee made its decision.

Fisher, a member of the credentials committee, testified that Dr. Feist did not refer to a conversation with Dr. Marasco, that he knows Dr. Marasco personally, and that he would have remembered any mention of Dr. Marasco. By contrast, Dr. Feist testified that he probably did mention his conversation with Dr. Marasco during the credentials committee meeting because "[i]t was part of my notes, and I would normally have referred to those notes." Tr. 4257. We need not resolve this discrepancy, however. Assuming that Dr. Fisher's recollection is accurate, Dr. Feist probably did not discuss his conversation with Dr. Marasco because the information that Dr. Marasco provided was not significant. Dr. Marasco, as a radiologist, had only limited exposure to Dr. Robinson. He could not evaluate Dr. Robinson's surgical ability, and his comments were general in nature. During the five months between Dr. Feist's conversation with Dr. Marasco and the credentials committee meeting on the Robinson application, the credentials committee received letters from several doctors who had had much more extensive contacts with Dr. Robinson.

The plaintiff's third challenge to Dr. Feist's conduct has its roots in Dr. Feist's failure to inform the other members of the credentials committee that Dr. James Martin was associated with Dr. Robinson. Dr. Martin had joined Dr. Robinson in practice in July, 1975. One of the reasons that the credentials committee gave for voting to recommend that Allegheny General reject Dr. Robinson's application was that Dr. Robinson performed surgery at several hospitals, thus raising the possibility that he would not have the ability to provide adequate coverage for his open heart patients at Allegheny General. Undoubtedly, the availability of an associate who could assist Dr. Robinson at Allegheny General should have quieted the committee's concern about adequate coverage. Dr. Martin, however, would not have been able to provide such coverage because he did not have staff privileges at Allegheny General, and he did not inquire about obtaining staff privileges until after the credentials committee had

made its decision on the Robinson application. Therefore, at the time when the credentials committee was considering Dr. Robinson's application, Dr. Martin's professional arrangement with Dr. Robinson had little significance.

Finally, the plaintiff asserts that Mr. Sanders displayed anticompetitive intent when he responded to Dr. Martin's request for an application for staff privileges. Mr. Sander's letter to Dr. Martin read in part as follows:

I am writing in reply to your letter of March 25, 1976 requesting an application for membership on our Medical Staff.

I infer from your letterhead that your interests may be in cardio-thoracic surgery. If so, please be advised that there are a number of criteria for appointment to this service which candidates should meet. These include: demonstrated ability to contribute to a resident training program, contributions to the field of cardio-thoracic surgery, faculty appointment at the School of Medicine at the University of Pittsburgh, inasmuch as the postgraduate program is affiliated with the University.

Since our cardio-thoracic service is very active and there are obvious limitations in both facilities and resident complement, these factors are also considered in applications to this service.

Prior to proceeding further with an application, it would be indicated that you discuss your interests and these points with Dr. George Magovern, who heads this service.

Pl.Exh. 20B.

Mr. Sanders admitted at his deposition that a faculty appointment was not a prerequisite to staff privileges at Allegheny General. Although Dr. Magovern and the administrative officers of Allegheny General gave great weight during the mid-1970's to applicants' eligibility for appointment to the University of Pittsburgh faculty, other factors could outweigh the absence of such eligibility. For example, Dr. Sang Park obtained staff privileges largely on the

strength of his extraordinary technical ability.

We believe that Mr. Sanders' letter would leave the reader with the impression that a faculty appointment was a prerequisite. Thus, it could discourage a surgeon who did not have a faculty appointment from submitting an application for staff privileges. Mr. Sanders did not testify at trial, and we did not receive a satisfactory explanation from any other source about the contents of Mr. Sanders' letter.

From among the many pieces of evidence that the plaintiff offers as support for his assertion that Dr. Magovern and the other alleged conspirators possessed a specific intent to monopolize the delivery of adult open heart surgical services, we have determined that only one statement by Dr. Magovern and one portion of a letter by Mr. Sanders arguably provide circumstantial evidence for a finding of anticompetitive intent.[49] Against this meager total of suspicious activities lie the explicit denials by the alleged conspirators of any anticompetitive intent, the substantive reasons given by the alleged conspirators for their opposition to the Robinson application,[50] and the plausibility of alternate, lawful explanations for the alleged conspirators' conduct.

Moreover, we note the striking absence of certain conduct that we would expect to find if a specific intent to monopolize did exist. In order to exclude Dr. Robinson from the Allegheny General medical staff, the alleged conspirators needed the support of the members of the credentials committee and the executive committee of the medical staff. Most of the members of these committees practiced medicine in fields that are unrelated to cardiothoracic surgery. They had no reason to compromise their integrity for the economic benefit of Dr. Magovern or CTSA, and they had

no reason to be prejudiced against Dr. Robinson. If Dr. Magovern or CTSA had a specific intent to monopolize, we would expect to find evidence of lobbying by Dr. Magovern among the members of the two committees. Those members who testified unanimously reported, however, that neither Dr. Magovern nor any representative of CTSA discussed the Robinson application with them.[51] Furthermore, each witness gave substantive reasons for voting to deny staff privileges to Dr. Robinson. The paucity of evidence of predatory conduct, the inability of the alleged conspirators to control the committees, the unanimous votes by both of the committees, and Dr. Robinson's ability to compete with CTSA by performing surgery at two of the other open heart hospitals in Pittsburgh, convince us that neither Dr. Magovern nor the other alleged conspirators had a specific intent to monopolize the delivery of adult open heart surgical services.

## C. Section 1 Claims

### 1. The Standard

Dr. Robinson asserts several claims under section 1 of the Sherman Act, 15 U.S.C. § 1 (1976). Section 1 provides in relevant part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States .... is declared to be illegal." A literal reading of section 1 would vitiate every commercial contract that affects interstate commerce, which is a result that Congress certainly did not intend. *National Society of Professional Engineers v. United States*, 435 U.S. 679, 687–88, 98 S.Ct. 1355, 1363–64, 55 L.Ed.2d 637 (1978). Therefore, the United States Supreme Court has employed a "rule of reason" standard when evaluating the legality of business relationships under section 1. *See*

**49.** These two disturbing pieces of evidence also would be consistent with a finding that Dr. Magovern and Mr. Sanders had the specific intent to exclude Dr. Robinson from the Allegheny General medical staff for noneconomic reasons.

**50.** We will discuss the validity of these substantive reasons later in this opinion. *See* section VII(C)(5)(d) *infra*.

**51.** We are omitting from this statement, of course, the four members of these committees who the plaintiff alleges were the principal conspirators.

*Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 & n.15, 97 S.Ct. 2549, 2557 & n.15, 53 L.Ed.2d 568 (1977). This standard forbids only unreasonable restraints of trade, which are defined generally as those activities where the anticompetitive effects outweigh the procompetitive effects. *See National Society of Professional Engineers v. United States*, 435 U.S. 679, 688–92, 98 S.Ct. 1355, 1363–65, 55 L.Ed.2d 637 (1978); *Sullivan* § 68, at 186–88, 196. Certain business combinations, however,

> because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable .... Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 210 [60 S.Ct. 811, 838, 84 L.Ed. 1129]; division of markets, *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, aff'd, 175 U.S. 211 [20 S.Ct. 96, 44 L.Ed. 136]; group boycotts, *Fashion Originators' Guild v. Federal Trade Comm'n*, 312 U.S. 457 [61 S.Ct. 703, 85 L.Ed. 949]; and tying arrangements, *International Salt Co. v. United States*, 332 U.S. 392 [68 S.Ct. 12, 92 L.Ed. 20].

*Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

Dr. Robinson asserts that the defendants' actions unreasonably restrained trade under rule of reason analysis and also were *per se* unreasonable because they constituted a group boycott, an effort to exclude Dr. Robinson from an essential facility, and a pattern of unfair acts that were performed with the specific intention of eliminating Dr. Robinson as a competitor. We will discuss each of these assertions, starting with the group boycott claim.

### 2. Group Boycott

The Supreme Court has held that a *per se* violation of section 1 occurs when a manufacturer terminates its relationship with a retailer in response to a request by a group of that retailer's competitors. *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). The involvement of the competitors transforms the manufacturer's action from a possibly reasonable vertical restraint into a *per se* unlawful horizontal restraint. *See Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 168 (3d Cir. 1979). Courts have proscribed group boycotts that are initiated by competitors of the target firm because the anticompetitive effect of excluding a firm from the market is unacceptably severe and any benefit that would result from the boycott almost always can be achieved through less restrictive means. *See Fashion Originators' Guild of America, Inc. v. Federal Trade Commission*, 312 U.S. 457, 467–68, 61 S.Ct. 703, 707–08, 85 L.Ed. 949 (1941); *Sullivan* § 85, at 240.

The availability of a *per se* theory removes from the path of a plaintiff two obstacles that would confront him if he was proceeding on a rule of reason theory. A plaintiff who can prove the existence of a group boycott can recover without establishing that the boycott actually caused any harm to the public or materially reduced competition. *See Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 213, 79 S.Ct. 705, 710, 3 L.Ed.2d 741 (1959); *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 165, 166 (3d Cir. 1979). Also, if a plaintiff proves the existence of a group boycott, the court will not permit the defendants to justify their conduct by introducing evidence of their reasons for instituting the restraint. *See United States v. General Motors Corp.*, 384 U.S. 127, 146, 86 S.Ct. 1321, 1331, 16 L.Ed.2d 415 (1966); *Silver v.*

*New York Stock Exchange,* 373 U.S. 341, 365, 83 S.Ct. 1246, 1261, 10 L.Ed.2d 389 (1963). Group boycotts are presumed to be harmful to the public and unduly restrictive.

Alleging that committee members, administrators and trustees took action to exclude him from Allegheny General's medical staff in response to pressure exerted by Dr. Magovern and CTSA, Dr. Robinson argues that the defendants engaged in an unlawful group boycott or a concerted refusal to deal. The defendants present a three-pronged response to the plaintiff's attempt to bring the instant case under the group boycott umbrella. First, the defendants assert that *per se* analysis is not appropriate when operating in an area that the courts have not previously explored. Second, they contend that they are legally incapable of performing concerted action because they all must be identified with the same economic entity. Finally, arguing in the alternative, they deny that they acted in concert. We will examine each of the defendants' contentions in detail.

Courts consistently have stated that *per se* analysis should be employed only after the judiciary has had considerable experience with the type of business relationship in question. *See, e. g., United States v. Topco Associates, Inc.,* 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133–34, 31 L.Ed.2d 515 (1972); *Harold Friedman, Inc. v. Thorofare Markets, Inc.,* 587 F.2d 127, 140–42 (3d Cir. 1978). This caution results from the courts' desire to avoid prohibiting or chilling beneficial business relationships and from the courts' recognition that it is often very difficult to predict the net competitive impact of a given type of business conduct in each of the multitude of factual situations that our complex economy presents. Therefore, courts prefer to approach most cases by examining the particular circumstances and weighing all the factors under a rule of reason analysis.

Although the judiciary has had extensive experience with group boycotts, it has had few occasions to examine group boycotts in the context of the health care industry.

Moreover, the Supreme Court stated in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), that

> [t]he fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently.

*Id.* at 788 n.17, 95 S.Ct. at 2013 n.17. *Accord, National Society of Professional Engineers v. United States,* 435 U.S. 679, 696, 98 S.Ct. 1355, 1367, 55 L.Ed.2d 637 (1978) ("by their nature, professional services may differ significantly from other business services, and, accordingly, the nature of the competition in such services may vary").

Recognizing that government regulation has caused significant economic distortions in the health care industry and noting the qualifications expressed by the Supreme Court in *Goldfarb* and *Professional Engineers,* the Ninth Circuit recently declined to apply *per se* analysis to an agreement between member physicians of two medical care foundations to establish a schedule of maximum fees that the members would claim in full payment for services that they provide to policyholders of approved medical insurance plans. *Arizona v. Maricopa County Medical Society,* 643 F.2d 553 (9th Cir. 1980), *cert. granted,* 450 U.S. 979, 101 S.Ct. 1512, 67 L.Ed.2d 813 (1981). Although the Supreme Court held in *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), and *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951), that the establishment of maximum resale prices by concerted action is a *per se* violation of

section 1 of the Sherman Act, the Ninth Circuit held that the agreement between health care professionals at issue in *Maricopa* must be evaluated under the rule of reason. *Accord, Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia,* 624 F.2d 476, 484–86 (4th Cir. 1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981) (court declined to apply *per se* analysis to group boycott claim, which was based on defendants' refusal to pay for services rendered by clinical psychologists unless such services are billed through a physician, but it found that this requirement violated the rule of reason). The Supreme Court has granted a petition for a writ of certiorari in *Maricopa* in order to consider the question of whether or not an agreement among competing physicians to establish maximum fee schedules for their individual services constitutes a *per se* violation of section 1 of the Sherman Act. 450 U.S. 979, 101 S.Ct. 1512, 67 L.Ed.2d 813 (1981).

The defendants in the present case and the Ninth Circuit in *Maricopa* advance substantial reasons for declining to apply *per se* analysis to alleged restraints on competition in the medical profession. We need not express an opinion on the issue, however, because we can decide the group boycott question in this case on a less controversial ground.

As a second line of defense to Dr. Robinson's group boycott claim, the defendants contend that they are not legally capable of engaging in concerted activity because they all must be identified as components of a single economic entity. The language of section 1 of the Sherman Act prohibits only concerted action. "Unilateral action, no matter what its motivation, cannot violate [section] 1." *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 110 (3d Cir. 1980). Therefore, a court may not find a section 1 violation unless it first identifies two independent economic entities that have engaged in concerted behavior. For example, courts consistently have held that no section 1 violation occurs when a corporation conspires with its officers, agents or employees to restrain trade. *See, e. g.,*

*Harvey v. Fearless Farris Wholesale, Inc.,* 589 F.2d 451, 455 & n.7 (9th Cir. 1979); *Goldinger v. Boron Oil Company,* 375 F.Supp. 400, 406 (W.D.Pa.1974), *aff'd mem.,* 511 F.2d 1393 (3d Cir. 1975).

The defendants advance two theories in support of their position that they all must be identified as members of the same economic entity. First, they argue that Allegheny General, Dr. Magovern and CTSA all are components of a single delivery system for adult open heart surgical services. A surgeon cannot perform an open heart procedure without a hospital's facilities and a hospital cannot offer open heart surgical services without the availability of a surgeon. According to the defendants' view, Dr. Robinson applied to join a single, unified delivery system. Therefore, no conspiracy with horizontal effects existed because the rejection of his application was a unilateral action. A violation of section 1 would have occurred only if two delivery systems based at separate hospitals conspired to prevent Dr. Robinson from joining either delivery system.

We cannot accept the defendants' "unified delivery system" theory. Most hospitals that are equipped to host open heart procedures can provide support services for more than one group of cardiothoracic surgeons, thus creating multiple delivery systems within the same hospital. For example, several cardiothoracic surgical groups practice at Shadyside Hospital. Each of these groups competes with the other groups for patients. If Group A was to conspire with administrators at Hospital X to revoke the staff privileges of the members of Groups B and C, certainly a court would find that Group A and the hospital were engaged in an illegal group boycott. We see no difference between this hypothetical example and the present case. Allegheny General and CTSA are independent corporate entities. If CTSA conspired with agents of Allegheny General to prevent a potential competitor from obtaining staff privileges, a group boycott with horizontal effects occurred.

The defendants' second theory attempts to bring the present case within the scope of the widely accepted proposition that no section 1 violation occurs when a corporation conspires only with its officers, agents or employees. *See, e. g., Sokol v. University Hospital, Inc.,* 402 F.Supp. 1029, 1030 (D.Mass.1975) (no concerted action even if several hospital personnel combined to impose restriction on surgeon's practice). This theory rests on the contention that Dr. Magovern, Dr. Feist, Mr. Grapski and Mr. Sanders all were functioning as agents of Allegheny General when they took actions that were adverse to Dr. Robinson's application. For example, Dr. Magovern was performing the duties of a director of one of the hospital's departments when he submitted his report on the Robinson application to the credentials committee.

Although we accept the defendants' basic contention that they were functioning as agents of Allegheny General when processing the Robinson application, we do not believe that this relationship shields the defendants from liability. Courts have recognized a narrow exception to the general rule that no violation occurs when a corporation conspires only with its officers, agents or employees. This exception provides that a violation can occur if the officer, agent or employee has an independent, personal stake in achieving the object of the conspiracy. *See, e. g., H&B Equipment Company, Inc. v. International Harvester Company,* 577 F.2d 239, 244 (5th Cir. 1978); *Greenville Publishing Company, Inc. v. Daily Reflector, Inc.,* 496 F.2d 391, 399 (4th Cir. 1974). Dr. Magovern wears two hats at Allegheny General. He acts as an agent of the hospital when he performs the duties of the Director of the Department of Surgery. He also conducts a private surgical practice at the hospital. The decisions that a department director makes may have a substantial impact on the private practitioners who are members of the department, and the objectives of the department director and the private practitioners do not necessarily coincide. Therefore, we must acknowledge the possibility that Dr. Magovern had an independent, personal stake in the action taken by Allegheny General on the Robinson application.

Finally, arguing in the alternative, the defendants contend that the plaintiff has failed to establish by a preponderance of the evidence that they engaged in concerted action to exclude him from the Allegheny General medical staff. We already have addressed one aspect of this issue in section VII(B)(3)(a) of this opinion, concluding there that Dr. Robinson failed to carry his burden of establishing that two or more of the defendants had conspired or agreed to take joint action to exclude him from the hospital's medical staff or to monopolize the delivery of adult open heart surgical services. We now hold that the plaintiff failed to prove that two independent entities had engaged in concerted action for the purpose of excluding Dr. Robinson from the medical staff.

Concerted activity within the scope of section 1 of the Sherman Act occurs when one business entity takes action at the request of a second business entity. *See Helix Milling Co. v. Terminal Flour Mills Co.,* 523 F.2d 1317, 1321–22 (9th Cir. 1975), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 782, 46 L.Ed.2d 642 (1976). A court will find the necessary collaboration even where the first entity does not receive any benefit from the concerted activity and acts only in response to coercion. *See Albrecht v. Herald Co.,* 390 U.S. 145, 149–50 & n.6, 88 S.Ct. 869, 871–72 & n.6, 19 L.Ed.2d 998 (1968). *Cf. Sullivan* § 84, at 236 (method by which supplier or customer is induced to cease dealing with firm that boycott perpetrators wish to exclude is irrelevant). Thus, the existence of a causal link is the key to a finding of concerted activity. *See Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir. 1980). If the first entity discontinues its business relationship with a firm for its own, independent reasons, no concerted activity has occurred even though the second entity had requested that the first entity take such action. *See Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164, 170 (3d Cir. 1979).

Having examined all of the evidence, we conclude that Allegheny General did not deny Dr. Robinson's application for staff privileges in response to a request by Dr. Magovern or CTSA. As we discussed earlier, the plaintiff failed to provide any plausible reason to explain why Mr. Grapski, Mr. Sanders, the members of the credentials committee, or the members of the executive committee of the medical staff would compromise their integrity for the benefit of CTSA. See section VII(B)(3)(a), (b) supra. Other than Dr. Feist and Mr. Grapski, all of the committee members who appeared at trial testified that no representative of CTSA contacted them about the Robinson application. Most of these men worked in divisions that are not related to thoracic surgery, and many faced competing groups of physicians within their respective divisions. Without question, Allegheny General values the presence of Dr. Magovern and the other CTSA surgeons on its staff. Nevertheless, we cannot believe that the members of the credentials committee and the executive committee of the medical staff so feared the consequences of angering Dr. Magovern that they voted unanimously to recommend the rejection of an applicant who they felt could make significant contributions to Allegheny General. In fact, we doubt that any of the committee members would have expected CTSA to leave Allegheny General had the hospital granted staff privileges to Dr. Robinson. CTSA has a thriving practice and access to thoracic surgery residents at Allegheny General; it probably would not leave this favorable environment just because the hospital granted staff privileges to a competitor or to an individual whom Dr. Magovern did not like.

One additional aspect of Dr. Robinson's group boycott claim merits discussion. In *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961), the Supreme Court held that the plaintiff had stated a group boycott claim by alleging that the American Gas Association operates a testing laboratory, that utilities will not supply natural gas for a burner that does not have the laboratory's seal of approval, that the laboratory did not use objective standards when it evaluated and rejected the plaintiff's gas burner, and that several of the plaintiff's competitors had influenced the laboratory's choice of standards. The plaintiff urges us to infer the existence of a group boycott from Allegheny General's alleged failure to apply a uniform set of standards to the applications for staff privileges in the Division of Thoracic Surgery. Dr. Robinson contends that the hospital applied different standards to applications from CTSA members than it applied to applications from non-CTSA surgeons.

During the ten years from 1971 to 1980, ten cardiothoracic surgeons applied for staff privileges in Allegheny General's Division of Thoracic Surgery. Three of these ten doctors were recruited by CTSA, and all three received staff privileges. Of the remaining seven surgeons, four obtained staff privileges at Allegheny General and three did not. These statistics alone substantially undermine the persuasiveness of the plaintiff's argument, and a brief examination of the various application files convinces us that Dr. Robinson's position is untenable.

Dr. Michael Gerber applied for staff privileges in early 1971. He had served as a resident in thoracic surgery at both Presbyterian University Hospital and Allegheny General. Dr. Gerber had received board certification in 1969 in both general surgery and thoracic surgery. In 1970, he joined the faculty at the University of Pittsburgh. Dr. Magovern supported Dr. Gerber's application for staff privileges. Allegheny General approved the application, and Dr. Gerber has remained on the staff to this day. Dr. Gerber has never been affiliated with CTSA.

Dr. George Liebler submitted his application for staff privileges in early 1972. At that time, he was completing a two-year residency in thoracic surgery at Allegheny General. Dr. Liebler had obtained board certification in general surgery in 1968, and he was working towards board certification in thoracic surgery. Dr. Magovern supported Dr. Liebler's application for staff

privileges and successfully recruited him for CTSA. Allegheny General approved the application. Dr. Liebler subsequently obtained board certification in thoracic surgery and a faculty appointment at the University of Pittsburgh.

Dr. Sang Park requested staff privileges in the Division of Thoracic Surgery in 1973 as he was completing a three-year residency at Allegheny General. During this residency, Dr. Magovern concluded that Dr. Park was a fine gentleman who had extraordinary technical ability. Although Dr. Park was eligible to apply for board certification in general surgery and thoracic surgery, he was not board certified in either specialty in 1973. Allegheny General granted staff privileges to Dr. Park, and he immediately joined CTSA. Dr. Park has never held a faculty appointment at the University of Pittsburgh. He obtained board certification in general surgery in 1976 and board certification in thoracic surgery in 1978.

In early 1975, Dr. Abdollah Alavi applied for staff privileges at Allegheny General. Dr. Alavi had served a residency in thoracic surgery at Allegheny General in 1968–69. He had board certification in both general surgery and thoracic surgery. At the time that Dr. Alavi applied to Allegheny General, he held the position of Chief of Surgery at Brownsville General Hospital in Fayette County, Pennsylvania. He wanted staff privileges at Allegheny General in order to have a forum in which to perform the occasional open heart case that his practice generated at Brownsville. He had not performed any open heart surgery during the previous five years, however. Dr. Magovern did not support Dr. Alavi's application. He wrote the following explanation of his position to the credentials committee:

As you know Dr. Alavi took his thoracic surgery training at Allegheny General and at that time functioned quite satisfactorily. He has remained in the Pittsburgh area, but to my knowledge has not had the opportunity to perform a substantial amount of cardiac surgery since finishing his residency. I would, therefore, feel that he could not at this time in the stage of our program make a meaningful, positive contribution to the professional enhancement or the post graduate medical education program at Allegheny General.

As an individual Dr. Alavi is a fine gentleman. I'm certain he will maintain high ethical standards of practice, but I could not recommend him for position on our staff. He has completed the minimal standards to practice thoracic surgery, that is, he has completed his Board Certification. Other than that he has not made any substantial contributions to the literature, and has not distinguished himself within the community in the past five years. As I stated, it disturbs me that I cannot recommend him for the position because as an individual he is a very fine and outstanding person.

Pl. Exh. 19W. Allegheny General denied Dr. Alavi's request for staff privileges.

Dr. John Burkholder submitted his application for staff privileges on August 19, 1975, which was one week before Mrs. Litman wrote her initial letter to Allegheny General about Dr. Robinson. Dr. Burkholder had served both his general surgical residency and his thoracic surgical residency at Presbyterian University Hospital. Dr. Magovern had operated with Dr. Burkholder on several occasions at Presbyterian. He successfully recruited Dr. Burkholder for CTSA and supported Dr. Burkholder's application at Allegheny General. The University of Pittsburgh appointed Dr. Burkholder to its faculty on September 1, 1975. The executive committee of the Board of Trustees granted staff privileges at Allegheny General to Dr. Burkholder on November 24, 1975. Shortly thereafter, Dr. Burkholder obtained board certification in general surgery. In 1978, he obtained board certification in thoracic surgery.

Dr. Pablo Hong-Barco, who has a professional relationship with Drs. Gerber and Madoff, submitted an application for staff privileges to Allegheny General in the spring of 1978. At that time, Dr. Gerber intended to reactivate his practice at Allegheny General with the assistance of Dr.

Hong-Barco and Dr. Kenneth Barron. Dr. Hong-Barco had served a two-year residency in thoracic surgery at Allegheny General. He had completed the first part of the process for board certification in general surgery, and he planned to obtain board certification in both general surgery and thoracic surgery in the near future. The letters of recommendation that were submitted on Dr. Hong-Barco's behalf described him as a hard-working, pleasant gentleman who worked smoothly with fellow surgeons, residents and support personnel. Dr. Magovern supported Dr. Hong-Barco's application on condition that he continue to work towards obtaining board certification in both general and thoracic surgery. The Board of Trustees granted staff privileges to Dr. Hong-Barco on November 27, 1978.

Dr. Kenneth Barron submitted his application for staff privileges to Allegheny General in June, 1978. In a letter to Mr. Sanders, Dr. Gerber gave the following explanation of the motivation behind Dr. Barron's application:

> As a measure of the depth of our commitment to doing the best possible job at Allegheny General Hospital, I would like to have Dr. Barron also make application to the staff so that he would be able to join us in providing not only more complete coverage with respect to patient care and staff responsibilities, but would, by virtue of his extensive academic background and training, enable us to participate more fully in various educational functions which are so important at Allegheny—particularly in the area of Thoracic and Cardiovascular Surgery.

Pl. Exh. 22A.

From his undergraduate education at Harvard College through his cardiac surgical residency at the University of Chicago, Dr. Barron trained at some of the finest institutions that this nation and England have to offer. One of his mentors in cardiac surgery at the University of Chicago, Dr. C. E. Anagnostopoulos, wrote to Allegheny General in glowing terms of Dr. Barron's ability as a surgeon and potential as a teacher. Dr. Anagnostopoulos concluded by describing Dr. Barron as, "without a doubt the best chief resident I have worked with at The University of Chicago since I arrived here in 1969." Pl. Exh. 22T. Dr. Barron obtained board certification in general surgery in 1976 and in thoracic surgery in 1978.

While Allegheny General was processing Dr. Barron's application, he terminated his professional association with Drs. Gerber, Madoff and Hong-Barco. Following this separation, Dr. Gerber sent a letter to Allegheny General's credentials committee. Dr. Gerber wrote that although Dr. Barron was "an extremely hard worker," he "proved to be a disruptive and divisive influence" and was "abusive toward operating room personnel and floor nurses." Pl. Exh. 22HH. Dr. Gerber's evaluation of Dr. Barron was consistent with an evaluation that Dr. Ronald Pellegrini gave of Dr. Barron in a letter to the credentials committee. Dr. Pellegrini, the Chief of the Division of Thoracic Surgery at Mercy Hospital, had been professionally associated with Dr. Barron in 1976–77. He wrote that "[o]ur disassociation was the result of his inability to manage interpersonal relationships of any magnitude, and there was a constant conflict which I felt was precipitated by him in reference to nursing personnel, resident staff as well as my interoffice personnel." Pl. Exh. 22II.

Dr. Magovern, citing the cloud that remained over him as a result of Dr. Robinson's pending lawsuit, declined to make a recommendation for the disposition of Dr. Barron's application. Dr. Richard Deitrick, the chairman of the credentials committee, invited Dr. Barron to appear for an interview. On March 1, 1979, Dr. Barron met with five of the six members of the credentials committee. They had a wide ranging discussion. After the interview, the members of the committee felt that Dr. Barron "had been very frank" and had "answered all their questions." Pl. Exh. 22NN. They concluded "that the two letters which contained derogatory information ... were strictly in the nature of personality conflicts between former business associates [and] ... that no other reference letters

from institutions where Dr. Barron works nor other persons with whom he has worked indicated any of these problems." *Id.* The credentials committee voted unanimously to recommend approval of Dr. Barron's application, and the Board of Trustees ultimately did grant staff privileges to Dr. Barron.

In the spring of 1979, Dr. Howard Pfupajena applied for staff privileges. At that time, he was completing a two-year residency in thoracic surgery at Allegheny General. Dr. Magovern recommended that the hospital deny Dr. Pfupajena's application because the departmental evaluations from the thoracic staff described Dr. Pfupajena as a marginal candidate with interpersonal problems. Dr. Pfupajena admitted at trial that at the end of his first year of residency, Dr. Magovern cautioned him that his work was barely satisfactory. Allegheny General did not receive any letters of recommendation that expressed strong support for Dr. Pfupajena's application. Dr. Pfupajena had obtained board certification in general surgery in 1978 and he expected to obtain board certification in thoracic surgery in 1980. He testified at trial that during the second year of his residency at Allegheny General, Dr. Magovern had given him significant responsibilities in the operating room and had recommended him to other hospitals. Allegheny General's Board of Trustees denied Dr. Pfupajena's application for staff privileges.

Also in the spring of 1979, Dr. John McCabe submitted an application for staff privileges. Dr. McCabe, a sole practitioner, bases his practice at Washington Hospital in Washington County, Pennsylvania. Washington Hospital does not have the capability to host open heart procedures. Dr. McCabe had served his residency in thoracic surgery at the University of Michigan Hospital. He practiced cardiothoracic surgery in Southern California before relocating in Western Pennsylvania. While on the West Coast, he received a faculty appointment at the University of California Medical School.

At the time of his application to Allegheny General, Dr. McCabe had board certification in both general surgery and thoracic surgery. All of the letters of recommendation that were submitted on behalf of Dr. McCabe were favorable. The letters that Allegheny General received from Dr. McCabe's former associates in California and in Pittsburgh [52] were particularly enthusiastic in their support, emphasizing Dr. McCabe's personable nature and interest in academics.

Dr. Magovern, who had served as one of the examiners when Dr. McCabe took his examination for certification in thoracic surgery, praised Dr. McCabe's credentials but expressed the concern that Dr. McCabe would not be able to adequately cover his open heart patients at Allegheny General because he was a sole practitioner who worked primarily at a hospital that was forty miles from Allegheny General. Despite Dr. Magovern's reservation about coverage, the credentials committee recommended that Allegheny General grant staff privileges to Dr. McCabe. The Board of Trustees ultimately accepted this recommendation.

Allegheny General denied staff privileges to three of the ten cardiothoracic surgeons who applied during the 1970's. Based on the limited amount of evidence that the parties presented to us on the subject, we cannot say that the hospital acted unreasonably or used a different set of standards when it rejected the applications of Drs. Alavi and Pfupajena.

Dr. Alavi had not performed an open heart procedure for five years before he applied to Allegheny General and, if admitted to the staff, he would have performed only occasional open heart procedures because he intended to continue as Chief of Surgery at Brownsville Hospital in Fayette County. As we discussed earlier, a surgeon must perform an average of three open heart procedures a week in order to maintain his proficiency. A decline in proficien-

---

52. Dr. McCabe had been professionally associated with Dr. Ronald Pellegrini at Mercy Hospital for a two-year period spanning the years

1975 to 1977. This is the same Dr. Pellegrini who had written a letter to Allegheny General in which he criticized Dr. Barron.

cy translates into an increase in mortality, so a responsible hospital cannot take the issue of proficiency lightly. Dr. Magovern and the Board of Trustees agreed that they would be exposing the patients to an unacceptable risk if they permitted Dr. Alavi to perform occasional heart procedures.

Dr. Magovern and many other members of Allegheny General's medical staff had had the opportunity to observe Dr. Pfupajena and his work. The general consensus was that Dr. Pfupajena did not excel in any area and that he did not have the potential of making significant contributions to Allegheny General. The letters of reference that were submitted on behalf of Dr. Pfupajena did nothing to change this view. Given these circumstances, Dr. Magovern acted responsibly when he recommended Dr. Pfupajena for certain types of work at other hospitals but did not recommend him for a position in the Division of Thoracic Surgery at Allegheny General.

After reviewing the evidence that was presented about the seven cardiothoracic surgeons who obtained staff privileges, we conclude that the plaintiff cannot assert any reasonable challenge to the appointment to the staff of Drs. Gerber, Liebler, Park, Burkholder and Hong-Barco. Each of these men possessed outstanding qualifications, presented no serious liabilities, and had the potential to make various types of significant contributions to Allegheny General. The applications of Drs. Barron and McCabe present closer cases, but we cannot say that Allegheny General acted unreasonably when it granted staff privileges to them.

Dr. Barron probably had the most impressive academic credentials among all of the applicants. Moreover, Allegheny General received several enthusiastic letters of recommendation that emphasized Dr. Barron's potential as a teacher. Finally, Dr. Barron had board certification in both general and thoracic surgery, indicating that he possessed acceptable technical skill. The pri-

mary concern about Dr. Barron arose from his prior inability to work with two sets of professional associates. In an effort to learn more about these interpersonal difficulties, the credentials committee interviewed Dr. Barron. The members of the committee were satisfied with Dr. Barron's responses to their questions, and they subsequently voted unanimously to support his application. On the basis of the available information, Allegheny General reasonably could have expected that Dr. Barron would become an important participant in its thoracic surgery residency program and in its research programs.

Dr. McCabe presented Allegheny General with an excellent background in both academic medicine and clinical experience. He had trained at some of this nation's finest institutions, had obtained board certification in both general and thoracic surgery, had held a faculty appointment and had practiced cardiothoracic surgery for six years in California and Pennsylvania. Dr. McCabe's only liability was the distance between Allegheny General and Washington Hospital. Consistent with his long-standing emphasis on the availability of the operating surgeon to respond to emergencies, Dr. Magovern informed the credentials committee that he considered Dr. McCabe's response time to be unacceptable. The credentials committee, and ultimately the Board of Trustees, determined that the overall strength of Dr. McCabe's record outweighed this one negative factor.[53]

Our examination of the ten applications has not uncovered any persuasive evidence establishing that Allegheny General applied one set of standards to applications submitted by CTSA surgeons and a second set of standards to applications submitted by non-CTSA surgeons. The hospital had a reasonable basis for denying staff privileges to Drs. Alavi and Pfupajena and for granting staff privileges to Drs. Gerber, Liebler, Park, Burkholder, Hong-Barco, Barron and McCabe. If any of the seven successful

---

**53.** In the cases of Dr. McCabe and Dr. Barron, we also must recognize the possibility that the pendency of Dr. Robinson's lawsuit made the various committees and the Board of Trustees hesitant to reject relatively strong, but flawed, applications.

applicants could be said to have received the benefit of a lower standard, they would be Drs. Barron and McCabe. Neither of these surgeons, however, was a member of CTSA.

### 3. Essential Facility

The second *per se* theory of liability that Dr. Robinson advances arises from the essential facility doctrine. The United States Court of Appeals for the District of Columbia Circuit gave the following concise description of the essential facility doctrine in *Hecht v. Pro-Football, Inc.*, 570 F.2d 982 (D.C. Cir. 1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978):

> The essential facility doctrine, also called the "bottleneck principle," states that "where facilities cannot practicably be duplicated by would-be competitors, those in possession of them must allow them to be shared on fair terms. It is illegal restraint of trade to foreclose the scarce facility." . . . To be "essential" a facility need not be indispensable; it is sufficient if duplication of the facility would be economically infeasible [because of natural advantage, custom, or restrictions of scale] and if denial of its use inflicts a severe handicap on potential market entrants. Necessarily, this principle must be carefully delimited: the antitrust laws do not require that an essential facility be shared if such sharing would be impractical or would inhibit the defendant's ability to serve its customers adequately.

570 F.2d at 992–93 (quoting A. D. Neale, *The Antitrust Laws of the United States*, 67 (2d ed. 1970)) (footnotes omitted). Dr. Robinson argues that Allegheny General qualifies as an essential facility because it is the only non-university hospital in Allegheny County with a residency program in thoracic surgery and the only hospital in the northwest section of Allegheny County with facilities for open heart surgery.

The existence of a residency program does not make Allegheny General an essential facility. We realize that with a resident's assistance, a surgeon often can operate without an associate surgeon and can minimize the amount of time that he must spend with a particular patient. Such use of a resident, however, without corresponding time spent instructing and working with the resident, is the type of conduct that Allegheny General must avoid if it is to retain accreditation for its thoracic surgery residency program. Thus, teaching commitments will reduce the time that is saved by using the resident in the operating room and during the critical post-operative period. Moreover, the relevant product market in this case is adult open heart surgical services rather than non-university, secondary teaching hospitals.

Although Allegheny General is the only hospital with open heart surgical facilities in northwest Allegheny County, we have held that the relevant geographic market encompasses a sixteen-county area. Five other hospitals within this sixteen-county area (indeed, within a few miles of Allegheny General) have the same type of surgical facilities. Dr. Robinson has staff privileges at three of those hospitals, and thereby can compete effectively in northwest Allegheny County for adult open heart patients. Therefore, the exclusion of Dr. Robinson from the Allegheny General medical staff did not impose a severe handicap on his competitive position.

### 4. Unfair Acts With Intent to Destroy Competition

The plaintiff's final *per se* theory of liability is that the defendants engaged in unfair acts involving the manipulation of the application process with the specific intent of destroying the plaintiff as a competitor in the field of adult open heart surgery. The first court to hold that a conspiracy to commit unfair acts with the specific intent to injure competition constituted a *per se* violation of section 1 of the Sherman Act was the United States Court of Appeals for the First Circuit in *Albert Pick-Barth Co., Inc. v. Mitchell Woodbury Corp.*, 57 F.2d 96 (1st Cir.), *cert. denied*, 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed.2d 1288 (1932). We view this theory as an effort to use the *per se* arm of

section 1 to combat garden variety business torts that, under the particular facts of a given case, otherwise might have escaped proscription by the Sherman Act. Since the First Circuit's decision in *Pick-Barth*, very few courts have relied on this theory. *See Havoco of America, Ltd. v. Shell Oil Company*, 626 F.2d 549, 555 (7th Cir. 1980).

■ We hold on two grounds that the defendants are not liable under the plaintiff's third *per se* theory. First, a line of recent cases has discredited the holding of *Pick-Barth* and has refused to find a *per se* violation of section 1 on the basis of a conspiracy to commit unfair acts with the specific intent of injuring a competitor. *See, e. g., Havoco of America, Ltd. v. Shell Oil Company*, 626 F.2d 549, 555–56 (7th Cir. 1980); *Stifel, Nicolaus & Company, Inc. v. Dain, Kalman & Quail, Inc.*, 578 F.2d 1256, 1260–61 (8th Cir. 1978); *Northwest Power Products, Inc. v. Omark Industries, Inc.*, 576 F.2d 83, 87–90 (5th Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979). Even the First Circuit has questioned the vitality of the holding of *Pick-Barth*. In *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547, 561–62 (1st Cir. 1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975), the First Circuit rejected the broad proposition established in *Pick-Barth* that unfair competitive practices accompanied by an intent to injure a competitor constitute a *per se* violation of section 1; it expressed the view that *Pick-Barth* has application only in cases that involve defendants that possess significant market power. The First Circuit modified its position after

> reflecting on the carefully selected considerations which have gone into the declaring of a few practices as per se violations, the danger of casual extension of the category, the value of prior case experience, the availability of the law of torts to deal with such issues as interference with contractual relations and interference with prospective advantage, not to forget the availability of the Federal Trade Commission Act.

508 F.2d at 561. For the reasons set forth by the First Circuit, we agree with the recent line of cases that declines to apply *per se* analysis to a conspiracy to damage a competitor by unfair means. Even if one of the alleged conspirators has significant market power, we believe that the court should examine the conduct under the rule of reason because garden variety business torts do not always involve conduct that is so pernicious and devoid of redeeming attributes that it can be labelled illegal *per se* without any risk of chilling procompetitive behavior.

■ The second reason for our unwillingness to find the defendants liable on the plaintiff's third *per se* claim is that the plaintiff has failed to prove two essential elements of his claim. Assuming for purposes of discussion that the *Pick-Barth* holding has retained some vitality, a plaintiff still cannot establish liability unless he proves that two or more business entities conspired and that the conspirators acted with the specific intent to injure a competitor. We already have held in section VII(C)(2) of this opinion that Dr. Robinson failed to prove that two independent entities had engaged in concerted activity. Likewise, in section VII(B)(3)(b), we held that Dr. Robinson failed to prove that any of the defendants had acted with anticompetitive intent.

### 5. Rule of Reason

In addition to asserting claims under three *per se* theories of liability, Dr. Robinson also alleges that the purpose or effect of the defendants' activities was to unreasonably restrain trade in violation of section 1 of the Sherman Act. The Supreme Court recently reaffirmed "the general rule that a civil violation can be established by proof of either an unlawful purpose or an anticompetitive effect." *United States v. United States Gypsum Co.*, 438 U.S. 422, 436 n.13, 98 S.Ct. 2864, 2873 n.13, 57 L.Ed.2d 854 (1978). We already have held in section VII(B)(3)(b) of this opinion that the defendants did not act with an anticompetitive purpose. Therefore, we will focus in this

section on the effects that the defendants' activities had on competition in the delivery of adult open heart surgical services.

When performing a rule of reason analysis, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). A given restrictive practice may have both anticompetitive and procompetitive effects. In such a case, the court will find a violation of section 1 only if the anticompetitive effects predominate. *See National Society of Professional Engineers v. United States*, 435 U.S. 679, 688–89, 98 S.Ct. 1355, 1363–64, 55 L.Ed.2d 637 (1978). The plaintiff has the burden of showing the unreasonableness of the restraint. *See Sitkin Smelting & Refining Co., Inc. v. FMC Corp.*, 575 F.2d 440, 448 (3d Cir.), *cert. denied*, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978); *United States v. Empire Gas Corp.*, 537 F.2d 296, 308 (8th Cir. 1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977). When proceeding on a rule of reason claim, as opposed to a *per se* claim, the plaintiff also must prove that the restraint actually harmed the public by reducing competition. *See DeVoto v. Pacific Fidelity Life Insurance Co.*, 618 F.2d 1340, 1344–45 (9th Cir.), *cert. denied*, 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980); *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 166 (3d Cir. 1979); *Stifel, Nicolaus & Company, Inc. v. Dain, Kalman & Quail, Inc.*, 578 F.2d 1256, 1259 (8th Cir. 1978). The definitions of the relevant product and geographic markets are critical to the determination of a restraint's impact on competition. *Cf. Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962) (section 7 of Clayton Act).

We will begin our rule of reason analysis by examining the purported basis for Allegheny General's decision to deny staff privileges to Dr. Robinson. The credentials committee advanced four reasons in support of its recommendation that Allegheny Gen-

eral reject Dr. Robinson's application for staff privileges. First, Dr. Robinson's pattern of practice would prevent him from adequately covering his open heart patients at Allegheny General. Second, Allegheny General was experiencing a shortage of operating room facilities. Third, Dr. Robinson did not have the ability or the interest to contribute to Allegheny General's residency program in thoracic surgery or to its research programs. Finally, the credentials committee had serious doubts about Dr. Robinson's ability to function harmoniously with his fellow staff members, the residents and the support personnel. These reasons, set forth in a letter from Dr. Feist to Dr. Brent, provided the framework for the review of Dr. Robinson's application by the executive committee of the medical staff and the Board of Trustees. Therefore, we will assume that Allegheny General adopted the reasons given by the credentials committee as its official explanation for the decision to deny staff privileges to Dr. Robinson.

The plaintiff has launched a five-pronged assault on Allegheny General's explanation for the rejection of his application. First, Dr. Robinson alleges that Allegheny General failed to inform him of the criteria that it intended to use when evaluating his application for staff privileges, and that this failure prevented him from making an effective presentation of his credentials and qualifications. Second, Dr. Robinson contends that the criteria that Allegheny General used when evaluating his application for staff privileges were not reasonably related to the legitimate objectives of the hospital, and therefore, that they imposed an unreasonable restraint on competition. Third, Dr. Robinson asserts that Allegheny General's competitive strategy imposes an unreasonable restraint on trade. Fourth, Dr. Robinson alleges that Allegheny General drew unsupportable conclusions about his credentials, qualifications and character. Fifth, Dr. Robinson argues that Allegheny General's decision on his application was inconsistent with its decisions on the applications of several other cardiothoracic surgeons. We will discuss seriatim the merits of each of these five challenges.

### a. Notice of Standards

■ We find that Allegheny General did inform Dr. Robinson of the standards that it intended to use when evaluating his application for staff privileges.[54] After receiving Mrs. Litman's initial letter and a letter from Dr. Robinson, Mr. Grapski mailed an application form and a copy of the Medical Staff Bylaws to Dr. Robinson. The Medical Staff Bylaws outline the application process and indicate the criteria that Allegheny General considers when evaluating an application for staff privileges.

Article III, section 1(b) of the bylaws provides that "[o]nly duly licensed physicians and professionals whose total background, experience and training assure, in the judgment of the Board of Trustees, that patients admitted to or treated in Allegheny General Hospital, will be given the best possible care, shall be qualified for membership to the Medical Staff." Jt. Exh. 88. Section 2(c) of article III states that "[a]pplicants for active membership must practice within a reasonable distance of the Hospital, must be able to render continuous care and supervision of their patients and agree to accept and faithfully discharge Staff and other committee assignments and to provide emergency care and consultation for any patient admitted to the Hospital." *Id.* Section 3(b) of article III instructs the credentials committee to "investigate the personal character and professional ethics of the applicant." *Id.* Finally, section 1(B)(2)(c) of article IV provides that

> [a] member of the Assistant Attending Staff shall assist the Department Director and Division Head in Division or Departmental functions. He shall be willing to contribute a large amount of

time, interest and energy to the training of House Staff. He shall be permitted to admit his own patients and to treat them. Factors to be considered in his promotion shall be his clinical performance, contributions to teaching activities, interest in Committees, attendance at meetings and other factors considered of importance to the Head of the Department. Ordinarily Assistant Attending Staff shall be chosen from: (1) outgoing Residents, (2) qualified personnel from outside the Medical Staff of the Hospital.

*Id.* Dr. Robinson would have become a member of the Assistant Attending Staff if the Board of Trustees had granted staff privileges to him.

The sections of the bylaws that we have set forth should have served to forewarn Dr. Robinson of three of the four objections that his application was to encounter. Section 2(c) of article III indicates that the hospital expects the members of its medical staff to devote a substantial amount of their time to Allegheny General and to personally cover their patients at Allegheny General. Knowing that open heart patients are particularly susceptible to suffering acute difficulties during the postoperative period, Dr. Robinson should have anticipated that Allegheny General would express concern about his pattern of performing thoracic surgery at several hospitals in different sections of Allegheny County. Article III, section 3(b), which explicitly states that Allegheny General considers an applicant's personal character, should have placed Dr. Robinson on notice that the hospital would examine his ability to work harmoniously with the other members of

**54.** We examine the allegation that Allegheny General did not provide notice of its criteria only in the context of Dr. Robinson's section 1 claim, and not as a component of his due process claim. The late Judge Daniel Snyder entered summary judgment in favor of the defendants on Count II of Dr. Robinson's complaint, which alleges a denial of due process and equal protection in violation of the Fifth and Fourteenth Amendments of the United States Constitution and section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983 (1976 & Supp. III 1979). Judge Snyder based his ruling on the absence of the necessary state action element. *Robinson v. Magovern*, 456 F.Supp. 1000, 1007–08 (W.D.Pa.1978). The alleged failure of Allegheny General to inform applicants of the criteria that the hospital uses when evaluating applications could have antitrust implications because it could have the effect of favoring applicants with whom Allegheny General already is familiar or who have access to inside information about the application process, such as Allegheny General residents or surgeons whom Dr. Magovern has recruited for CTSA.

the medical staff, the residents and the support personnel. The description contained in article IV, section 1(B)(2)(c), of the functions of the Assistant Attending Staff clearly reflects the emphasis that Allegheny General places on its residency programs. Knowing that the Division of Thoracic Surgery operates a residency program, Dr. Robinson should have expected Allegheny General to examine his application for indications of interest and ability to make contributions to the education of the residents. Of the four reasons that Allegheny General gave for denying staff privileges to Dr. Robinson, only the lack of operating room time did not have a basis in the Medical Staff Bylaws. Of course, the lack of operating room time is a practical consideration that is unrelated to a particular candidate's qualifications; Dr. Magovern did mention this problem to Dr. Robinson during the initial interview.

Even assuming, however, that the bylaws did not adequately alert Dr. Robinson to the criteria that the hospital would consider when evaluating his application, we still would find that Allegheny General gave Dr. Robinson timely notice of its preliminary reservations about his application and an opportunity to address those areas of concern. After the executive committee of the medical staff finished its initial review of the credentials committee's recommendation on the Robinson application, Mr. Grapski notified Dr. Robinson that he had the right to request a hearing before the executive committee of the medical staff pursuant to article III, section 6(a), of the Medical Staff Bylaws. The bylaws provide for such a hearing in order to insure that every applicant has an opportunity to correct any erroneous information that the credentials committee may have relied upon in arriving at its recommendation or to expose any prejudice that members of the credentials committee may have felt towards the applicant. In advance of the hearing on Dr. Robinson's application, Mr. Sanders mailed to Mrs. Litman a copy of Dr. Robinson's completed application form, copies of all letters of reference that the hospital received concerning Dr. Robinson, and a copy

of the report and recommendations of the credentials committee.

The evidence thus established that Allegheny General twice provided Dr. Robinson with information about its standards for admission to the medical staff. Therefore, we conclude that Dr. Robinson does not have a factual basis for claiming that Allegheny General deprived him of the opportunity to make an effective presentation of his credentials, qualifications and character by failing to notify him of the criteria that it intended to use when evaluating his application.

### b. Standards Reasonably Advance Hospital's Legitimate Objectives

■ We find that the criteria that Allegheny General used when evaluating Dr. Robinson's application for staff privileges were reasonably related to the hospital's legitimate institutional objectives. Allegheny General's primary objective is to provide excellent patient care as a regional referral hospital. During the late 1960's, Allegheny General's leadership determined that excellent secondary and tertiary medical care could best be provided by an institution that had a stimulating educational environment and flourishing research programs. Therefore, under the direction of Mr. Grapski, the hospital sought to develop and maintain an integrated approach to the delivery of medical services.

The hospital's policy of encouraging its medical staff to concentrate their practices at Allegheny General does advance the hospital's institutional objectives. A physician who fragments his practice among several hospitals necessarily expends time travelling and multiplies his responsibilities to standing hospital committees. Such a physician would be less likely to have the time and the inclination to contribute to Allegheny General's educational and research programs than would a physician who centers his practice at Allegheny General. Moreover, a physician who practices at several hospitals may have difficulty providing continuous care for his patients at Allegheny General. If a cardiothoracic surgeon was

unavailable to provide necessary care for one of his open heart patients, a resident would have to cover for the absent surgeon.[55] Allegheny General objects to such use of residents on two grounds. First, the hospital must provide the residents with an educational experience, rather than with a service experience, in order to retain accreditation for the residency program. The frequent use of residents to cover patients for unavailable surgeons would impair the residents' educational experience. Second, the quality of patient care may decline because a resident has less experience than does the operating surgeon, and he probably is not as familiar with the particular patient. In the field of open heart surgery, where patients often suffer acute postoperative difficulties, a responsible hospital must attempt to insure that every patient receives the highest level of care.

The hospital's concern about Dr. Robinson's interest and ability to make a contribution to the residency program in thoracic surgery is directly related to the furtherance of the hospital's institutional objectives. Allegheny General cannot create and maintain a stimulating educational environment and productive research programs unless most of the members of its staff have some degree of interest and ability in academic medicine. Moreover, the Liaison Committee on Graduate Medical Education, which is the national accrediting body for hospital residency programs, has stated that an institution operating a residency program must have staff who are "qualified on the basis of educational background and professional accomplishment, oriented to the requirements and responsibilities of the teaching appointment and motivated to assign acceptable priority to teaching duties." AGH Exh. 104, at 24. Therefore, Allegheny General would jeopardize the accreditation of its residency program and cripple its effort to maintain an integrated approach to the delivery of medical services if the hospital filled its thoracic surgery staff with physicians who focus only on the clinical aspects of their profession.

Dr. Robinson's alleged inability to work harmoniously with his fellow surgeons, the residents and the support personnel could have had an impact on the hospital's effort to achieve its primary objective, which is to provide outstanding patient care. An open heart operation is a cooperative project involving the efforts of from eight to twelve people. The difficulty of the procedure and the time constraints imposed by the limitations of the cardiopulmonary by-pass machine make it necessary that each member of the operating team continuously concentrates on his or her duties. Dissension or conflict among the operating room personnel undoubtedly would distract the participants from the task at hand, thus increasing the risk to the patient.[56] Therefore, the hospital is acting indirectly to further the quality of medical care when it considers personality as one of its criteria for staff selection.

---

55. Our statement assumes that the absent surgeon is a sole practitioner or, if he is a member of a professional group, that none of his associates is available to cover for him.

56. When asked at trial whether it was important for a cardiothoracic surgeon to have an even disposition, Dr. Magovern gave the following testimony:

We are all using the same facilities ..., and one has got to realize that in medicine the patients are ill; they are not themselves; their families are concerned; and the doctor is frequently confronted with situations in which nobody is acting like they are at a cocktail party or being particularly affable. The situation in medicine is getting particularly involved in terms of it bringing interdisciplinary dimensions .... You take an open-heart case, for instance. You have anesthesia; you have profusionists; you have circulating nurses; operating nurses; surgeons. You maybe have 12 people in one room. And in addition to that you are calling upon the services of numerous laboratories. It is just a very complicated situation now in medicine, particularly in surgery, and people have got to—The day of prima donna throwing instruments and so forth is just not there anymore. We have to learn to cooperate with people. So this is an important thing that we look for in evaluating people for the staff.
Tr. 4965.

We conclude that the criteria that Allegheny General used when evaluating Dr. Robinson's application for staff privileges were reasonably related to its institutional objectives. Now we must determine whether Allegheny General's competitive strategy, which flows directly from these institutional objectives, imposes an unreasonable restraint on trade.

### c. Standards Do Not Impose Unreasonable Restraint

Allegheny General's marketing strategy rests on the assumption that a reputation for high quality programs in patient care, teaching and research will attract large numbers of patients to a regional referral hospital. In an effort to achieve its institutional objectives and to implement its competitive strategy, Allegheny General has granted staff privileges only to applicants who meet very high standards. The plaintiff alleges that this policy of selectivity imposes an unreasonable restraint on trade.

Unquestionably, Allegheny General's policy toward staff appointments has created a restraint on trade. Certain competent physicians who are licensed to practice medicine, and perhaps who also have board certification in some specialty, cannot practice their profession at Allegheny General. Nevertheless, Allegheny General's restrictive staff selection policy does not violate section 1 of the Sherman Act because the procompetitive effects of the policy outweigh the anticompetitive effects. The Third Circuit recently reaffirmed the proposition that "a manufacturer may include in its marketing strategy certain restraints designed to improve its overall competitive position." *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 167 (3d Cir. 1979). Allegheny General approaches each application for staff privileges by seeking to determine whether the applicant has the potential to enhance Allegheny General's reputation for excellence in patient care, teaching or research. By rejecting the concept of an open staff and, instead, by building a high quality staff that takes an integrated approach to the delivery of medical services, Allegheny General has improved its ability to compete with the other regional referral hospitals in Western Pennsylvania, Eastern Ohio and Northern West Virginia. Vigorous competition among these hospitals should raise the prevailing level of care, thus benefiting the public. *Cf.* Borsody, *The Antitrust Laws and the Health Industry*, 12 Akron L.Rev. 417, 449 n.152 (1979) (in the absence of anticompetitive intent, proof that defendants acted for primary purpose of establishing high quality patient care standards is persuasive defense to antitrust claim).

The offsetting anticompetitive effects of Allegheny General's restrictive staff selection policy are not severe. Almost all candidates for open heart surgery select a particular surgeon rather than a particular hospital. *See* section III(A) *supra*. Although a given surgeon may be unable to practice at Allegheny General, he almost certainly will have access to hospital facilities in the relevant geographic market. For example, Dr. Robinson has staff privileges at three of the six hospitals in the relevant market that possess the capability to host open heart operations. Therefore, Dr. Robinson has the ability to accommodate any open heart patient in the relevant geographic market who specifically wants him to perform the surgery. Neither Allegheny General's staff selection policy nor its competitive strategy prevents any cardiologist from referring a case to Dr. Robinson [57] or prevents any patient from obtaining the services of Dr. Robinson.

The selectivity that Allegheny General exercises when reviewing applications for staff privileges enhances Allegheny Gener-

---

[57]. Even cardiologists who practice solely at Allegheny General can refer cases to surgeons who do not have staff privileges at the hospital. Dr. Don Fisher, the Director of the Cardiac Laboratory at Allegheny General, testified that he will refer a patient to a surgeon who does not have staff privileges at Allegheny General when he believes that the non-Allegheny General surgeon is better qualified to treat the condition of that particular patient. Tr. 5997–98, 6068.

al's ability to compete with other regional referral hospitals, but it does not unduly impair a patient's ability to obtain the services of the physician of his choice. Therefore, we conclude that Allegheny General's institutional objectives and competitive strategy do not impose an unreasonable restraint on trade. *Cf. Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 52 n.19, 97 S.Ct. 2549, 2558 n.19, 53 L.Ed.2d 568 (1977) (interbrand competition provides a significant check on the exploitation of intrabrand market power because consumers can substitute a different brand of the same product).

### d. Allegheny General's Conclusions About Dr. Robinson

The plaintiff alleges that the conclusions that Allegheny General reached about his credentials, qualifications and character were not supported by the information that the hospital had received. He first challenges the conclusion that his multiple staff appointments would have prevented him from adequately covering his open heart patients at Allegheny General or from contributing to the hospital's residency and research programs. Dr. Robinson argues that he performed a significant amount of work at only three of the seven hospitals listed on his curriculum vitae and that he would have concentrated his practice at Allegheny General if he and Dr. James Martin had received staff privileges.

We find that Allegheny General reasonably could have concluded on the basis of the available information that Dr. Robinson's multiple staff appointments not only would have seriously reduced his ability to contribute towards the attainment of Allegheny General's institutional objectives, but also that they might have impaired the thoracic surgery residency program and lowered the quality of patient care. Dr. Robinson's argument that he performed a significant number of procedures at only three of the seven hospitals listed on his curriculum vitae both misses the point and is somewhat disingenuous. The Allegheny General personnel who reviewed Dr. Robin-

son's application focused on time and availability rather than on the total number of appointments. They felt strongly that a cardiothoracic surgeon cannot provide high quality patient care and contribute to teaching and research programs if he is performing surgery at more than one or two hospitals.

Dr. Richard Deitrick, a member of the credentials committee, gave the following testimony about multiple staff appointments while explaining why he voted against the Robinson application:

I know the commitment that I have and the time that I spend at my hospital. It would just be physically impossible to be that active with that kind of a commitment to three other hospitals, let alone seven. That was one reason.

My second reason is because I feel that you have a commitment when you are on a hospital staff. I consider it a privilege, and that privilege means that you have a certain obligation and commitment to that hospital, to the division in which you are working, and to the educational residency program in that division. Now, that takes more time than just coming in and seeing a patient, doing what you have to do, and leaving. There is more to it than that.

Being on the staff alone commits you to a certain number of committee meetings as well as general staff meetings. So it is a time process. But, I think, you owe this to the hospital for the privilege of working there. I did not see that that would be quite possible.

Tr. 4381. Dr. Don Fisher, also a member of the credentials committee, emphasized in his testimony the potential impact of multiple staff appointments on the thoracic surgery residency program:

That is the part of the problem being attached to too many hospitals in far locations. How does one give attention to patients, particularly in case of emergency during post-operative situations, and this is just where he would be a detriment to the teaching program, interfering with the educational arrangements

with the residents, who provide service and care of the patient in response to, on the other hand, their teaching and instruction and training given by the surgeons. Then, along comes a surgeon who cannot give them this training, and, in turn, asks them to care for his patients in his absence, destroying the reciprocal arrangement that is so essential to the educational situation.

Tr. 6064. Finally, Dr. Frank Begg, a member of the executive committee of the medical staff, testified that he did not believe that "it was possible, because of limitation of time, for a surgeon who operated in a number of institutions to contribute to either the scientific literature consistently or contribute in the education of these surgical residents." Tr. 4498. Allegheny General knew from the letters of recommendation that Dr. Robinson was performing thoracic surgery at three geographically dispersed hospitals—McKeesport, St. Francis and North Hills Passavant. Of course, Allegheny General did not know that the plaintiff also was performing a significant number of procedures at Suburban General Hospital, where he had joined the staff in mid-1975.

Dr. Robinson stated at trial that he would have changed his style of practice if he and Dr. Martin had obtained staff privileges at Allegheny General. By his own admission, however, Dr. Robinson had failed to communicate this intention to Allegheny General during the application process. On cross-examination at trial, Dr. Robinson gave the following testimony:

Q And your intention then was to continue the partnership with Dr. Martin at Allegheny General as well?

A Allegheny General would have been essentially where we tried to build our practice.

Q Did you testify to that Doctor? Did you tell the Credentials Committee or the Executive Committee at the time of the hearing that you wanted to build your practice at Allegheny General?

A No one asked me that. It didn't come up in that way.

Q Did you tell anyone at that hearing that you intended to make Allegheny General your main hospital?

A I don't think it came up.

Q You don't think it came up?

A No. There was no—there was a lot of questions and answers and no question like that.

Q Did you read this letter before that hearing, Doctor?

A I read—yes, I probably glanced over it.

Q Didn't you think that was an appropriate subject for you to address in this hearing?

A I thought it was just somebody trying to say something to hold you off the staff, listing out a lot of reasons. I still feel that way.

Tr. 573–74. The letter that counsel for Allegheny General referred to was Dr. Feist's letter to Dr. Brent, in which Dr. Feist reported the recommendation of the credentials committee and the reasons underlying that recommendation. That letter read in part:

Dr. Robinson already holds active Staff appointments in his specialty in 7 other area hospitals. This would inevitably fragment his professional efforts and preclude the prompt availability and devotion of the requisite time and effort necessary to render continuous care and supervision to his own patients. Moreover, it would be physically impossible to fulfill all the Staff responsibilities inherent in such a critical specialty, were he also to be appointed here.

Jt. Exh. 1–UU. Thus, Dr. Robinson had notice of the objection, but he failed to address it. Therefore, we must conclude that Allegheny General had a reasonable basis for inferring that Dr. Robinson's multiple staff appointments would have prevented him from making any major contribution to Allegheny General and that they even might have been detrimental to both the quality of patient care and the residency program.

Dr. Robinson also challenges the validity of Allegheny General's second reason for

denying his application—a shortage of operating room time. The overwhelming weight of the evidence established, however, that the surgeons at Allegheny General were experiencing a severe shortage of operating room time in 1976. Ms. Mary Tobias, the Assistant Director, Nursing Service, Operating Room, testified that Allegheny General had nine major operating rooms in 1975, but that they all were outdated. Starting in late 1975 and continuing through March, 1977, Allegheny General built three new operating rooms and renovated the original nine operating rooms. At times during the renovation as few as six operating rooms were available. Dr. Deitrick, a gynecologist, and Dr. Laibe Kessler, a neurosurgeon, testified that surgeons had difficulty obtaining operating room time during the renovation. We must note, however, that the shortage of operating rooms was not a long term problem.

Dr. Robinson challenges on three grounds Allegheny General's conclusion that he had neither the interest nor the ability to contribute to its teaching and research programs: he had expressed his interest in academic medicine at the hearing before the executive committee of the medical staff; Creighton University School of Medicine had offered him an appointment as chief of cardiac and thoracic surgery and professor of surgery; and he had participated in St. Francis' residency program in thoracic surgery. After reviewing all of the evidence, we find that Allegheny General had a reasonable basis for its conclusion.

Dr. Robinson has written only one formal research paper during his entire medical career, and the topic of that paper is unrelated to thoracic surgery. Dr. Feist, the chairman of the credentials committee, attached great significance to this dearth of academic writing. He testified that most cardiovascular surgeons who attend outstanding institutions such as Baylor and the Texas Heart Institute will produce several research papers during their training and while in private practice on topics related to their specialties. Tr. 4063–64.

Although Dr. Robinson relies heavily on Creighton University's offer of a faculty appointment, we believe that this evidence is a two-edged sword. It shows that at least one medical school determined that Dr. Robinson had the ability to teach. On the other hand, Dr. Robinson's decision to decline the offer and instead to enter private practice with Dr. Giacobine indicates that his interest lay in the clinical aspects of his profession rather than in the academic aspects.

Dr. Robinson's participation in St. Francis' thoracic surgery residency program has a similar two-edged quality. It gave Dr. Robinson experience with teaching and with interpersonal relations, which should assist him in the future when he serves as an instructor. On the other hand, the St. Francis residency program lost its accreditation, which does not reflect well on the members of the thoracic surgery staff. Moreover, during his interview with Dr. Magovern, Dr. Robinson displayed a negative attitude toward the St. Francis residency program and its residents. This attitude surprised and disappointed Dr. Magovern, who felt that a young thoracic surgeon should recognize the value of participating in the education of residents and should work enthusiastically to improve the program.

Finally, the plaintiff did not have a faculty appointment at the University of Pittsburgh. Dr. Robinson told Dr. Magovern during the interview that he had spoken with a representative of the medical school about joining the faculty, but that he believed that he could not now obtain an appointment.

Citing the many positive comments contained in the letters of recommendation that were submitted to Allegheny General on his behalf, Dr. Robinson challenges the hospital's conclusion that he might not have been able to work harmoniously with his fellow staff members, the residents and the support personnel. Although we acknowledge that several references represented that Dr. Robinson had good interpersonal skills, we note that Allegheny General also

had before it information that indicated that Dr. Robinson could have become a disruptive force at the hospital. A brief summary of that information follows.

Dr. Denton Cooley wrote that "Dr. Robinson can be a rather stern, rigid person in his dealings with others." Jt. Exh. 1–RR. Dr. Giacobine informed the credentials committee that Dr. Robinson suffers from an "inability to accept criticism." Jt. Exh. 1–TT. Allegheny General learned through Dr. Magovern that Dr. Robinson had filed a lawsuit against Dr. Giacobine over certain aspects of the dissolution of their association. Dr. Robinson also used an attorney to obtain an application for staff privileges from Allegheny General. During the interview with Dr. Magovern, Dr. Robinson criticized St. Francis' residency program in thoracic surgery, referred to certain foreign residents at St. Francis as "camel drivers," and implied that a former Allegheny General resident was a homosexual. Finally, Dr. Robinson admitted to the executive committee of the medical staff that he had exchanged punches with a doctor at St. Francis.

Standing alone, no one piece of information is particularly damaging. For example, former business associates often sue each other. Considering the evidence as a whole, however, we cannot say that Allegheny General acted unreasonably in expressing concern about Dr. Robinson's ability to function harmoniously in the stressful environment of the practice of cardiothoracic surgery.

■■ We have determined that Allegheny General had a factual basis underlying each of the four reasons that it gave for denying staff privileges to Dr. Robinson. We want to state clearly, however, that we are not holding that any one of Allegheny General's four conclusions was correct or that the hospital ultimately made the correct decision on Dr. Robinson's application. The situation that confronts us is very similar to the situation that confronted the Ninth Circuit in the widely known case of *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). In *Hawaiian Oke*, the court observed that

[t]here is . . . much evidence that both Seagram and Barton were dissatisfied with plaintiff as a distributor. Plaintiff presented considerable evidence that they should not have been dissatisfied, including evidence of praise of plaintiff by their agents and evidence that Portside did no better for them than plaintiff, and perhaps not as well. From this, plaintiff infers that Seagram and Barton were not dissatisfied with it. From this, it urged the jury to find that the parties conspired. It says that because it presented evidence that the expressed reason for the change may not have been valid, and hence may not have existed, some sinister, anticompetitive motive can be inferred. We think not; the most that plaintiff's evidence suggests is that Seagram and Barton may have been mistaken in judging the quality of plaintiff's performance and the probable ability of McKesson to do better. Nothing in the record suggests, much less would support an inference, that their purpose was to eliminate or damage plaintiff, or to force it to comply with unlawful demands, rather than to get better distribution of Seagram and Barton products.

416 F.2d at 78. As in *Hawaiian Oke*, we find that Dr. Robinson's evidence established only that Allegheny General may have misjudged the plaintiff's ability to contribute to the attainment of the hospital's institutional objectives. The record does not support the inference that Allegheny General acted with an anticompetitive purpose.

### e. Consistent With Other Personnel Decisions

The plaintiff argues that even if Allegheny General had a factual basis underlying the reasons that it gave for denying him staff privileges, the hospital's decision on his application was inconsistent with its decisions on the applications of Drs. Liebler, Park, Burkholder, Hong-Barco, Barron and

McCabe. With each of these successful applicants, Dr. Robinson has highlighted an alleged inconsistency between Allegheny General's response to a certain factor in the successful application and its response to that factor in his application. For example, Allegheny General gave as one of its reasons for denying Dr. Robinson's application his failure to display an interest in academic medicine. The hospital granted staff privileges to Dr. Park, however, even though he had little potential for making a contribution to academic medicine. Similarly, personnel at Allegheny General expressed concern about Dr. Robinson's ability to work harmoniously with the medical staff, the residents and the operating room staff. Nevertheless, the hospital granted staff privileges to Dr. Barron even though Drs. Gerber and Pellegrini had criticized Dr. Barron's lack of interpersonal skills.

We cannot accept the validity of Dr. Robinson's approach for two reasons. First, Allegheny General considered whole applications rather than isolated factors. Each applicant presented the hospital with a distinct blend of characteristics. Allegheny General personnel then evaluated each individual's strengths and weaknesses in light of the hospital's institutional objectives and competitive strategy. Dr. Deitrick, a member of the credentials committee, testified that

we try to balance out the pluses and the minuses . . . . We do not make any decision on any one factor unless it is a very important factor. What we try to do is evaluate each applicant for the pluses and the negatives. And which way the balance goes, that is the way we usually vote.

Tr. 4380.

Considered as a whole, Dr. Robinson's application was substantially weaker than any of the successful applications. Allegheny General could not identify any area in which it could expect Dr. Robinson to make a significant contribution to the hospital. Moreover, the available information indicated the presence of several deficiencies that could have resulted in a decline in the quality of patient care, the impairment of the residency program and an increase in the incidence of discord in the Division of Thoracic Surgery. By contrast, each of the successful applicants displayed the potential to make a significant contribution toward the attainment of at least one of Allegheny General's institutional objectives,[58] and none had the number of deficiencies that encumbered Dr. Robinson's application.[59] Thus, the scale tipped in favor of each of the successful applicants and against Dr. Robinson.

58. Drs. Liebler and McCabe had superb qualifications in both the clinical aspects and the academic aspects of cardiothoracic surgery. Drs. Park and Hong-Barco had the potential to substantially strengthen Allegheny General in the area of patient care. Drs. Burkholder and Barron had the potential to become major contributors to the education of the thoracic surgery residents.

59. The plaintiff emphasized at trial that Allegheny General granted staff privileges to Dr. Burkholder at approximately the same time that it denied him staff privileges. Dr. Robinson asks how the hospital can add a cardiothoracic surgeon to the staff at the same time that it gives a shortage of operating room time as one of the reasons for rejecting another surgeon's application. We believe that the answer lies in a combination of two considerations.

First, the shortage of operating room time was a short term problem. As the junior member of an established group, Dr. Burkholder would not be expected to attract additional cases to Allegheny General during his first few years. Instead, he would be expected to reduce the burden on the senior members by handling some of the cases that they attracted to the hospital. Thus, the addition of Dr. Burkholder to the staff was not expected to materially change the total number of procedures that CTSA would perform at Allegheny General. Dr. Robinson, on the other hand, would have been more likely to bring cases to Allegheny General that otherwise would have been performed at another hospital.

Second, Allegheny General did not view the shortage of operating room time as a determinative factor. The hospital was willing to accommodate an additional surgeon who had much to offer in return, but it was not willing to give scarce operating room time to a surgeon who would not contribute toward the attainment of Allegheny General's institutional objectives.

The second reason why we cannot accept the validity of the plaintiff's factor-by-factor approach is that we would expect a few inconsistencies to occur in a dynamic staff selection process. Many people participate in the review of applications, and the personnel on the various committees changes over time. For example, Dr. Deitrick replaced Dr. Feist as chairman of the credentials committee in 1977. Moreover, the hospital's staffing needs fluctuate over time. Each department director attempts to maintain a balanced staff that, in the aggregate, will have strength and depth in clinical, teaching, and research skills. Also, when the hospital increases the number of operating rooms, as occurred during the second half of the 1970's, it will expand its complement of practicing surgeons. Given these considerations, we must conclude that none of the alleged inconsistencies that the plaintiff highlighted was of a magnitude that would cause us to infer the presence of anticompetitive intent or to find that the defendants' actions created an unreasonable restraint on trade.

## VIII.

### The Legal Action: Pendent Jurisdiction Claims

Having concluded that the defendants did not violate either section 1 or section 2 of the Sherman Act, we now must consider the merits of the plaintiff's three state law claims pursuant to our pendent jurisdiction. These three claims involve many issues of fact that we already have discussed at length during our examination of the plaintiff's federal antitrust claims.

### A. Breach of Contract

The plaintiff alleges that he is a third-party beneficiary of the Medical Staff Bylaws and that Allegheny General injured him by failing to comply with certain provisions of those bylaws. We hold that this claim lacks both a legal and a factual basis.

Under the law of Pennsylvania, "[t]he staff bylaws of a hospital constitute the terms of a legally binding contract be-

tween the hospital and the doctors on its staff." *Miller v. Indiana Hospital*, 277 Pa. Super. 370, 419 A.2d 1191, 1193 (1980) (citing *Berberian v. Lancaster Osteopathic Hospital Ass'n*, 395 Pa. 257, 149 A.2d 456 (1959)). Both *Miller* and *Berberian* involved an attempt by a hospital to revoke the privileges of a member of its medical staff. Dr. Robinson, however, never held staff privileges at Allegheny General. Therefore, he seeks to assert a right under the bylaws pursuant to a third-party beneficiary theory.

To be a third party beneficiary entitled to recover on a contract it is not enough that it be intended by *one* of the parties to the contract and the *third person* that the latter should be a beneficiary, but *both parties to the contract* must so intend and must indicate that intention in the contract; ... the obligation to the third party must be created, and must affirmatively appear, in the contract itself.... The fact, therefore, that plaintiffs would be incidentally benefited would not give them a right to recover on the policy ....

*Spires v. Hanover Fire Insurance Co.*, 364 Pa. 52, 56–57, 70 A.2d 828, 830–31 (1950) (citations omitted) (emphasis in original).

The text of Allegheny General's Medical Staff Bylaws does not contain any language that explicitly states the intention of the parties to confer rights on an applicant for staff privileges. We recognize, of course, that if the intent to create rights in favor of a third-party beneficiary clearly can be inferred from the language of the contract taken as a whole in light of the accompanying circumstances, the fact that the parties did not expressly create rights in favor of a third-party beneficiary is not determinative. *See Matter of Gebco Investment Corp.*, 641 F.2d 143, 147 (3d Cir. 1981); *Logan v. Glass*, 136 Pa.Super. 221, 225–26, 7 A.2d 116, 118 (1939), *aff'd mem.*, 338 Pa. 489, 14 A.2d 306 (1940). Taking the language of the bylaws as a whole, however, we cannot clearly infer the intent to confer rights on applicants for staff privileges. Article III of the bylaws focuses on

the prerequisites for obtaining staff privileges and on the division of labor within the hospital superstructure for processing applications rather than on the duties that the hospital owes to applicants. No Pennsylvania decision has recognized an applicant for staff privileges as a third-party beneficiary of the medical staff bylaws of a private hospital. We find that Allegheny General's medical staff and Board of Trustees did not intend to confer any rights on applicants for staff privileges when they adopted the Medical Staff Bylaws, and that the text of the bylaws does not reflect an intention of the parties to impose duties on the hospital for the benefit of such applicants. Therefore, we hold that the plaintiff's claim lacks a legal foundation.

Even if our legal analysis is incorrect, however, we find that the plaintiff has no factual basis for his claim. While processing Dr. Robinson's application, Allegheny General fully complied with all substantive provisions of the bylaws. Dr. Robinson had ample opportunity to present Allegheny General with information in support of his application. We believe that the hospital gave fair and full consideration to the plaintiff's request for staff privileges.

### B. Interference With Prospective Contractual Relationship

 The plaintiff contends that Dr. Magovern committed certain tortious acts with the intent to interfere with a prospective contractual relationship between the plaintiff and Allegheny General for the purpose of maintaining CTSA's dominant position in Allegheny General's Division of Thoracic Surgery. A plaintiff is entitled to recover on a claim of interference with a prospective contractual relationship when the evidence establishes the following four essential elements: (1) the plaintiff probably would have entered the contractual relationship but for the defendant's interference; (2) the defendant acted with the purpose or intent to harm the plaintiff by preventing the execution of the contract; (3) the defendant acted without privilege or justification; and (4) the plaintiff suffered

actual damage as a result of the defendant's actions. *See Glenn v. Point Park College*, 441 Pa. 474, 479–80, 272 A.2d 895, 898–99 (1971); *Yaindl v. Ingersoll-Rand Co.*, 281 Pa.Super. 560, 422 A.2d 611, 621–22 & n.11 (1980).

 We find that the plaintiff's claim lacks merit because the evidence failed to establish at least two of the four essential elements. Earlier in this opinion we determined that Allegheny General made an independent decision to deny Dr. Robinson staff privileges. *See* section VII(C)(2) *supra*. We believe that the Board of Trustees would have refused to admit Dr. Robinson to the staff even if Dr. Magovern had not aggressively opposed Dr. Robinson's application. Moreover, the evidence established that Dr. Magovern had ample justification for participating in the hospital's review of Dr. Robinson's application. The Board of Trustees delegated to Dr. Magovern the primary responsibility for building an integrated Department of Surgery that would further the hospital's effort to achieve its institutional objectives. In addition, the Medical Staff Bylaws explicitly impose on the appropriate department director the duty of submitting a report on any physician who applies for staff privileges. We previously concluded that Dr. Magovern had a factual basis for his principal objections to Dr. Robinson's application. *See* section VII(C)(5)(d) *supra*.

### C. Conspiracy in Restraint of Trade

 The plaintiff also alleges that the defendants injured him by conspiring, in restraint of trade, to prevent him from obtaining staff privileges at Allegheny General. The three essential elements of a state law claim for conspiracy in restraint of trade are: (1) a combination or agreement between two or more persons or business entities to commit an unlawful act or to accomplish a lawful objective through unlawful means; (2) an intent to injure the plaintiff; and (3) an absence of justification for the defendants' agreement in restraint of trade. *See Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 211, 412 A.2d 466, 472 (1979).

We hold that the plaintiff's claim lacks merit because the evidence failed to establish any of the three essential elements. We already have determined that the defendants did not engage in concerted action for the purpose of defeating Dr. Robinson's application for staff privileges. *See* section VII(C)(2) *supra*. Likewise, we previously have concluded that the defendants did not act with anticompetitive intent. *See* section VII(B)(3)(b) *supra*. Finally, the principal defendants had justification for most of the actions that they took while processing Dr. Robinson's application. The hospital conferred on them the responsibility of thoroughly examining all applications for staff privileges. After evaluating all of the available information on Dr. Robinson, they reached defensible conclusions that had factual bases. *See* section VII(C)(5)(d) *supra*.

### Conclusion

This action, involving one surgeon's attempt to obtain staff privileges at one regional referral hospital, has consumed a tremendous quantity of legal and judicial resources during its four and one-half year life span. We only can hope that this opinion, which is the end product of these years of effort and expense, will enable future courts to quickly narrow the issues when they are presented with anti-trust claims arising from a hospital's decision to deny a physician staff privileges.

The opinion and judgment order that we enter today neither impugn Dr. Robinson's reputation as a talented cardiothoracic surgeon nor certify the accuracy of the conclusions that Allegheny General reached after evaluating Dr. Robinson's application. Rather, they affirm the right of a private regional referral, secondary teaching hospital to develop and implement a competitive strategy that will enable it to effectively compete for patients with similar institutions in the relevant geographic market.

Allegheny General seeks to attract patients by cultivating a reputation as an integrated health care provider with a tradition of excellence in patient care, academic medicine and medical research. The hospital selects its staff on the basis of the applicants' ability to contribute toward the attainment of the hospital's institutional objectives and the implementation of its competitive strategy. In the Department of Surgery, the capacity of the physical facilities also places a limit on the number of surgeons whom the hospital can accommodate.

The Board of Trustees appointed Dr. Magovern as Director of the Department of Surgery in 1968 and gave him primary responsibility for building a department that would spearhead the hospital's effort to become an outstanding health care provider. Dr. Magovern has more than justified the confidence that the Board of Trustees showed in him. During the 1970's, the Department of Surgery developed a reputation for excellence in patient care, maintained accreditation for its residency programs and conducted valuable research. The Division of Thoracic Surgery received national recognition for its particularly impressive performance.

Early in 1975, Dr. Robinson inquired about obtaining staff privileges in the Division of Thoracic Surgery at Allegheny General. In his capacity as department director, Dr. Magovern interviewed Dr. Robinson. Dr. Magovern left the interview with the belief that Dr. Robinson had serious personality flaws that would prevent him from working harmoniously with his fellow staff members, the residents and the support personnel in the stressful environment of cardiothoracic surgery. Additional information later supplied to the hospital reinforced Dr. Magovern's belief. After reviewing Dr. Robinson's application form and curriculum vitae, Dr. Magovern determined that Dr. Robinson's multiple staff appointments would seriously impair his ability to provide high quality patient care and to contribute to research programs or to the instruction of residents. Also, Dr. Magovern saw no indication that Dr. Robinson had the interest or the ability to participate in the thoracic surgery residency program. The department director recom-

**928**

mended that Allegheny General deny staff privileges to Dr. Robinson, thereby saving scarce operating room time for surgeons who had greater potential for making significant contributions to the hospital.

Allegheny General's credentials committee conducted an independent and thorough examination of Dr. Robinson's credentials, qualifications and character. The committee reached the same basic conclusions that the department director had reached, and therefore, it too recommended that the hospital reject Dr. Robinson's application. After carefully reviewing Dr. Robinson's file and after holding an adversary, evidentiary hearing on his application, the executive committee of the medical staff voted unanimously to endorse the recommendation of the credentials committee. The Board of Trustees determined that the credentials committee and the executive committee of the medical staff had given Dr. Robinson's application full and fair consideration and that they had arrived at the correct conclusion. Therefore, the Board of Trustees voted to deny Dr. Robinson staff privileges.

Allegheny General's action has not prevented Dr. Robinson from competing for adult open heart patients in the relevant geographic market. Six hospitals in Western Pennsylvania have the capability of hosting adult open heart procedures. Dr. Robinson now has staff privileges at three of those hospitals. Any open heart candidate residing in the relevant geographic market who wants Dr. Robinson to perform his or her surgery can obtain Dr. Robinson's services. Allegheny General maintains a one-third share of the relevant market. Although Dr. Magovern's professional group has dominated the delivery of adult open heart surgical services at Allegheny General, the staff does include four cardiothoracic surgeons who are not members of CTSA.

On the basis of these findings, we hold that the defendants neither unreasonably restrained trade nor monopolized the delivery of adult open heart surgical services when they participated in Allegheny General's decision to deny Dr. Robinson staff privileges. We also hold that Dr. Robinson

failed to prove (1) that the defendants breached any contractual duty owed to him, (2) that any defendant tortiously interfered with a prospective contractual relationship or (3) that any two defendants conspired to restrain trade.

We will enter an appropriate order implementing the conclusions of this opinion.